**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| KIM PINDAK, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 10 C 6237 |
| ) | |
| COOK COUNTY, COOK COUNTY ) | |
| SHERIFF THOMAS J. DART, THE ) | Judge Rebecca R. Pallmeyer |
| PUBLIC BUILDING COMMISSION OF ) | |
| CHICAGO, MB REAL ESTATE ) | |
| SERVICES, LLC, a Delaware Corporation, ) | |
| SECURITAS SECURITY SERVICES USA, ) | |
| INC., an Illinois Corporation, DERON ) | |
| TRUMAN, ANTONIO KELLY and Unknown ) | |
| Sheriff's Deputies Jim DOES I and II, ) | |
| ) | |
| Defendants. ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Kim Pindak alleges that Defendants imposed a "blanket prohibition on peaceful panhandling" in Daley Plaza that is unconstitutional, both facially and as applied to him. Plaintiff asserts a 42 U.S.C. § 1983 claim against Defendants for violating his First Amendment rights. Defendants are the Public Building Commission of Chicago ("PBC"), MB Real Estate Services, LLC ("MBRE"), and Securitas Security Services USA, Inc. ("Securitas") (Count I); Securitas security officers Antonio Kelly and Deron Truman (Count II); Cook County, Illinois ("Cook County") and Cook County Sheriff Thomas Dart (Count III); and two unnamed sheriff's deputies, Jim Doe I and Jim Doe II (Count IV).[1] Plaintiff seeks declaratory, injunctive, and monetary relief. Defendants moved to dismiss under Federal Rule 12(b)(6). For the reasons explained below, Defendants' motions to dismiss are granted in part and denied in part.

---

[1] Plaintiff has voluntarily withdrawn a *respondeat superior* claim against Securitas (Count V). (Pl.'s Consolidated Resp. to Defs.' Mots. to Dismiss Pl.'s 5th Am. Compl. [94], hereinafter "Pl.'s Resp.", at 2, n.2.)

## **FACTUAL BACKGROUND**

Plaintiff Kim Pindak is a male resident of the City of Chicago, in Cook County, Illinois. (Fifth Am. Compl. for Civil Rights Violations, Declaratory J., Injunctive Relief and Monetary Damages [84], hereinafter 5th Am. Compl., at ¶ 4.) Pindak receives public assistance, which pays his monthly room and board as a resident of Bryn Mawr Care Nursing Home Facility. Plaintiff also receives an additional $30.00 per month in public assistance for other living expenses. (*Id.*) Pindak asserts that he has no other income or savings, and that he frequently panhandles (begs for money) to supplement his limited funds, including at Daley Plaza.[2] (*Id.* at ¶¶ 4, 13-14.) Plaintiff's complaint does not specify how long or how regularly Pindak has plied his trade in this location, but it does describe his style: Pindak stands with a cup in his hand and asks passersby, "Can you spare some change?" (*Id.* at ¶ 13.) Pindak asserts that he is not aggressive and always thanks donors. (*Id.*)

Plaintiff alleges that two governmental entities contribute to policing Daley Plaza: the PBC, a municipal corporation which manages the property, and Cook County. (*Id.* at ¶¶ 5, 34.) PBC contracts with MBRE, a private property management company, for security operations on Daley Plaza. MBRE, in turn, contracts with Securitas, a private security company. to provide security officers on the Plaza. (*Id.* at ¶¶ 6-7.) Plaintiff asserts that Cook County also polices the Plaza through sheriff's deputies. (*Id.* at ¶ 34.)

Plaintiff alleges that he has "routinely" been ordered by security personnel to leave Daley Plaza because he was panhandling, and specifies four particular incidents. The first alleged

---

[2] Daley Plaza is the courtyard adjacent to the Richard J. Daley Center, which houses some 120 court and hearing rooms, the Cook County Law Library, and the offices of the Clerk of the Circuit Court. Daley Plaza occupies the southern half of the block and regularly features civic events that range from farmers' markets to various ethnic festivals. Daley Plaza also serves as the home for an unnamed 50-foot sculpture by Pablo Picasso and has played a cameo role in films such as *The Blues Brothers*, *The Fugitive*, and *The Dark Knight*. *Richard J. Daley Center*, WIKIPEDIA (March 18, 2013), http://en.wikipedia.org/wiki/Daley_Plaza.

incident occurred on September 23, 2009, when unidentified "private security personnel" told Plaintiff, "You can't beg at all [on Daley Plaza]. It is illegal." (*Id.* at ¶ 29.) The second incident occurred a few weeks later on Oct. 6, 2009, when Plaintiff asserts he was escorted off the grounds by security personnel working in the Plaza. (*Id.* at ¶ 28.)

The third alleged incident occurred almost a year later. According to Plaintiff, on September 24, 2010, Securitas officers Kelly and Truman told him that panhandling was forbidden in Daley Plaza and ordered him to leave the area. (*Id.* at ¶¶ 23-24.) According to Plaintiff, Kelly announced that panhandling on Daley Plaza is prohibited, "this year, the following year, and the year after that." (*Id.* at ¶ 25.) Kelly also warned Plaintiff that if he did not vacate the premises, Kelly would "put handcuffs on [him]." (*Id.*) When Pindak asked where it was acceptable for him to panhandle, the Securitas officers repeated that there could be "no soliciting on the plaza" and instructed him to go "outside the plaza" to a street corner to panhandle. (*Id.* at ¶ 26.)

The fourth incident occurred more than a year later, on May 7, 2012, when Plaintiff alleges that a "short black male" sheriff's deputy, Jim Doe I, told Plaintiff that he had been "banned" from Daley Plaza and was not permitted to panhandle there. (*Id.* at ¶¶ 16-17.) Plaintiff left Daley Plaza, but returned later that day and approached unidentified sheriff's deputy Jim Doe II, who was stationed in a booth at the Plaza. Plaintiff alleges that he asked Jim Doe II whether he could panhandle in Daley Plaza and was told that no one was permitted to panhandle there. (*Id.* at ¶¶ 18-20.) Plaintiff asserts that Jim Doe II also reported that his boss was "Tom Dart." (*Id.* at ¶ 22.) According to Plaintiff, "the same no-panhandling policy on Daley Plaza was enforced against [him] on numerous other occasions" by unidentified security personnel. (*Id.* at ¶ 27.)

Plaintiff asserts that Defendants have a uniform practice of removing panhandlers from Daley Plaza. As to PBC, MBRE, and Securitas, Plaintiff asserts that either PBC has issued a policy "absolute[ly] prohibit[ing] all peaceful panhandling," or PBC and its agents, MBRE and Securitas, have failed to adequately train security officers to protect the First Amendment rights of peaceful

panhandlers. (*Id.* at ¶ 32.) The PBC has written Plaza Regulations which do not apply to "private discussions or meetings" between people in the Plaza. (Daley Center Regulations [85-1] at 2.) Although the Regulations do not explicitly refer to panhandling (*id.* at 7-8), the PBC contends that the reference to "private discussions" means that the Regulations effectively permit panhandling. (Public Building Comm'n's Mot. to Dismiss 5th Am. Compl. and Supporting Mem. [85], hereinafter "PBC Mem.", at 5.)

As to Cook County and Sheriff Dart (collectively "County Defendants"), Plaintiff alleges that Sheriff Dart "is the final policymaker" for the County and the sheriff's department, and that a lawsuit Plaintiff filed on September 29, 2010 gave Sheriff Dart notice that sheriff's deputies were enforcing a "no-panhandling" policy on Daley Plaza. (*Id.* at ¶¶ 33-34.) According to Plaintiff, Sheriff Dart failed to implement policies or train employees about panhandlers' rights even though he was aware of First Amendment violations. Plaintiff alleges that "[t]he uniformity of the practice by personnel and/or agents of the Sheriff's Department of removing peaceful panhandlers" from Daley Plaza indicates that either it is the policy of the County Defendants to absolutely prohibit peaceful panhandling, or they have failed to adequately train sheriff's deputies. (*Id.* at ¶ 37.)

In a 2011 order, this court denied an earlier motion to dismiss by Sheriff Dart and Cook County. *Pindak v. Dart*, No. 10 C 6237, 2011 WL 4337017 (N.D. Ill. Sept. 14, 2011). The court ruled that Plaintiff had standing to request injunctive relief and that *Younger* abstention did not apply. The court did not reach the merits of whether a ban on panhandling in Daley Plaza would be a valid time, place, and manner restriction. *Id.* After learning during the discovery process that PBC, MBRE, and Securitas were involved in policing Daley Plaza, Plaintiff added those Defendants in his current complaint.

## DISCUSSION

In order to survive a motion to dismiss for failure to state a claim, a plaintiff's complaint must contain "a short and plain statement . . . showing that the pleader is entitled to relief." FED. R.

4

CIV. P. 8(a)(2). In ruling on a 12(b)(6) motion, the court treats all well-pleaded allegations as true and draws all reasonable inferences in the non-movant's favor. *Wilson v. Price*, 624 F.3d 389, 391 (7th Cir. 2010). Though detailed factual allegations are not required, a plaintiff must provide "enough facts to state a claim to relief that is plausible on its face" and that "raise[s] a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545, 547 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009).

The parties do not dispute at this stage that there is a First Amendment right to panhandle. Nor do the parties dispute that Plaintiff has alleged that Daley Plaza is a traditional public forum for free speech purposes. The court therefore focuses on Plaintiff's allegations that Defendants are liable under § 1983 for infringement of his free speech rights.

### I. Securitas and MBRE as State Actors

Section 1983 liability requires state action. Private persons are treated as state actors only when the state "effectively directs, controls, or encourages [their] actions . . . or delegates a 'public function'" to them. *Wade v. Byles*, 83 F.3d 902, 905 (7th Cir. 1996). PBC, MBRE, and Securitas argue that the Securitas officers who interacted with Plaintiff are private individuals not acting under color of law, so the Defendants cannot be held liable under § 1983. (PBC Mem. at 9; Def. MB Real Estate Servs., LLC's Mot. to Dismiss [87] at 4-7; Def. Securitas Security Servs.' Mot. to Dismiss [89], hereinafter "Securitas Mem.", at 4-6.) The Defendants contend that Plaintiff has not adequately pleaded that MBRE and Securitas "assumed the character of state actors" when they contracted with PBC to manage the Plaza. (PBC Mem. at 9; Securitas Mem. at 3-5.)

Plaintiff is correct that if the state delegates to a private party a function "traditionally exclusively reserved to the State," *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 352, 95 S.Ct. 449, 454 (1974), then the private party is a state actor. *See Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 624-25, 111 S.Ct. 2077, 2085-87(1991); *Rendell-Baker v. Kohn*, 457 U.S. 830, 842, 102 S.Ct. 2764, 2771-72 (1982); *Blum v. Yaretsky*, 457 U.S. 991,1011, 102 S.Ct. 2777, 2789

(1982); *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 155, 98 S.Ct. 1729, 1732-33 (1978). This test is difficult to satisfy. "While many functions have been traditionally performed by governments, very few have been 'exclusively reserved to the State.' " *Flagg Bros.*, 436 U.S. at 158, 98 S.Ct. at 1734 (quoting *Jackson*, 419 U.S. at 356, 95 S.Ct. at 456).

Plaintiff alleges that the circumstances here meet the test. He asserts that PBC granted MBRE and Securitas "authority to regulate the activities of citizens in the public forum of Daley Plaza," including banning panhandling. (5th Am. Compl. ¶ 31.) When MBRE and Securitas exercised their delegated authority to regulate citizen speech, Plaintiff urges, they became state actors because "regulation of constitutionally protected speech in a public forum is an exclusively government function." (Pl.'s Resp. at 15.) Plaintiff therefore argues that although Securitas and MBRE are private corporations, Defendants PBC, MBRE, and Securitas are nevertheless liable under § 1983. Plaintiff urges that Defendants are liable for the actions of the Securitas officers because the officers were performing an exclusively public function. The court examines each Defendant in turn.

    **A.**    **Securitas**

Securitas contends that the activities its employees perform on the Plaza are not exclusively public functions because "private real estate is managed in the same manner [as Daley Plaza is managed]." (Securitas Mem. at 5.) Securitas also contends that it contracts with MBRE for security services in Daley Plaza in the same way it would for private property. (Securitas Mem. at 5.) PBC joins this argument, urging that Securitas employees' duties on the Plaza are not public functions because they are not "traditionally the exclusive prerogative of the State." (*Id.*, citing *Jackson*, 419 U.S. at 353 ((supplying utility service "is not traditionally the exclusive prerogative of the State," so private utility company not liable).) As a result, PBC argues, it is not liable under § 1983 for the conduct of Securitas officers.

As support for their argument that Securitas officers are not state actors, Defendants cite *Wade v. Byles,* 83 F.3d 902 (7th Cir. 1996). In *Wade*, the plaintiff entered the lobby of a residential building owned by the Chicago Housing Authority ("CHA") and was shot by a guard hired by a private company with whom the CHA contracted to provide security. The district court granted summary judgment in favor of the defendant on the resulting § 1983 claim for excessive force. Affirming that ruling, the Seventh Circuit held that the private security guard was not a "state actor" because he did not perform any functions "*exclusively* reserved to the police" and "possessed powers no greater than those of armed security guards who are commonly employed by private companies to protect private property." *Id.* at 906 (emphasis in original). PBC, MBRE, and Securitas argue that the Securitas officers involved in this case also do not perform any functions beyond those commonly performed by private security guards.

In response, Plaintiff cites *Evans v. Newton* to argue that private actors are subject to "the constitutional limitations placed upon state action" when they take on governmental powers or functions. 382 U.S. 296, 299 (1966). In *Evans*, the Supreme Court held that management of a city park is a traditionally public function, such that private managers could not exclude persons from it on the basis of race. *Wade* is distinguishable, Plaintiff contends, because that case did not involve regulation of constitutionally-protected speech in a public forum, which he argues is always "an exclusive government function." (Pl.'s Resp. at 15-17.) In support, Plaintiff cites *Marsh v. Alabama*, 326 U.S. 501, 509 (1946), where the Supreme Court held that it was unconstitutional to impose criminal punishment on a Jehovah's Witness for distributing religious literature on a company-owned sidewalk in a company town. The Court determined that a private corporation's ownership of the sidewalk was "not sufficient to justify the State's permitting a corporation to govern . . . citizens so as to restrict their fundamental liberties." 326 U.S. at 509. The situation in *Marsh* differs from this one, but arguably in a way that favors Plaintiff: the Daley Plaza is a public space, not a private sidewalk.

More recent cases confirm that a private actor regulating speech in a public forum is always

7

a state actor, Plaintiff contends. (Pl.'s Resp. at 16.) In *Lee v. Katz*, the Ninth Circuit held that a private corporation that leased, from the City of Portland, a plaza located beside city-owned public facilities performed an "exclusively and traditionally public function within a public forum" when it regulated free speech in the plaza. 276 F.3d 550, 554 (9th Cir. 2002). Similarly, in *Citizens To End Animal Suffering & Exploitation, Inc. v. Faneuil Hall Marketplace, Inc.*, a Massachusetts federal district court held that regulating the lanes of an open commercial marketplace is a public function akin to police work. 745 F. Supp. 65, 70-72 (D. Mass. 1990). In another case cited by Plaintiff, a New York federal district court held that a private group organizing a public Memorial Day parade on public property was a state actor when it regulated which groups could march in the parade. *N. Shore Right to Life Comm. v. Manhasset Am. Legion Post No. 304*, 452 F. Supp. 834, 838 (E.D.N.Y. 1978).

The court agrees with Plaintiff that the alleged regulation of his speech in a public forum is a public function. Plaintiff has adequately asserted that Securitas officers were regulating his speech when they interfered with his peaceful panhandling because there was no apparent security threat from his conduct. Nothing in the record suggests that Plaintiff's presence or actions posed a threat to other citizens on Daley Plaza. When Securitas personnel allegedly banned Plaintiff while he was making only non-threatening overtures, they took on the mantle of state actors regulating speech in a public forum. Plaintiff has adequately alleged to survive a motion to dismiss that Securitas is liable pursuant to § 1983 because its officers were performing a public function.

### B. MBRE

MBRE also seeks dismissal here, and Securitas has joined its arguments; Securitas reasons that it can be liable as a state actor only if MBRE, the company that contracted with Securitas to provide guards, is also liable. (Securitas Mem. at 5.) The court disagrees. Unlike the allegations against Securitas officers, nothing in the record suggests that MBRE was carrying out a uniquely public function by acting as a property manager for Daley Plaza or contracting for

8

security services. Nor does Plaintiff allege that any individual at MBRE was aware that Securitas officers had repeatedly interfered with his peaceful panhandling. Plaintiff does note a 2006 case that he filed against the City of Chicago, challenging the City's enforcement of a ban on panhandling in Millennium Park. *Pindak v. City of Chicago*, 06 CV 5679 (N.D. Ill.) Plaintiff notes that Millennium Park, like the Daley Plaza, is also managed by MBRE. Plaintiff argues that MBRE therefore "ha[d] knowledge of the need for policies regarding the legal rights of panhandlers" and, by implication, had knowledge of and condoned the Securitas officers' alleged actions. (Pl.'s Resp. at 12-13.) In the court's view, a lawsuit filed four years earlier than this one, involving a separate property, is not sufficient to establish MBRE's knowledge of, and liability for the conduct of employees of a security company with which it contracted to provide security at Daley Plaza. Nor does MBRE's alleged failure to enact formal policies about panhandling suggest that it was performing a state action.

MBRE's only alleged role in Plaintiff's injuries was hiring Securitas to carry out security services. Plaintiff has not sufficiently alleged that MBRE was a state actor subject to § 1983 liability. MBRE's motion to dismiss Count I of Plaintiff's complaint [87] is granted.[3]

## II.     *Monell* Liability

Plaintiff brings his claims against Defendants pursuant to *Monell v. Dep't of Social Servs.* A plaintiff may establish a § 1983 violation pursuant to *Monell* in three ways. 436 U.S. 658, 690-91 (1978) (local governing bodies may be liable under § 1983 when either their official policies or their unofficial customs deprive plaintiffs of constitutional rights). *Monell* liability exists when a governing body has "(1) has an express policy that causes a constitutional deprivation when enforced; (2) a widespread practice that is so permanent and well settled as to constitute a custom or practice or [where there is] (3) an allegation that the constitutional injury was caused a person with final

---

[3] The court therefore need not address MBRE's remaining arguments that Plaintiff fails to allege a § 1983 claim against MBRE. (Def. MB Real Estate Servs., LLC's Reply [97], at 4-7.)

policymaking authority." *Teesdale v. City of Chicago*, 690 F.3d 829, 834 (7th Cir. 2012); *McCormick v. City of Chicago*, 230 F.3d 319, 324 (7th Cir. 2000). Plaintiff argues that Defendants had an express policy of prohibiting panhandling. In the alternative, Plaintiff argues that Defendants had a widespread practice of banning panhandling. (Pl.'s Resp. at 4.)

### A. Public Building Commission

#### 1. Express Policy Prohibiting Panhandling

The PBC urges that Plaintiff's *Monell* claim against it should be dismissed because the Commission does not have a no-panhandling policy. PBC first contends that its written Plaza Regulations expressly permit panhandling, because they allow "private discussions or meetings" between people in the Plaza. (PBC Mem. at 5.) Plaintiff argues in response that the Plaza Regulations are not explicit enough in their approval of panhandling to credit PBC's interpretation at the motion to dismiss stage. (Pl.'s Resp. at 5.) The court agrees that the policies' silence on this issue defeats the contention that their language by itself dictates that PBC be dismissed.

As an alternative, PBC argues that the court can dismiss the complaint against it on the strength of the fact that the PBC Plaza Regulations do not expressly prohibit panhandling. (PBC Mem. at 5.) Plaintiff admits that the written regulations do not explicitly ban panhandling, but argues that the vague language of the regulations makes it plausible that security personnel would in fact interpret the regulations as barring panhandling. (Pl.'s Resp. at 6.) Plaintiff argues that the "reality in the field is that security personnel are banning panhandlers from the Plaza routinely." (Pl.'s Resp. at 7.) Evidence about Securitas officials' unofficial understanding of the policy is more appropriately considered under the "widespread practice" prong below, however. As Plaintiff implicitly admits, PBC has no express policy prohibiting panhandling. Just as the policies' silence

on the matter cannot be interpreted as requiring a ruling in PBC's favor on this issue, so that silence does not by itself require that PBC's motion to dismiss be denied.[4]

### 2. Widespread Practice of Banning Panhandling

Plaintiff adequately alleges that Securitas officers working for MBRE, and by extension for PBC, have a widespread practice of prohibiting panhandling. Plaintiff cites several instances where he was prohibited from panhandling and alleges that Securitas officers told him the prohibition was perpetual. Plaintiff also asserts that the ban was routinely enforced by different Securitas officers over several years.

Though Plaintiff's allegations are sufficient to state a claim that Securitas officers are engaged in "state action," however, those allegations are not sufficient to state a claim that PBC is liable for them. Plaintiff admits that PBC's written regulations do not explicitly ban panhandling. (Pl.'s Resp. at 6.) And he has not named any individual decision-maker at PBC who should have had notice that he was being repeatedly banned from the Plaza for panhandling. A municipality cannot be held liable for a constitutional violation without evidence of "a custom, policy or practice that effectively caused or condoned the alleged constitutional violations." *Matthews v. City of E. St. Louis*, 675 F.3d 703, 708 (7th Cir. 2012). As a case cited by Plaintiff himself points out, when there is no evidence that a municipality is acting in concert with another actor to deprive a plaintiff of his rights, the municipality cannot be held liable under § 1983. *N. Shore Right to Life*, 452 F. Supp. at 837 (municipality that was indifferent to who participated in parade not liable for American Legion's denial of a group's participation); *see also Lebron v. Nat'l R.R. Passenger Corp.*,

---

[4] The court also rejects Plaintiff's argument that PBC's policy is unconstitutionally vague. (Pl.'s Resp. at 7.) Unlike *Palmer v. Chicago*, which Plaintiff cites as support, the absence of language in the policy permitting panhandling does not create a "grave risk" of constitutional violations. 562 F. Supp. 1067, 1076 (N.D. Ill. 1983) (police department's practices created grave risk of non-disclosure of exculpatory materials in criminal cases). Moreover, the injunction entered in *Palmer* was substantially limited on appeal. *See Palmer v. City of Chicago*, 755 F.2d 560 (7th Cir. 1985).

513 U.S. 374, 412-13 (1995) (when no evidence showed Amtrak's decision to disapprove of an advertisement could be imputed to the government, there was no government liability even though the government pervasively influenced Amtrak's management and operation).

Plaintiff argues that knowledge about Securitas's alleged practice of violating his constitutional rights can be imputed to PBC based on the widespread nature of the practice itself. (Pl.'s Resp. at 11.) But Plaintiff fails to allege that PBC had a widespread practice of condoning Securitas officers' denial of his rights. PBC did not even contract directly with Securitas. The court will not assume that PBC was aware of the actions of individual Securitas officers and condoned them , absent more specific allegations from Plaintiff. Because Plaintiff has not sufficiently alleged that PBC was controlling or encouraging Securitas officers' actions, he fails to plead that PBC had a widespread practice of banning panhandling.

### 3. Failure to Train

Municipalities and private corporations acting under color of state law may be liable under § 1983 for failing to train employees when their failure to train amounts to deliberate indifference to known or obvious consequences. *Rice ex rel. Rice v. Corr. Med. Servs.*, 675 F.3d 650, 675 (7th Cir. 2012) (private corporations acting under color of law liable "for injuries resulting from their policies and practices."). The mere allegation that a defendant's training is inadequate does not suffice, however. *City of Canton v. Harris*, 489 U.S. 378, 389 (1989) (city not liable for failure to train police about proper medical attention to detainees), *abrogated as to prison officials by Farmer v. Brennan*, 511 U.S. 825 (1994). A defendant's deliberate indifference must be a policy or practice that is consciously chosen. *Id.* ("Only where a failure to train reflects a 'deliberate' or 'conscious' choice by a municipality[,] . . . can a city be liable for such a failure under § 1983.").

Plaintiff contends that PBC is liable for failing to train Securitas officers about panhandlers' First Amendment rights. The fact that Securitas officers routinely interfere with his peaceful panhandling activity demonstrates, Plaintiff argues, that PBC has failed to train its agents. (5th Am.

12

Compl. ¶ 32.) Plaintiff believes that the need for training about panhandlers' rights is so obvious that Defendants' alleged failure to implement training about it shows deliberate indifference. (Pl.'s Resp. at 14.) The court disagrees. As with Plaintiff's widespread practice argument, Plaintiff fails to allege that anyone at PBC had knowledge that Securitas officers allegedly interfered with Plaintiff's panhandling. Nothing in the record suggests that PBC made a *deliberate* choice not to train employees about obvious constitutional threats, and negligent conduct is insufficient to establish a violation of § 1983. See *Rice*, 675 F.3d 687 (drawing a distinction between conduct that is "deliberately indifferent as opposed to negligent"). Plaintiff alleges that PBC delegated its authority to MBRE, which hired Securitas. Plaintiff also does not assert any specific facts about the training PBC employees or agents received. Plaintiff's complaint therefore does not adequately allege that PBC was aware that First Amendment violations were likely, but deliberately chose not to train employees. PBC's motion to dismiss Count I of Plaintiff's complaint [85] is granted.

**B.    Securitas**

Plaintiff has alleged that Securitas officers interfered with his panhandling on Daley Plaza repeatedly over several years. He also asserts that different Securitas officers informed him that "there [was] no soliciting" on Daley Plaza, including "this year, the following year, and the year after that." (5th Am. Compl. ¶¶ 25-26.) In addition to describing several specific incidents, Plaintiff alleges that security personnel routinely interfered with his peaceful panhandling on other unspecified dates. Plaintiff has adequately alleged that Securitas had a widespread practice of banning peaceful panhandling on Daley Plaza sufficient to survive a motion to dismiss. Securitas's motion to dismiss Count I of Plaintiff's complaint [89] is denied.[5]

---

[5] Since Securitas's motion to dismiss is denied, the court does not address whether Securitas is liable for a failure to train employees acting under color of state law. The court also disregards Securitas's argument that evidence about Plaintiff's alleged encounter on September 24, 2010 should be excluded because of the Illinois Eavesdropping Act. (Def. Securitas Security Servs. USA, Inc.'s Reply Brief [98], at 8-9.) There is no basis in the record to conclude that Plaintiff
(continued...)

### C. Cook County and Sheriff Dart

#### 1. Express Policy Prohibiting Panhandling

Plaintiff argues that Cook County and Sheriff Dart (collectively "County Defendants") do not have "any policies whatsoever" regarding panhandling on Daley Plaza. (Pl.'s Resp. at 8.) Plaintiff contends that the County Defendants' lack of an official policy about panhandling qualifies as an express policy causing a constitutional deprivation under the first prong of *Monell*. (Pl.'s Resp. at 8.) The court disagrees. Though the court is sensitive to Plaintiff's contention that a government body's failure to engage in guidance or oversight of its officers can subject it to liability, that issue is better considered under the widespread practice prong of *Monell*.

#### 2. Widespread Practice of Prohibiting Panhandling

Sheriff Dart contends that Plaintiff has not alleged sufficient facts to support a "widespread practice" by the County Defendants of infringing on peaceful panhandlers' free speech rights. Sheriff Dart cites *Grieveson v. Anderson* as evidence that "the word 'widespread' must be taken seriously" in a "widespread practice" *Monell* claim. 538 F.3d 763, 774 (7th Cir. 2008) (citations omitted) (inmate's single "broad, vague statement about an occurrence affecting other inmates in a detention facility" not sufficient for a widespread practice claim). Sheriff Dart argues that, at most, Plaintiff's allegations against the County Defendants are limited to "one instance" on May 7, 2012, when a sheriff's deputy allegedly banned him from the Plaza, and another deputy's comment later that day that panhandling was not permitted. (Def. Sheriff Dart's Mot. to Dismiss Count III of Pl.'s 5th Am. Compl. [91], hereinafter "Dart Mem.", at 4; Def. Sheriff Dart's Reply [100], hereinafter "Dart Reply", at 4.) Sheriff Dart urges that Plaintiff's allegations about May 7, 2012 are not enough to show a series of violations. (Dart Mem. at 4, citing *Jackson v. Marion County*, 66 F.3d 151, 152

---

[5](...continued)
recorded any of his encounters with Securitas officers, and the Seventh Circuit has held that the Illinois Eavesdropping Act is likely unconstitutional. *American Civil Liberties Union v. Alvarez*, 679 F.3d 583 (7th Cir. 2012).

("[P]roof of a single act of misconduct will not suffice; for it is the series that lays the premise of the system of inference.").)

Though Plaintiff has identified only a single May 7, 2012 interaction with sheriff's deputies, he does also allege that unidentified security personnel prohibited him from panhandling on many other unspecified dates. He alleges, further, that the County Defendants uniformly ban panhandling on Daley Plaza. Though Plaintiff fails to specify key details about the other encounters he alleges he had with sheriff's deputies, he has asserted enough to survive a motion to dismiss. Further, Plaintiff adequately alleges that Sheriff Dart had knowledge that deputies were violating his constitutional rights based on (1) the allegedly widespread nature of the practice itself; (2) Sheriff Dart's alleged policy-making role; and (3) Plaintiff's 2010 lawsuit against him.[6]

Sheriff Dart also argues that Plaintiff fails to allege that the supposed policy of banning panhandling was the "moving force" behind Plaintiff's alleged injury, as required for *Monell* liability. (Dart Mem. at 4-5.) As support, Sheriff Dart cites *McCauley v. City of Chicago*, a case where the Seventh Circuit held that a plaintiff's allegations that the City of Chicago had a policy of deliberately failing to protect female victims of domestic violence were not plausible. 671 F.3d 611, 618 (7th Cir. 2011). Plaintiff's allegations differ from those in *McCauley*, however, because Plaintiff does not allege that County Defendants failed to prevent harm. Instead, he alleges that the County Defendants actively caused him harm by carrying out a ban on panhandling in Daley Plaza. Nor

---

[6] Plaintiff's original complaint in this case, filed on September 29, 2010, named Cook County and Sheriff Dart as Defendants. (Compl. for Civil Rights Violations [1], at 1.) Plaintiff voluntarily dismissed the County Defendants on May 2, 2012 as part of his second amended complaint. A few weeks later, however, Plaintiff again named the County Defendants in his third amended complaint. He argued that he dismissed his claims against them based on "representations . . . regarding the Sheriff Department's role in policing the Plaza that were false." (Pl.'s Mot. to Vacate May 10, 2012 Order [58], at 1-2.) Sheriff Dart argues that Plaintiff's earlier decision to dismiss his claims against the County Defendants means his original complaint did not put Sheriff Dart on notice of constitutional violations. (Dart Reply at 4-5.) The court does not agree that Plaintiff's temporary withdrawal of his allegations means that Sheriff Dart was not aware of them at all.

is it implausible that the County Defendants deliberately seek to remove panhandlers from that public space. Plaintiff asserts that Sheriff Dart is the final policy-making authority for the County and the sheriff's department. (5th Am. Compl. at ¶ 33.) He has sufficiently pleaded that the lawsuit he filed in 2010 put Sheriff Dart on notice that sheriff's deputies were violating his First Amendment rights. (*Id.* at ¶ 34.) At the motion to dismiss stage, the court interprets all facts in the light most favorable to Plaintiff. Plaintiff has sufficiently alleged that the County Defendants have a widespread practice of prohibiting panhandling. Sheriff Dart's motion to dismiss Count III of plaintiff's complaint [91] is denied.

### 3. Failure to Train

As discussed above, municipalities may be liable under § 1983 for failure to train employees only when they show deliberate indifference that is consciously chosen. *City of Canton*, 489 U.S. at 389. Plaintiff asserts that "[t]here is an obvious need for the county to implement policies and training regarding the legal rights of panhandlers" in Daley Plaza (5th Am. Compl. ¶ 35), and argues that the County Defendants' failure to do so is deliberate indifference. As the court has denied Sheriff Dart's motion to dismiss Count III for other reasons, it declines to consider whether the County Defendants are liable under § 1983 for a failure to train.

## CONCLUSION

For the reasons stated above, PBC's motion to dismiss [81, 85] and MBRE's motion to dismiss [80] as to Count I are granted. Defendants' motions to dismiss [77, 89, 91] are otherwise denied.

ENTER:

Dated: March 25, 2013

_____
REBECCA R. PALLMEYER
United States District Judge