**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| KIM PINDAK et al., | ) | |
| | ) | |
| Plaintiffs, | ) | 10 C 6237 |
| | ) | |
| v. | ) | Judge Pallmeyer |
| | ) | Magistrate Judge Kim |
| COOK COUNTY, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AGAINST
SECURITAS SECURITY SERVICES INC., DERON TRUMAN and ANTONIO KELLY**

# Table of Contents

I.      Introduction.................................................................................... 1

II.     Factual Background........................................................................ 2

        A.      Parties.................................................................................. 2

        B.      Daley Plaza......................................................................... 4

        C.      Interference with Plaintiffs' First Amendment Rights...................... 4

        D.      The Post Orders................................................................... 7

        E.      Securitas' Guards' Understanding of the Policy on
                Panhandling at Daley Plaza ................................................. 10

        F.      Training............................................................................... 12

        G.      Contract.............................................................................. 14

        H.      Securitas' Marketing Materials......................................... 15


III.    Argument....................................................................................... 15

        A.      Plaintiffs Have a Protected First Amendment Right to Engage in
                Peaceful Panhandling on a Public Forum ........................... 16

                1.      Panhandling is Protected Speech ........................... 16

                2.      Daley Plaza is a Traditional Public Forum.......................... 16

        B.      Individual Defendants Kelly and Truman Violated Plaintiffs'
                First Amendment Rights......................................................... 17

                1.      Evidence of Interference with Plaintiffs' Rights.................. 17

                2.      Defendants Kelly and Truman Chilled Plaintiffs'
                        First Amendment Rights ......................................... 18

                3.      Defendants Truman and Kelly Acted Under Color of Law... 19

                        a.      Truman and Kelly Were Exercising State Authority
                                Delegated to Them By Contract ................................. 20

                        b.      The Defendant Guards Acted Under Color of
                                Law Because They Carried Out a Traditional
                                Public Function............................................................ 22

                        c.      The Guards' Actions Were Reasonably Perceived to
                                Be "Cloaked With State Authority" ........................... 23

        C.      Defendant Securitas' Liability Under *Monell* .................................... 26

                1.      Express Policy ........................................................................ 27

2. Widespread Practice.................................................. 29

3. Final Policymaker.................................................... 30

4. Failure to Train..................................................... 31

5. Causation............................................................ 33

D. The Inadequacy of Securitas' Defenses to *Monell* Liability................. 33

1. Securitas' Assertion That It Possessed No Policymaking Authority At Daley Plaza Is Not a Defense to *Monell* Liability And Is Belied By the Contract Itself.......................................................... 34

    a. Securitas Voluntarily Entered Into A Contract that Required It to Implement and Enforce the Post Orders........................................ 34

    b. Securitas Had an Independent Legal Obligation to Carry Out Its Delegated Duties in a Lawful Manner ............................................. 35

    c. Securitas Had a Contractual Obligation to Carry Out Its Delegated Duties in a Lawful Manner, But Chose to Ignore Such Duties................... 36

    d. Regardless of What Decision-Making Powers Were Retained By Its Client, Securitas Was Delegated the Authority To Prevent Panhandling Activities On Daley Plaza and Adopted and Exercised Such Authority ................................................ 36

2. Securitas' Assertion that It Was "Just Following Orders" Is Not A Defense to *Monell* Liability....................... 38

3. Securitas' Claim That It Had In Place An Oral Post Order that Undid The Written Policies Is Unavailing as a Defense to *Monell* Liability ......................... 40

    a. Other Than Highly Self-Serving Testimony, There Is No Evidence that Securitas Had Any Oral Post Order In Effect At Daley Plaza. ................ 41

    b. Even Crediting As True The Existence Of This Oral Post Order, It Still Constitutes An Unconstitutional Policy............................................ 41

4. Securitas Misreads the Plain Language of the Post Orders in an Effort to Evade Liability ...................................... 42

5. Securitas' Guards Are State Actors........................................... 43

E. Securitas Should Be Found Liable Under *Respondeat Superior* ........ 44

1. This Court Should Correct Historical Error and Conclude that *Respondeat Superior* Applies to §1983 Actions Against Private Corporations...................................................................... 45

2. The Imposition of *Respondeat* Liability Promotes Sound Public Policy.................................................................. 46

3. Securitas Should Not Be Permitted to Exploit the Flaws in the "*Monell* Paradigm" As It Is Applied to Corporate Entities........................................................................ 48

IV. Conclusion......................................................................................... 50

**Table of Authorities**

**Case Law**

*ACLU of Nevada v. Las Vegas*, 466 F.3d 784 (9th Cir. 2006)............................................ 16

*Bell v. Keating*, 697 F.3d 445 (7th Cir. 2012)..................................................... 18, 19, 29

*Bethesda Lutheran Homes & Services v. Leean*, 154 F.3d 716 (7th Cir. 1998)............. 40

*Buckner v. TORO*, 116 F.3d 450 (11th Cir. 1997)............................................................ 22

*Chicago v. Morales*, 527 U.S. 41 (1999)................................................................. 19, 28

*Citizens To End Animal Suffering and Exploitation v. Faneuil Hall Marketplace*,
745 F. Supp. 65 (D. Mass. 1990) ........................................................................ 22

*City of Canton v. Harris*, 489 U.S. 378 (1989). ........................................................ 27, 31

*Connick v. Thompson*, 131 S. Ct. 1350 (2011)............................................................. 33

*Estelle v. Gamble*, 429 U.S. 97 (1976) ........................................................................ 27

*Evans v. Newton*, 328 U.S. 296 (1966)................................................................. 20, 23

*FutureSource LLC v. Reuters Ltd.*, 312 F.3d 281(7th Cir. 2002).................................... 43

*Forsyth Cnty., Ga.v. Nationalist Movement*, 505 U.S. 123 (1992)................................ 19

*Fox v. Ghosh*, 2012 U.S. Dist. LEXIS 6927 (N.D. Ill., January 19, 2012)................... 27, 31

*Gernetzke v. Kenosha Unified Sch. Dist. No. 1*, 274 F.3d 464 (7th Cir. 2001)............... 31

*Georgia v. McCollum*, 505 U.S. 42 (1992)................................................................. 19

*Gresham v. Peterson*, 225 F.3d 899 (7th Cir. 2000)...................................................... 16

*Grutzmacher v. Public Bldg. Com'n of Chicago*, 700 F. Supp. 1497 (N.D.Ill. 1988)....... 16

*Hafer v. Melo*, 502 U.S. 21 (1991)............................................................................. 19

*Hague v. CIO*, 307 U.S. 496 (1939)............................................................................ 16

*Hodgkins v. Peterson*, 355 F.3d 1048 (7th Cir. 2004)................................................... 18

*Iskander v. Village of Forest Park*, 690 F.2d 126 (7th Cir. 1982) ................................. 44

*Kennedy v. Los Angeles Police Department*, 901 F.2d 702 (9th Cir. 1989).................... 42

*Lebron v. Amtrack*, 513 U.S. 374 (1995)..................................................................... 35

*Lee v. Katz*, 276 F.3d 550 (9th Cir. 2002).................................................................... 22

*Loper v. New York City Police Dep't*, 999 F.2d 699 (2d Cir. 1993) .............................. 16

*McCormick v. Chicago*, 230 F. 3d 319 (7th Cir. 2000) ................................................ 27

*McTigue v. Chicago*, 60 F.3d 381 (7th Cir. 1995) ....................................................... 30

*Marsh v. Alabama*, 326 U.S. 501 (1946)..................................................................... 22

*Monroe v. Pape*, 365 U.S. 167 (1961) ............................................................. 24

*Monell v. Department of Social Services*, 436 U.S. 658 (1978)........................................ *passim*

*Oklahoma City v. Tuttle*, 471 U.S. 808 (1985) ................................................ 34

*Owen v. City of Independence*, 445 U.S. 622 (1980)........................................ 33

*Petruska v. Gannon University*, 462 F.3d 294 (3d Cir. 2006) ........................ 35

*Rodriguez v. Plymouth Ambulance Serv.,* 577 F.3d 816 (7th Cir. 2009) ......................... 20, 21, 35

*Shields v. Illinois Dep't of Corr.*, 746 F.3d 782 (7th Cir. 2014) ..................................... 20, 42–50

*Smith v. Fort Lauderdale*, 177 F.3d 954 (11th Cir. 1999) ................................ 16

*Taylor v. Plousis*, 101 F. Supp. 2d 255 (D.N.J. 2000) .................................... 35

*Terry v. Adams*, 345 U.S. 461 (1953) ............................................................ 20

*United Church of Christ v. Gateway Econ. Dev. Corp.*, 383 F.3d 449 (6th Cir. 2004).... 22

*Valentino v. Village of South Chicago Heights*, 575 F.3d 664 (7th Cir. 2009)............... 37

*Venetian Casino v. Local Joint Executive Board*, 257 F.3d 937 (9th Cir. 2001).............. 22

*Virginia v. Am. Booksellers Ass'n,* 484 U.S. 383 (1988)................................... 18

*Vodak v. City of Chicago*, 639 F.3d 738 (7th Cir. 2011)................................... 37

*Vt. Right to Life Comm. v. Sorrell,* 221 F.3d 376 (2d Cir. 2000) ..................... 18

*West v. Atkins*, 487 U.S. 42 (1988)............................................................... 27

**Statutes**

42 U.S.C. § 1983.......................................................................................... *passim*

225 ILCS 447/25-20...................................................................................... 13

§8-4-025 of Chicago Municipal Code.......................................................... 41

**Other Authorities**

Dominique Custos And John Reitz, *Public-Private Partnerships*,
58 Am. J. Comp. L. 555, 576 (2010).......................................................... 37

Richard Frankel, *Regulating Privatized Government Through §1983*,
76 The University of Chicago Law Review 1449 (2009).............................. 39

Michael Greenberg, '*Broken Windows' and the New York Police*, The New York
Review of Books, Nov. 6, 2014.................................................................. 33

Carsten Gerner-Beuerle, *The Market for Securities and Its Regulation*,
23 Temp. Int'l & Comp. L.J. 372 (2009)..................................................... 21

Peter W. Singer, *The Dark Truth about Blackwater*, Brookings Institution (2007)........... 36

Paul R. Verkuil, *Public Law Limitations On Privatization of Government Functions*, 84 N.C.L. Rev. 397 (2006) ............................................................................................... 36

Steven L. Winter, *The Meaning of "Under Color of" Law*, 91 Mich. L. Rev. 323 (1992).. 23

## I.    INTRODUCTION

This is a §1983 case concerning the First Amendment right to peacefully panhandle in Daley Plaza. Plaintiffs are three individuals who have sought to exercise that right and have been told that panhandling is illegal on the Plaza, have been escorted from the Plaza, and/or have been threatened with arrest. There are two entities responsible for monitoring the Plaza—the Cook County Sheriff and the private security contractor Securitas Security Services USA Inc. ("Securitas"). In this summary judgment motion, Plaintiffs are seeking judgment on their *Monell* liability claim against Securitas and individual liability claims against Securitas' guards Deron Truman and Antonio Kelly.

There is overwhelming evidence that Securitas had defective policies that led to repeated violations of Plaintiffs' rights. The written documents setting forth the duties and responsibilities of Securitas' guards (referred to as "Post Orders" in industry parlance) explicitly instructed the guards to "remove any panhandlers" from the Plaza. Every person deposed in this case who has worked as a security guard at Daley Plaza testified that they have been instructed to remove (some or all) panhandlers from the Plaza and have so complied. Moreover, there is documentary evidence that supports the existence of this policy. There is a September 2010 video showing Defendants Kelly and Truman escorting Plaintiff Kim Pindak from the Plaza and telling him that there is no panhandling on the Plaza "last year, this year, and the year after that" and that if he did not leave, he would be handcuffed; and there is an October 2009 video showing Truman and Kelly's direct supervisor Melvin Waters telling Pindak that Daley Plaza is "private property" and he may not panhandle there. There is also a May 2012 audio recording of Sheriff's Deputy Dalibor Jevtic telling Pindak there is no panhandling on the Plaza, which Jevtic testified was his understanding of the building's policy. Based on these undisputed facts, Plaintiffs are entitled to summary judgment against Securitas and its guards.

1

In this brief, Plaintiffs show: (1) Plaintiffs have a protected First Amendment right to peacefully panhandle on the Plaza; (2) the Defendants unconstitutionally interfered with Plaintiffs' First Amendment rights; (3) the guards were acting under color of law when they interfered with Plaintiffs' rights, subjecting them to §1983 liability; (4) Securitas is subject to *Monell* liability because they had, among other things, an express policy that directly led to their guards' interfering with Plaintiffs' legal rights; and (5) Securitas should also be liable for its guards' unlawful actions under a theory of *respondeat superior.*

In this brief, Plaintiffs also respond to the four primary defenses Securitas has asserted in this case: (1) that their guards should not be regarded as state actors and thus cannot be subject to §1983 liability; (2) that Securitas does not have authority to "make policy" and therefore cannot be liable under *Monell*; (3) that Securitas should not be held liable under *Monell* because it was merely following orders given to it by others; and (4) that Securitas did not in fact have an unconstitutional policy with regard to panhandling. Plaintiffs demonstrate that none of these defenses are borne out by the evidence or supported by law.

## II.    FACTUAL BACKGROUND

### A.    Parties

Plaintiffs Kim Pindak, Norman Talley, and Sam Phillips have all sought to exercise their First Amendment right to engage in peaceful panhandling on Daley Plaza. (Statement of Facts, ¶ 1.) Pindak typically panhandles by holding out a cup and asking passersby "can you spare any change?" (SOF, ¶ 2.) Phillips typically panhandles by holding a sign that reads, "I'm Just Hungry" and holding out a cup. (SOF, ¶ 3.) Talley prefers to panhandle by engaging individuals in one-on-one conversations in which he describes his situation and requests a donation. (SOF, ¶ 3.) Pindak, Talley, and Phillips have all been told by security officers and/or sheriff's deputies

working on Daley Plaza that panhandling on the Plaza is not allowed and that if they continue to panhandle they will be arrested. The specific incidents affecting each Plaintiff are detailed in §IIC, *infra* at 5.

Securitas Security Services USA Inc. ("Securitas") is the moniker under which the approximately 640 U.S. branches of Swedish firm Securitas AB operate. (SOF, ¶ 5.) Securitas is the self-described "largest private security firm in the world" and employs approximately 86,000 private security guards in the U.S. (SOF, ¶ 6.) Securitas has had the contract to provide security services at the Daley Center and Daley Plaza in Chicago since October 2010, when it acquired Security Management and Investigations Inc. ("SMI"), the private security contractor that previously held the Daley Center contract. (SOF, ¶ 7.) Securitas provides security services on the Plaza pursuant to a contract with MB Real Estate ("MBRE"), the property management company that manages the Daley Center, and the Public Building Commission ("PBC") of the City of Chicago, the independent municipal entity that owns Daley Center. (SOF, ¶ 8.)

Defendant Antonio Kelly has worked as a security officer at Daley Center since 2004. (SOF, ¶ 9.) He was first hired by Aargus Security, which had the contract to provide security services at Daley Center prior to SMI. (SOF, ¶ 10.) Kelly continued working as a security officer on the Plaza when SMI and later Securitas took over the contract. *Id*. Throughout his ten years working at the Daley Center, Kelly has always been assigned to work outside on Daley Plaza at the guard booth located on the east side of the building near Dearborn and Randolph. (SOF, ¶ 11.) His hours of work are 6:00 a.m. to 2:30 p.m., Monday through Friday. (SOF, ¶ 12.)

Defendant Deron Truman has worked as a security guard on Daley Plaza since 2006. (SOF, ¶ 13.) He first worked for SMI. When Securitas bought out SMI in 2010, Truman continued working for Securitas. (SOF, ¶ 14.) Throughout his eight years working at Daley

3

Center, Truman's assignment has always been working the "outside detail" on the Plaza. (SOF, ¶ 15.) Truman is also posted at the guard booth located on the east side of the building near Dearborn and Randolph. (SOF, ¶ 16.) He describes Antonio Kelly as his "partner" officer. *Id*. His hours are 9:00 a.m. to 5:30 p.m., Monday through Friday. (SOF, ¶ 17.)

Securitas shares responsibility for security operations at Daley Center with the Cook County Sheriff's Office. Three sheriff's deputies are assigned to work outside on Daley Plaza every weekday. (SOF, ¶ 23.) One deputy is typically assigned to occupy the guard booth with Defendants Truman and Kelly. (SOF, ¶ 24.) The specifics of the sheriff's involvement are set forth in detail in Plaintiffs' motion for summary judgment against the County Defendants (to be filed on November 17, 2014).

**B.      Daley Plaza**

Daley Plaza is a major open-air civic space, located in the heart of the Chicago Loop and situated on the same property as the Daley Center, which houses the State's busiest courthouse. The Plaza contains one of the City's most famous tourist landmarks—the untitled Picasso statue—along with a fountain, an "eternal flame" monument dedicated to those who died in the U.S. armed forces, and lunch tables open for the use of the general public. The Plaza is regularly used for rallies, protests, and various civic and cultural events.

**C.      Interference with Plaintiffs' First Amendment Rights**

There is videotaped evidence showing Defendant-Officers Truman and Kelly interfering with Plaintiff Kim Pindak's First Amendment right to engage in peaceful panhandling on the Plaza. Specifically, a Friday, September 24, 2010, video depicts security guards Kelly and Truman telling Pindak that there is absolutely no panhandling allowed in Daley Plaza. (SOF, ¶ 25.) Defendant Kelly told Pindak that there was no panhandling there "this year, the following

4

year, and the year after that" and that if he didn't get off the premises he was "going to put handcuffs on [him]." *Id*. When Pindak asked the guards to show him where he could panhandle, Truman told Pindak "there [was] no soliciting on the plaza" and that he must go "outside the plaza" to panhandle. (SOF, ¶ 26.) Pindak videotaped this incident with the help of a friend Jeffrey Kramer. (SOF, ¶ 27.) Pindak and Kramer decided to make a video because Pindak had been told to leave the property by the security guards several times before, and he wanted evidence of the practice. (SOF, ¶ 28.)

The incident depicted on this video is consistent with a long history of interference with the activities of peaceful panhandlers on the Plaza by security personnel. For example, a video from October 6, 2009 depicts Captain Melvin Waters, a supervisory guard employed by Securitas' subcontractor Star Security, telling Plaintiff Pindak that Daley Plaza is "private property," that the office of the building does not permit panhandling on the Plaza, and that he could only beg on the public sidewalk "away from the Plaza." (SOF, ¶¶ 18, 29.) Waters has been Defendant Truman and Kelly's immediate supervisor for more than seven years. (SOF, ¶ 19, 20.)

Likewise, a May 7, 2012, audio recording depicts Defendant Sheriff's Deputy Dalibor Jevtic telling Kim Pindak, "There is no panhandling on the Plaza itself for anyone." (SOF, ¶ 30.) When Pindak asked whether panhandling was permitted on the sidewalks outside the Plaza, Jevtic responded: "No. Not on the Plaza anywhere. Across the street you can." (SOF, ¶ 31.) In his deposition, Jevtic testified that when he made these statements to Pindak, a Securitas guard (either Truman or Kelly) was in the guard booth with him and was saying "no panhandling." (SOF, ¶ 32.) Jevtic testified that he was repeating what the guard was trying to say to Pindak. (*Id*.)

5

Further, Jevtic testified that before becoming a sheriff's deputy, he worked as private security guard at Daley Plaza from 2000 to 2003 for Aargus Security (the security contractor that had the Daley Center contract until it was acquired by SMI). (SOF, ¶ 33.) He testified, "When I was employed with Aargus, ... we were told no panhandlers on the plaza or the lobby area." (SOF, ¶ 34.) Indeed, Jevtic's understanding was that from 2000 until the time of his deposition in November 2013, no panhandling was permitted on the Plaza. (SOF, ¶ 35.)

Plaintiff Norman Talley testified that in the summer 2012, he was panhandling in Daley Plaza near Dearborn and Randolph when Defendant Kelly approached him and told him that panhandling is allowed on the public sidewalks, but not on Daley Plaza. (SOF, ¶ 36.) Kelly further told Talley that "if [he] continued to panhandle on the Plaza, [he] will be arrested." (SOF, ¶ 37.)

Plaintiff Sam Phillips regularly panhandles on the corner of Clark and Randolph Streets. (SOF, ¶ 38.) He testified that he has been told by both sheriff's deputies and by the Defendant security guards that it is OK to remain on that corner but that he may not beg on the Plaza itself. (SOF, ¶ 39.) He stated that between 10 and 20 times he has been told that he cannot beg there. (SOF, ¶ 40.)[1]

Plaintiff Pindak testified that as a result of the several incidents in which security guards and sheriff's deputies have told him that panhandling is illegal on the Plaza, he is afraid to panhandle there and has only returned for short periods of time, always careful to conceal his activities from any security personnel. (SOF, ¶¶ 43,44.) Plaintiff Talley testified that, as a result of being told that he would be arrested for panhandling on the Plaza, he never returned to

---

[1]    Plaintiffs' experiences are consistent with those of a fourth person who has tried to panhandle on Daley Plaza. In summer 2012, Abana Tabb tried to panhandle in Daley Plaza and was told by security officers: "You cannot beg in the Plaza." (SOF, ¶ 41.) The officer told him: "You are going to have to leave, and if I see you out here again, you are going to jail." (SOF, ¶ 42.)

panhandle at the Plaza because he "didn't want to be locked up." (SOF, ¶ 45.) Plaintiff Phillips testified that as a result of repeatedly being told by security guards that he cannot panhandle on the Plaza, he now remains stationary on the corner because he believes that panhandling on the Plaza is prohibited. (SOF, ¶ 47.)

### D.   The Post Orders

The duties of security officers are set forth in a written document called the Post Orders. (SOF, ¶ 48.) The Post Orders identify the job responsibilities and duties of the security guards stationed at the nine posts in Daley Center and Daley Plaza. (*Id.*) The Post Orders for Daley Center consist of 23 chapters/sections. (SOF, ¶ 147.) Specifically at issue in this case are Chapters 10 and 16. Chapter 10 of the Post Orders, titled "Post Instructions," describes the job responsibilities and duties of officers stationed at the nine posts in Daley Center and Daley Plaza. (SOF, ¶ 49.) At all relevant times, Defendants Truman and Kelly were assigned to one of the posts, referred to in the Post Orders as "Ramp 1 and Ramp 2." (SOF, ¶ 50.) This post is located outside of the Daley Center on Daley Plaza.

Chapter 10 of the Post Orders explicitly instructs the officers assigned to that post that one of their job duties is to "remove any panhandlers." (SOF, ¶ 51.) Chapter 10 also instructs guards assigned to Ramp 1 and Ramp 2 that they have responsibility to "perform hourly patrols of the Plaza" and to "remove ... sleeping vagrants or unauthorized solicitors" from the Plaza. (SOF, ¶ 52.)

Chapter 16 of the Post Orders, titled "Dealing with and Handling Undesirables," defines panhandlers as "disruptive," "undesirable," and "suspicious" and instructs guards to "inform the subject to leave the property" if such a person is observed on the Plaza. (SOF, ¶¶ 53, 54.) Chapter 16 also instructs security officers that they have arrest powers, stating as follows:

"Members of the security department do not have police powers, but can enforce and arrest for misdemeanor and felony offenses that occur on Richard J. Daley Center property." (SOF, ¶ 56.)

Tee Coleman is Securitas' Security Manager for Daley Center. He has had that title since 2006. (SOF, ¶ 21.) His responsibilities are set forth in Chapter 6 of the Post Orders, which is titled "Code of Conduct and General Orders: Security Manager." Coleman has responsibilities for, among other things, coordinating training; maintaining an awareness of legal responsibilities in handling security matters; developing, implementing, and reviewing comprehensive security policies and post procedures; and hiring, firing, and discipline of security staff. (SOF, ¶ 22.)

The full set of Post Orders is located at each of the posts security officers occupy at Daley Center, including the guard booth to which Truman and Kelly are assigned. (SOF, ¶ 60.) In addition, the guards are required, under threat of discipline, to know and follow the contents of these Post Orders. The introduction to the orders emphasizes that Securitas' personnel can be subjected to discipline including "reprimands," "suspension" or "termination" for failing to follow any of the written Post Orders. (SOF, ¶¶ 57–59.)

Tee Coleman, who was designated as Securitas' 30(b)(6) witness about the Post Orders, testified that in his more than seven years of employment with Securitas (and predecessor security contractors at the Daley Center) the Post Orders have never been modified except to (1) add a section concerning operation of the closed circuit television system that was installed prior to the NATO Summit in 2012; and (2) to update references from "SMI" to "Securitas." (SOF, ¶ 61.) Truman, Kelly, and Waters all testified that they were not aware of any substantive changes being made to the Post Orders throughout their employment at Daley Center. (*Id.*)

It is disputed who actually authored the Post Orders at issue in this case. Ed Carik, MBRE's Rule 30(b)(6) witness concerning Post Orders, testified that MBRE did not write the

Post Orders and that Securitas has authority to draft and edit the Post Orders without input from anyone at MBRE. (SOF, ¶¶ 63–65.) In contrast, Securitas' 30(b)(6) witness Tee Coleman testified that he doesn't know who actually drafted the Post Orders, but that it was his understanding that they came from MBRE. (SOF, ¶ 66.) To add to the confusion, Securitas' own Security Officer Handbook and Securitas' own training and marketing materials all indicate that Securitas' regular practice is to draft Post Orders in collaboration with its clients. (SOF, ¶ 67.) Moreover, Plaintiffs' expert witness Richard Sem explained that the industry norm is for security contractors and clients to collaborate on writing Post Orders. (SOF, ¶ 69.) Regardless of who originally drafted the Post Orders, Coleman testified that he "believes" that Securitas had input into the Post Orders for Daley Plaza, or at least reviewed and agreed to them at the time the contract with MBRE was made. (SOF, ¶ 71.) In August 2012, as part of Securitas' negotiations to renew its contract with MBRE, Securitas agreed in its response to MBRE's request for proposal to "analyze and revise general and Post Orders and other directives as needed, [and] complete a Post Orders requirements survey." (SOF, ¶ 70.)

Despite Chapter 10's explicit direction to "remove any panhandlers" and despite Chapter 16's definition of panhandlers as "undesirable and/or suspicious" and its explicit direction to guards to "inform the subject to leave the property," Tee Coleman testified that there has always been in place an unwritten "oral post order" that contradicts and overrides these written directives. (SOF, ¶ 73.) According to Tee Coleman, the unwritten policy is that "aggressive panhandling" is "impermissible" on the Plaza but peaceful panhandling is allowed. (SOF, ¶ 74.) Coleman further testified that guards are only to tell an individual engaged in what they deem to be "aggressive" behaviors to "discontinue" the aggressive behavior and/or "suggest" to them that "it might be easier if you go out to the perimeter along the sidewalks" to panhandle. (SOF, ¶ 75.)

Coleman states that all guards know that they do not have the authority to "remove" anyone from the Plaza, although he acknowledges that the written directive stating otherwise remains on the books. (SOF, ¶¶ 76, 77.)

### E. Securitas' Guards' Understanding of the Policy on Panhandling at Daley Plaza

There is no testimony to support Coleman's assertion that Securitas has implemented this "oral post order." Defendants Kelly and Truman and their supervisor Captain Melvin Waters[2] all testified otherwise. Each testified either (1) that all panhandling—peaceful and aggressive—has been prohibited on the Plaza, or (2) that individuals engaged in panhandling activity that they deemed to be "aggressive" are to be asked to leave the premises.

Defendant Deron Truman was asked point blank in his June 3, 2013, deposition whether panhandling was permitted on Daley Plaza, and he answered unequivocally that it was not.

> Q: Is panhandling permitted on the plaza?
> A: We have been told that it is not.

(SOF, ¶ 80.) Truman testified that the "no panhandling" rule was communicated to him through his supervisors and building management, including Tee Coleman. (SOF, ¶ 81.) The "no panhandling" policy never changed at any time that Truman has worked at the Plaza. (SOF, ¶ 82.) His understanding was that panhandling has always been prohibited. *Id*. When asked what he is supposed to do if he sees someone engaged in panhandling on the Plaza, he stated that "we ask the person to leave the plaza; if they refuse we call the supervisor and see what they want to do." (SOF, ¶ 83.) He stated that if someone is being "bothered or offended by panhandling," guards ask the person if they will leave the Plaza and go to the sidewalk, where "they're not under our jurisdiction." (SOF, ¶ 84.) Truman further testified that it was one of his job duties to

---

[2] Plaintiffs refer to Waters as "Captain Melvin Waters" because that is how he identifies himself. Waters is not a "captain" in the U.S. military. Securitas, however, uses a military-style hierarchy to identify the ranks of its various security officers. (SOF, ¶ 124.)

conduct periodic "perimeter checks" of the Plaza to make sure there is no "unwanted or criminal activity going on," such as "soliciting, panhandling, [or] any confrontations." (SOF, ¶ 85.) When asked specifically about the videotaped incident involving Plaintiff Pindak, Truman testified that he told Pindak there was "no soliciting on the plaza" because "we've been told that you can't be begging or trying to sell anything on the plaza without a permit." (SOF, ¶ 86.)

After a break in Truman's deposition during which Securitas' counsel instructed Truman to change his testimony, Truman then testified that only "aggressive panhandling" was prohibited. (SOF, ¶ 87.) When asked about his understanding of aggressive panhandling, Truman stated that he'd received no training concerning aggressive panhandling and that the determination of whether someone was aggressive was "up to [him]." (SOF, ¶ 88.) He defined aggressive as "bothering customers and clients, disturbing regular activity along the plaza, being defiant, not cooperating if we ask them to leave the plaza." (*Id.*)

Defendant Antonio Kelly testified that his understanding of the policy on panhandling is that he is supposed to "keep aggressive panhandlers off the plaza, and move them to the public city sidewalks." (SOF, ¶ 89.) Kelly testified that he has not received any training or written instructions (from any security company he has worked for, or from MBRE) about what is considered "aggressive panhandling." (SOF, ¶ 90.) Rather, he agreed that the definition of what constitutes aggressive panhandling has been left "totally up to [his] discretion." (*Id.*) His definition of "aggressive panhandling" is "just basically someone being a public nuisance." (SOF, ¶ 91.) He states that "if we get any type of complaint whatsoever on a panhandler, we ask them to move, whether they're being peaceful or aggressive." (SOF, ¶ 92.) Kelly also testified that he understands that a security guard cannot make an arrest, but he testified that he does have authority to "do a detainment." (SOF, ¶ 93.)

11

In his December 2013 deposition, Captain Melvin Waters testified that it was his understanding that building management prohibited all panhandling on the Plaza. (SOF, ¶ 94.) Over the course of his 20 years working at Daley Center, Waters estimated that he had asked panhandlers to leave the Plaza more than 50 times. (SOF, ¶ 96.) When specifically asked about the videotaped interaction with Plaintiff Pindak in which Waters approached Pindak, told him panhandling is not allowed on the Plaza because the Plaza is "private property," and escorted Pindak off the Plaza to the street corner, Waters stated that he did so because: "At that time, that's what I was told to do." (SOF, ¶ 97.) Waters testified that this was the policy until July 2013 when he attended a new training class in which he was instructed for the first time not to interfere with peaceful panhandling. (SOF, ¶¶ 95, 98) However, even after testifying that the policy concerning panhandlers had changed, when Waters reviewed Chapter 16 of the Post Orders during his deposition, he testified that "unless they've written another document" then his understanding would be that he is supposed to "inform the subject to leave the property" if he encounters a panhandler. (SOF, ¶ 99.) It is undisputed that Chapter 16 remains in the Post Orders to this day. (SOF, ¶ 77.)

## F.    Training

Securitas is contractually obligated to provide all the relevant training for its security guards working at Daley Center. (SOF, ¶ 100.) The undisputed evidence shows that Securitas' guards did not receive adequate or appropriate training about the legal rights of panhandlers. As shown below, the guards were not trained in their obligations under First Amendment; in individuals' legal right to panhandle on a public forum; in the difference between private property and a public forum; in the definition of the term "aggressive panhandling;" or in even the existence of Chicago's Aggressive Panhandling Ordinance and its terms:

12

- Kelly and Truman received no training on the First Amendment or the significance of the fact that Daley Plaza is a public forum; (SOF, ¶ 101);

- Kelly, Truman and Waters received no training on the legal definition of "aggressive panhandling;" (SOF, ¶ 102);

- The guards never received a copy of the City of Chicago's Aggressive Panhandling Ordinance; (SOF, ¶ 103);

- The only training Kelly recalled receiving on panhandling was in the "customer service class." Kelly's understanding of the training he'd received on panhandling in that class was that panhandling "wasn't allowed, pretty much;" (SOF, ¶ 104);

- As of his September 2013 deposition, Tee Coleman agreed that the only training that discussed panhandling and/or aggressive panhandling was the "Customer Service Class;" (SOF, ¶ 105);

- Neither the Power Point slides nor the speaker notes for the "Customer Service Class" mention panhandling, aggressive panhandling, or anything pertaining to the First Amendment and the rights of individuals to engage in speech activities in public places; (SOF, ¶ 106); and

- Securitas undertook new training of guards in July 2013. The course, titled "Limits of Authority," reviewed the text of the City of Chicago municipal panhandling ordinance. This training did not instruct guards that they do not have the legal authority to ask someone to leave the Plaza; (SOF, ¶ 107);

- Even after the updated "Limits of Authority" training, the Post Orders instructing guards to "remove any panhandlers" and defining panhandlers as "undesirable and/or suspicious" remained in the Post Orders. (SOF, ¶ 77.)

Moreover, the evidence also shows that Securitas violated its legal obligations by failing to lawfully maintain training records for their employees. Pursuant to Illinois law set forth at 225 ILCS 447/25-20(d) and (e), all private security guards are required to complete eight hours of annual training, and it is the obligation of the employer to "certify" completion of such training—proof of which "shall be placed in the employee's file with the employer for the period the employee remains with the employer." In disregard of Securitas' legal obligations, the personnel files for Defendants Kelly and Truman, updated through November 2013, do not

contain proof of any such training for any of years of their employ with Securitas or any other security company. (SOF, ¶ 108.)

### G. Contract

When Securitas acquired SMI in October 2010, it took over a pre-existing contract, dated January 15, 2010, between SMI, MB Real Estate, and the Public Building Commission (the "Contract"). (SOF, ¶ 109.) The Contract ran until January 31, 2013. (SOF, ¶ 110.) Section 2 of the Contract expressly incorporated the duties set forth in a 2009 Request for Proposal ("RFP") issued by MBRE and PBC on October 1, 2009 setting forth the security services being sought. *Id.* ("Service Contractor shall timely and fully perform all the Contract Duties set forth in Exhibit A attached hereto which is taken from the RFP dated October 1, 2009 and incorporated by reference herein.") These duties included the following: (1) Understanding and implementing the Post Orders; (2) Providing information to management if the Post Orders can be improved; (3) Maintaining an awareness of the legal issues relevant to the provision of security services and reporting to building management any discrepancy between the duties assigned by the Post Orders and applicable law; (4) Hiring security officers and supervisory security personnel; (5) Evaluating the performance of security officers and imposing discipline when necessary; (6) Providing uniforms to security officers; (6) Payroll for all security personnel; and (7) Developing a training program and providing ongoing field training to security personnel concerning applicable law, their duties, and the Post Orders. (SOF, ¶¶ 111, 112.)

The Contract includes an indemnification clause providing that Securitas must indemnify both MBRE and PBC "against any and all liabilities, obligations, claims, demands, causes of action" arising from Securitas' performance of the contract duties and any "violation of law, negligence or willful misconduct in performance of the contract duties," even if MBRE and/or

PBC's negligence contributed to such liability. (SOF, ¶¶ 113, 114.) In 2013, Securitas entered into a new contract with MBRE that imposed the same duties and obligations. This contract runs from March 1, 2013 to February 28, 2016. (SOF, ¶ 115.)

### H.    Securitas' Marketing Materials

Seeking to minimize the scope of their delegated powers and decision-making authority at Daley Plaza, Securitas has repeatedly sought to misrepresent itself as a mere "staffing" company.[3] This makes sense. If they can sell themselves as a "staffing" company, their security guards will be thought of as little more than inert bodies with no power or authority. Securitas' own marketing materials, however, reveal that Securitas is much more than a mere "staffing" company. Securitas markets itself as an industry leader and expert on security matters that provides public and private clients with comprehensive security services. (SOF, ¶¶ 119, 120.) Securitas promotes the wholesale outsourcing of its clients' security functions. See Ex. 29(A), Securitas Outsourcing Brochure, p. 2 ("Is the solution to outsource all or part of your security program? There are compelling reasons why 80 percent of Fortune 1000 companies contract their security needs with Securitas.") Further, Securitas seeks to sell its services by encouraging clients to hire them to perform certain "policing" functions. (SOF, ¶ 121.)

## III.    ARGUMENT

Plaintiffs have brought two counts against the Securitas defendants: (1) violation of the individual Plaintiffs' First Amendment rights by Defendant-Officers Truman and Kelly; and (2)

---

[3]       Defendant Securitas' mischaracterization of themselves as a mere "staffing" company has been persistent throughout this litigation: See (1) Dkt. #156 at 12-13 ("Securitas USA responded to a request ... to provide certain security staffing services as the Daley."); (2) Dkt #176 at 2 ("In October of 2010, Securitas USA acquired Security Management and Investigation, Inc. and took over SMI's contract to provide security staffing services at Daley Center/Plaza."); and (3) Dkt # 208 at 10 ("[T]he contract [under which Securitas provided its services] merely call[s] for an outside vendor to staff the security plan."); (4) Defendant's expert report (referring to Securitas as a "security staffing service" or "security staffing provider" at least 10 times) (Ex. 19).

*Monell* liability against Securitas because its official policies were the moving cause behind those violations. For the reasons explained below, Plaintiffs are entitled to summary judgment on both of these claims. In the analysis below, Plaintiffs first set forth the law applicable to the First Amendment right to engage in peaceful panhandling on a public forum. Next, Plaintiffs discuss the individual Defendants' interference with Plaintiffs' rights. And finally, Plaintiffs discuss why Securitas is liable for these violations pursuant to *Monell* and *respondeat superior*.

### A. Plaintiffs Have a Protected First Amendment Right to Engage in Peaceful Panhandling on a Public Forum

#### 1. Panhandling is Protected Speech

Courts have routinely recognized that panhandling is speech protected under the First Amendment. See, e.g., *Gresham v. Peterson*, 225 F.3d 899, 904 (7th Cir. 2000) ("While some communities might wish all solicitors, beggars and advocates of various causes be vanished from the streets, the First Amendment guarantees their right to be there, deliver their pitch and ask for support."); *ACLU of Nevada v. Las Vegas*, 466 F.3d 784, 792 (9th Cir. 2006) ("It is beyond dispute that solicitation is a form of expression entitled to the same constitutional protections as traditional speech."); *Smith v. Fort Lauderdale*, 177 F.3d 954, 956 (11th Cir. 1999) ("[L]ike other charitable solicitation, begging is speech entitled to First Amendment protection."); *Loper v. New York City Police Dep't*, 999 F.2d 699, 704 (2d Cir. 1993) ("It cannot be gainsaid that begging implicates expressive conduct or communicative activity.")

#### 2. Daley Plaza is a Traditional Public Forum

Under the First Amendment's forum-based approach, restrictions on speech are subject to the highest scrutiny when they regulate speech on traditional public forums, such as public sidewalks, parks or public plazas. *Hague v. CIO*, 307 U.S. 496, 515 (1939) (Public streets and parks have "immemorially been held in trust for the use of the public.") Here, there is no

question that Daley Plaza is a traditional public forum on which speech activities are entitled to the highest degree of protection. See, *Grutzmacher v. Public Bldg. Com'n of Chicago*, 700 F. Supp. 1497, 1500 (N.D.Ill. 1988) ("The Plaza has always been and obviously was intended to be a superior type of traditional public forum within the meaning of First Amendment jurisprudence.") Accordingly, interference with peaceful panhandling on the Plaza runs afoul of the First Amendment.

**B.** **Individual Defendants Kelly and Truman Violated Plaintiffs' First Amendment Rights**

**1.** **Evidence of Interference with Plaintiffs' Rights**

There is irrefutable, videotaped evidence that Defendant-Officers Truman and Kelly interfered with Plaintiffs' First Amendment right to engage in peaceful panhandling on the Plaza. The September 24, 2010, video depicts Securitas' guards Antonio Kelly and Deron Truman telling Pindak that there is absolutely no panhandling allowed in Daley Plaza. Kelly forcefully told Pindak that there was no panhandling on the Daley Plaza "this year, the following year, and the year after that," that if he didn't get off the premises he was "going to put handcuffs on [him]." (SOF, ¶ 25.) When Pindak asked the guards to show him where he was allowed to panhandle on the Plaza, Truman told Pindak "there [was] no soliciting on the Plaza" and that he had to go "outside the plaza" to the street corner to panhandle. (SOF, ¶ 26.)

Upon reviewing the video of this incident, Tee Coleman agreed that Truman and Kelly acted inappropriately, but maintained that this was an isolated incident inconsistent with the training and policies in place at Daley Center. (SOF, ¶ 79.) However, all of the other evidence in this case points to the conclusion that this was not an isolated incident, but rather just one example of guards carrying out a longstanding directive to clear the Plaza of panhandlers. There is a video from October 2009 depicting Captain Waters telling Plaintiff Pindak that panhandling

is prohibited on the Plaza; there is a May 2012 audio recording of Deputy Jevtic along with a Securitas guard telling Pindak panhandling is prohibited; there is Jevtic's testimony that security contractors have prohibited panhandling on the Plaza since 2000; there is Deron Truman's testimony that panhandling is prohibited on the Plaza; and there is Waters' testimony that the ban on panhandling didn't change until 2013. (SOF, ¶¶ 62, 82, 95.) In short, the uniformity of the guards' actions as depicted on video and audio recordings along with their testimony indicates that prohibiting panhandling on the Plaza was a longstanding practice.

### 2. Defendants Kelly and Truman Chilled Plaintiffs' First Amendment Rights

In addition to the documented incidents in which Plaintiffs were directly forced off the Plaza and/or threatened with arrest if they engaged in peaceful panhandling, Plaintiffs have been, and continue to be, afraid to freely panhandle on the Plaza, demonstrating that their speech has been "chilled" in violation of the First Amendment.

It is well established in First Amendment jurisprudence that a plaintiff can challenge a law or government action that has a "chilling effect" on his or her exercise of protected First Amendment rights. Plaintiffs must show only "an actual and well-founded fear" of injury resulting from the exercise of their First Amendment rights to state an actionable claim. *Vt. Right to Life Comm. v. Sorrell,* 221 F.3d 376, 382 (2d Cir. 2000) (quoting *Virginia v. Am. Booksellers Ass'n,* 484 U.S. 383, 393 (1988)). Put another way, an unconstitutional "chilling effect" occurs when government actions or regulations discourage expression protected by the First Amendment by placing people in fear that exercise of their First Amendment rights will result in some harm. *Hodgkins v. Peterson,* 355 F.3d 1048, 1056 (7th Cir. 2004). An arrest is not required for there to be actionable interference with Plaintiffs' rights. Rather, courts agree that a "realistic threat of arrest is enough to chill First Amendment rights." *Id*. at 1056; *Bell v. Keating,* 697 F.3d

18

445, 453 (7th Cir. 2012) ("arrest, prosecution, and conviction are tangible harms, and so is abandoning one's constitutional right of free speech in order to avert those harms.")

Here, Plaintiffs uniformly testified that they believed that the guards had the power and authority to enforce their directives to leave the Plaza or stop panhandling. This caused all of the Plaintiffs to avoid freely exercising their First Amendment rights. For example, Norman Talley testified that he never returned to panhandle at the Plaza because he "didn't want to be locked up." (SOF, ¶ 45.) Kim Pindak testified: "the statement that he could arrest me gave me enough information to believe that he was capable of making such an arrest." (SOF, ¶ 133.) And Sam Phillips testified: "I never tried to panhandle on the plaza. Because ... every time you go in there, they bum-rush you, and I just tried to stay out of any trouble." (SOF, ¶ 134.)[4]

### 3.   Defendants Truman and Kelly Acted Under Color of Law

Throughout this litigation, Securitas has contended that the security officers who police the Plaza are private individuals not acting "under color of law" and therefore cannot be held liable pursuant to §1983.[5] It is true that Truman and Kelly are not directly employed by a

---

[4]       There are at least two other ways Defendants' conduct can be said to have violated Plaintiffs' First Amendment rights: (1) The Defendant guards testified that it is completely up to them to decide when a panhandler should be told to leave the Plaza due to his "aggressive panhandling." (SOF, ¶¶ 88, 90.) Such discretion is irreducibly subjective and thus at serious odds with the requirements of the First Amendment to provide adequate notice and minimal guidelines to citizens as to what conduct is prohibited. See *Chicago v. Morales*, 527 U.S. 41, 56 (1999) ("Vagueness may invalidate a criminal law for either of two independent reasons. First, it may fail to provide the kind of notice that will enable ordinary people to understand what conduct it prohibits; second, it may authorize and even encourage arbitrary and discriminatory enforcement."); (2) Both Kelly and Truman testified that they ask panhandlers to leave the Plaza whenever someone "complains" about that person. (SOF, ¶ 92.) This essentially amounts to a "heckler's veto." *Forsyth Cnty., Ga.v. Nationalist Movement*, 505 U.S. 123, 134 (1992) ("Listeners reaction to speech is not a content-neutral basis for regulation.").

[5]       Section §1983 requires that "Every person who, *under color of any statute, ordinance, regulation, custom, or usage*, ... subjects, or causes to be subjected, any citizen ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured." Notably, §1983 does not use the phrase "state action"; it requires "acting under color of [law]." The Supreme Court has said many times that the two have the same meaning. *Georgia v. McCollum*, 505 U.S. 42, 53 n.9 (1992); *Hafer v. Melo*, 502 U.S. 21, 28 (1991).

government entity, but that is not the end of the inquiry into whether their actions were taken under color of law. The Supreme Court has held that "[c]onduct that is formally 'private' may become so entwined with governmental policies or so impregnated with a governmental character as to become subject to the constitutional limitations placed upon state action. … When private individuals or groups are endowed by the State with powers or functions governmental in nature, they become agencies or instrumentalities of the State, and subject to its constitutional limitations." *Evans v. Newton*, 328 U.S. 296, 299 (1966).

Courts have developed three principal approaches to determining whether a private individual acted under color of law: (1) whether the individual was acting pursuant to state authority delegated by contract; (2) whether the individual was performing an "exclusive government function"; and (3) whether the individual's actions were cloaked with state authority such that members of the public would reasonably perceive the individual as a state actor. As shown below, Securitas' guards were state actors under each of these approaches.

### a. Truman and Kelly were Exercising State Authority Delegated to Them By Contract

The Seventh Circuit has explained that when state functions are contractually delegated to private actors, those private actors are regarded as acting under color of law. *Shields v. Illinois Dep't of Corr.*, 746 F.3d 782 (7th Cir. 2014) ("a business that ... undertakes freely, and for consideration, responsibility for a specific portion of the state's overall constitutional obligation ... acts under color of state law for purposes of §1983."); citing *Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 822 (7th Cir. 2009). In *Rodriguez*, the Court explained:

> When a party enters into a contractual relationship with the state ..., the provider has assumed freely the same liability as the state. Similarly, when a person accepts employment with a private entity that contracts with the state, he understands that he is accepting the responsibility to perform his duties in conformity with the Constitution.

*Rodriguez* at 827.

Here, Securitas' Contract specifically delegates to Securitas the authority and responsibility to engage in government action—regulating speech activities on a public forum. As described in §II(G) *supra* at 14-15, the Contract explicitly incorporates the duties set forth in the RFP; and the RFP in turn requires Securitas to "implement and enforce" the Post Orders; and the Post Orders state that one of Securitas' guards' duties is to "remove any panhandlers."

Moreover, the Contract gives Securitas broad powers to act as the security force at Daley Center without oversight from MBRE, the PBC or anyone else. Under the terms of the Contract, Securitas has been given unchecked authority to hire, fire, train and discipline security guards. (SOF ¶ 63, 112.) In further support of the broad powers delegated to Securitas at Daley Plaza, MBRE's 30(b)(6) witness Ed Carik testified that MBRE has "outsourced" security to Securitas. (SOF, ¶ 117.) On its own website, MBRE identifies its role in providing security at Daley Center as the mere "procurement" of such security services. (SOF, ¶ 116.) Securitas' own expert witness Frank Murphy agreed that MBRE has "outsourced" security functions at Daley Center and Daley Plaza to Securitas. (SOF, ¶ 118.)

Finally, the broad indemnification clause in Securitas' contract, which requires Securitas to indemnify MBRE and/or PBC for "any and all liabilities, obligations, claims, demands, causes of action, losses, expenses, damages, fines, judgments, settlements and penalties, including ... any violation of any laws or any negligence," strongly indicates that Securitas has been delegated control of the security functions at Daley Plaza. (SOF, ¶113, 114.) Logically, a private company would not take on financial responsibility for something over which it has no control. See, Carsten Gerner-Beuerle, *The Market for Securities and Its Regulation*, 23 Temp. Int'l & Comp. L.J. 372-73 (2009) ("If parties can freely enter into indemnification agreements, they will

21

allocate the risk in the way that the party best positioned to control the risk bears the burden of liability. Ideally, the market participant that ultimately assumes the risk is able to control it perfectly well.")

   **b.** **The Defendant Guards Acted Under Color of Law Because They Carried Out a Traditional Public Function**

   Courts have explained that when a private entity contracts with a municipality to provide a function traditionally within the exclusive prerogative of the state, it "becomes the functional equivalent of the municipality." *Buckner v. TORO*, 116 F.3d 450, 452 (11th Cir. 1997). The U.S. Supreme Court has squarely held that regulation of constitutionally protected speech in a public forum is an exclusive government function. *Marsh v. Alabama*, 326 U.S. 501, 509 (1946). In *Marsh*, the Court examined whether a company that regulated speech in a shopping district in its privately owned town became a state actor. The Court concluded that it did. The Court held that the fact that the property was privately owed "is not sufficient to justify the State's permitting a corporation to govern a community of citizens so as to restrict their fundamental liberties." *Id.* at 509.[6] Here, it cannot be seriously disputed that Defendant-Officers Truman and Kelly, in regulating the speech activities of individuals on a traditional public forum such as Daley Plaza, take on the character of state actors and are subject to constitutional limitations.

---

[6] Every court that has had occasion to consider the question has reaffirmed the principle articulated in *Marsh*—a private actor regulating speech in a public forum is a state actor subject to constitutional limitations. See, *Lee v. Katz*, 276 F.3d 550, 554-557 (9th Cir. 2002) (private corporation that leased an outdoor area next to city-owned public facilities was subject to §1983 liability for interfering with street preachers' right to engage in expression); *United Church of Christ v. Gateway Econ. Dev. Corp. of Greater Cleveland*, 383 F.3d 449, 454-455 (6th Cir. 2004) (First Amendment applied to privately owned sidewalk around privately owned sports complex); *Citizens To End Animal Suffering and Exploitation v. Faneuil Hall Marketplace*, 745 F. Supp. 65 (D. Mass. 1990) (a private corporation's regulation of free speech activities on publicly owned land leased by the corporation was a public function); *Venetian Casino v. Local Joint Executive Board*, 257 F.3d 937, 943 (9th Cir. 2001) (a sidewalk constructed on private property to replace a public sidewalk, accommodating pedestrian traffic adjacent to Las Vegas Boulevard, was deemed a public forum subject to the protections of the First Amendment).

c. **The Guards' Actions Were Reasonably Perceived to Be "Cloaked With State Authority"**

A third way courts have sought to determine whether a private individual ought to be viewed as a "state actor" for purposes of §1983 liability is by looking at whether the private individual's actions are governmental in nature such that a member of the public would reasonably perceive the actor to be cloaked with state authority. *Evans*, 382 U.S. at 299 (formally private conduct that is "impregnated with a governmental character" becomes "subject to the constitutional limitations placed upon state action.") This might be best referred to as "the social reality" test, whereby courts look at social realities to determine whether it was proper and reasonable for a person to have viewed a particular action as one performed by the state.[7]

Here, the evidence demonstrates that each Plaintiff perceived the Securitas guards as being cloaked with state authority and having the same powers as government actors. (SOF, ¶¶ 132–134.) There are at least four reasons why this perception was reasonable such that Securitas guards should be considered state actors—(1) the forum in which the action took place; (2) the guards' uniforms and overall appearance; (3) the guards' statements; and (4) the institutional approval that accompanied the guards' actions.

The Forum: The fact that the guards patrol Daley Plaza, a public forum located in the shadow of the City's busiest courthouse, sent a powerful message to observers that the guards had governmental authority. It was logical for one to assume that only a police officer or other governmental actor had the authority to regulate citizens' access to one of Chicago's most prominent public spaces.

---

[7]     See Steven L. Winter, *The Meaning of "Under Color of" Law*, 91 Mich. L. Rev. 323 (1992) (providing a thorough analysis of the state action doctrine and its underlying concerns with "social reality" and "social meaning").

<u>The Guards' Uniforms and Appearance of Authority</u>: The appearance of Securitas' guards supports a reasonable belief that they were cloaked with state authority. See *Monroe v. Pape*, 365 U.S. 167, 238 (1961) (Frankfurter, J., dissenting) ("an appearance of official authority ... is in itself a factor of significance in dealings between individuals. Certainly the nighttime intrusion of the man with a star and a police revolver is a different phenomenon than the nighttime intrusion of a burglar. The aura of power which a show of authority carries with it has been created by state government.")

As exhibited by the photo of Defendant Kelly (right) (Ex. 30), it is undisputed that when working on Daley Plaza, Defendants Truman and Kelly wear five-pointed metal star badges, bulletproof vests, and "military-style" BDU pants. (SOF, ¶ 122.) They also wear police-style duty belts with equipment including walkie-talkies and flashlights. (*Id.*) At the time relevant to this lawsuit, Securitas' guards also carried handcuffs,



which suggested that the guards had the power to engage in acts of physical restraint. (SOF, ¶ 123.) Securitas describes this uniform as "military type." (SOF, ¶ 129.) Captain Melvin Waters wears a different uniform that reflects his rank. He wears a similar badge and nameplate, but wears a white shirt with stripes on the sleeves similar to that worn by police sergeants. He also wears a variety of metal pins indicating his rank within the security organization. (SOF, ¶ 124.)

Tellingly, Defendants' expert Frank Murphy, who has been in the private security business since the 1980s, when shown the image of Kelly, admitted that he "could be" a police officer. (SOF, ¶ 125.) Murphy's own expert report indicates that the standard in the security

industry is for security officers to wear "square badges" to distinguish them from police officers or other sworn law enforcement officials who wear stars—a standard with which Securitas does not comply, instead outfitting its guards with uniforms and badges that bear a striking similarity to those worn by police officers. (SOF, ¶ 126.)[8]

Unsurprisingly, Securitas' officers are often mistaken for police. Waters admitted in his deposition that he is mistaken for a police officer while working at Daley Center. (SOF, ¶ 130.) Securitas' 30(b)(6) witness Tee Coleman likewise testified that "people ... always appear to think that a security officer has the same power as a police officer." (SOF, ¶ 131.)

The Guards' Assertions of their Legal Authority: In addition to having the appearance of governmental authority through their uniforms and presence on a public plaza, the guards also acted and spoke as though they had law enforcement powers by describing the ban on panhandling in terms that suggest it has the force of law behind it. For instance, Kelly threatened to handcuff Pindak; the guards told individuals that their activities were "illegal;" and Truman, Kelly and Waters all admitted that they instructed people that they must move off the Plaza to the sidewalk or across the street. (SOF, ¶ 25, 37, 45.) Any lay observer of these actions would assume that only a government actor could make such threats and/or give such orders.

The Institutional Approval of the Guards' Authority: Finally, the impression of law enforcement authority is conveyed by the indicia of institutional approval of the guards' authority. This occurs in several ways. First, officers assigned to work on the Plaza occupy a special guard booth located on the Plaza that is not open to the public and is accessible only to

---

[8]     Plaintiffs' expert Richard Sem has explained that the uniforms and equipment worn by security officers are often deliberately designed to resemble police attire to create the perception that a security officer is a law enforcement officer so that members of the public behave accordingly in their presence. (See SOF, ¶ 128.) Consistent with this practice, Securitas has put extensive emphasis on its officers' appearance. Six pages of the Securitas' Security Officer Handbook (pp. 38–44) are devoted to guards' uniforms and grooming standards. (SOF, ¶129.)

sheriff's deputies and security officers. (SOF, ¶ 24.) Second, the security guards and the Sheriffs deputies perform patrols of the Plaza together. (SOF, ¶ 23.) Third, and most importantly, sheriff's deputies defer to Securitas' guards' authority on the Plaza—Defendant Deputy Jevtic testified that when he told Pindak that panhandling was not allowed, he was simply repeating what the Securitas guards were telling him. (SOF, ¶ 32.)

In summary, as concerns §1983 liability of Defendant-Officers Truman and Kelly, it is undisputable that they (a) violated Plaintiffs' rights and (b) did so while acting under color of law. But as shown below, the blame for the violations of Plaintiffs' rights isn't appropriately placed only on the shoulders of the Defendant-Officers. Securitas must be held liable for the violations under both *Monell* and *respondeat superior*. It is apparent that these violations occurred precisely because Securitas fell far short of its obligations to provide security officers with appropriate training and guidance and that the Defendant-Officers were simply acting in accordance with the demands and directions of their employer.

### C.     Defendant Securitas' Liability Under *Monell*

Under *Monell*, a municipality is not automatically liable for the constitutional torts of its employees unless it can be shown that the municipality's policy was the underlying cause of the violation. There are at least four ways to establish *Monell* liability under §1983: (1) the Defendant had an express policy that, when enforced, causes constitutional deprivations; (2) the Defendant had widespread practice that, although not authorized by written law or express policy, is so permanent and well settled as to constitute a custom or usage within the force of law; (3) plaintiff's constitutional injury was caused by a person with final policymaking authority; or (4) the Defendant acted with "deliberate indifference" to the rights of Plaintiffs or others by failing

to train, discipline and/or supervise its employees. *McCormick v. Chicago*, 230 F. 3d 319, 324 (7th Cir. 2000); *City of Canton v. Harris*, 489 U.S. 378 (1989).

Courts have held that the standard for holding a private company such as Securitas liable under §1983 on a *Monell* theory is the same as that applied to a municipality. *West v. Atkins*, 487 U.S. 42, 54–57 (1988); citing *Estelle v. Gamble*, 429 U.S. 97 (1976) (in a claim against a private doctor who provided services to inmates at a state prison hospital the Eighth Amendment standard applied); *Fox v. Ghosh*, 2012 U.S. Dist. LEXIS 6927 at *3–4 (N.D. Ill., January 19, 2012) (Holderman, J.) ("A private corporation acting under the color of state law is subject to the same rules as a municipality under 42 U.S.C. §1983.")

Here, the undisputed facts establish that Securitas is liable for Plaintiffs' constitutional injuries under each of these four bases for *Monell* liability.

### 1. Express Policy

As discussed above, the Post Orders setting forth guards' duties on the Plaza contained unconstitutional express, written orders that instruct the guards to "remove any panhandlers" from the Plaza. Specifically, Chapter 10 of the written Post Orders instructs officers to: "Remove any panhandlers, sleeping vagrants, or unauthorized solicitors." (SOF, ¶ 51, 52.) Chapter 16 of the Orders, titled "Dealing With and Handling Undesirables," states: "An undesirable or suspicious person is anyone who is seen or appears to be conducting disruptive activity (loitering, stealing, panhandling, etc.)" and directs officers to "inform the subject to leave the property." (SOF, ¶ 53, 54.) The Post Orders do not elaborate on how guards should interact with panhandlers; nor do they differentiate anywhere between peaceful and aggressive panhandling.

(SOF, ¶78.) Chapters 10 and 16 are the only two places in which panhandling is addressed in the written Post Orders.[9]

The introduction to the Post Orders admonishes guards that the Orders "apply to all security officers and supervisors at all times" and that "any violation of these guidelines may result in an official reprimand and disciplinary action will ensue." (SOF, ¶¶ 57–59.) Coleman and other Securitas officials acknowledged in their depositions that officers are "required" to follow the Post Orders and can be disciplined for failing to do so. (*Id.*)

The evidence in this case supports the conclusion that Securitas adopted and implemented these Orders such that *Monell* liability should be imposed. Defendant Truman testified that he has been told to remove panhandlers from the Plaza for years. Waters likewise testified that removing panhandlers from the Plaza has been the policy of security providers for years. Indeed, the evidence suggests that this policy has been in effect and imposed by private security guards working on Daley Plaza for more than a decade (as early as 2000 when Jevtic testified he was instructed to prohibit panhandling). (SOF, ¶¶ 33, 34.) In addition, the fact that Truman and Kelly were never disciplined or reprimanded for the videotaped incident in which they forced Pindak to leave the Plaza lends further support to the idea that guards were instructed that they should remove panhandlers. (SOF, ¶ 135.)

Indeed, removing panhandlers from the Plaza is not an aberration. Rather, it is consistent with Securitas' inappropriate exercise of other police functions on the Plaza in violation of the First Amendment. For instance, the Post Orders instruct guards that they have the responsibility to "remove" loiterers from the Plaza, although the Supreme Court has found "peaceful loitering" to be constitutionally protected. *Chicago v. Morales*, 527 U.S. 41, 49 (1999) ("[T]he freedom to

---

[9]   As discussed in §II(D)(2) *infra* at 40, to the extent that there is any ambiguity in these orders, Coleman has testified that he is the sole person authorized to interpret the Post Orders.

loiter for innocent purposes is part of the "liberty" protected by the Due Process Clause of the Fourteenth Amendment.") Likewise, Securitas' national training ("Advanced Certification Training") materials instruct guards that they have authority to "disperse" loiterers (SOF, ¶ 136), even though such dispersal orders constitute police action. See *Keating v. Bell*, 697 F.3d 445, 460 (7th Cir. 2012) ("Law enforcement may constitutionally order dispersal of those engaged in protected expression upon 'serious inconvenience' only when dispersal is required to combat the specified nuisances before it.") In addition, Securitas' local training materials (specifically the Power Point presentation for the "Customer Service" class) call for guards to keep the Plaza "uncluttered" with people. (SOF, ¶137.)

Securitas' defense to liability for adopting and implementing these unconstitutional orders about panhandlers is twofold and fundamentally contradictory. On one hand, Securitas claims that it cannot be liable for this unconstitutional express policy because it did not write the Post Orders and had no authority to do anything other than follow them; and on the other hand, Securitas claims that it never actually followed the orders to remove panhandlers and instead implemented a different, oral Post Order. Plaintiffs fully address each of these defenses *infra* at §II(D)(3). But regardless which one of these contradictory stories is credited, Securitas is liable under *Monell.*

### 2.     Widespread Practice

Even if there is no express policy, the second basis for imposing *Monell* liability here is that there was a longstanding and well-established custom and/or practice of banning panhandlers from the Plaza. Courts have explained that an entity is liable for its employees' unconstitutional acts under *Monell* if those acts were consistent with a widespread custom or

practice "so permanent and well settled as to constitute a custom or usage with the force of law." *McTigue v. Chicago*, 60 F.3d 381, 382 (7th Cir. 1995).

Here, the evidence establishes numerous instances of Securitas' guards' removing panhandlers from the Plaza. (See §II(C), *supra* at 4.) Just as importantly, as a result of the persistent and long-standing nature of the ban, individuals who wished to panhandle on Daley Plaza were effectively deterred from doing so and avoided going to the Plaza out of fear of arrest. (SOF, ¶¶ 44–47.)

The evidence shows that the ban has been in place since at least 2000 through the summer 2013, when Waters testified that new training was provided modifying the policy. (SOF, ¶ 95.) This is confirmed by the testimony of Defendant Sheriff's deputy Jevtic. Before he become a sheriff's deputy, Jevtic worked as a private security guard at Daley Plaza for Argus Security from 2000–2003 and then (after becoming a sheriff's deputy) worked the "outside perimeter security" at Daley Plaza in 2007 and continued to work (on and off) on the Plaza up to and through this lawsuit. (SOF, ¶¶ 33–35.) He testified that during this whole time (2000–2013) panhandling was "not allowed on the Plaza." (*Id*.)

Finally, even crediting the notion that Securitas instructed its guards to ignore the written Post Orders and enforce an oral Post Order that was directed only against perceived "aggressive panhandling," Tee Coleman's testimony confirms that this "no-aggressive-panhandling" policy was the permanent and well-settled custom since 2006 when he began working at Daley Plaza. As discussed in §D(3)(b) *infra*, this too constitutes an unconstitutional policy.

### 3. Final Policymaker

To make a determination as to who the final policymaker is with respect to the allegedly unconstitutional acts, "the court must determine who in the corporation is 'the apex of authority

for the action in question,' regardless of whether that person's authority may be characterized as legislative or executive." *Fox*, at *3–4 (citing *Gernetzke v. Kenosha Unified Sch. Dist. No. 1*, 274 F.3d 464, 468 (7th Cir. 2001). There is no question here that that person is Securitas' Security Manager Tee Coleman.

Coleman testified that he is the "top person" at Daley Plaza. (SOF, ¶138.) The Post Orders identify the Security Manager as "the security expert at the property" and the person responsible for the "development and implement[ing], and review of comprehensive security policies and post procedures" at Daley Plaza, as well as the person responsible for training all staff "in the implementation and enforcement of security policies and procedures" at Daley Plaza. (SOF, ¶ 139.) Moreover, Coleman testified that he is the only person authorized to interpret the meaning of the Post Orders. (SOF, ¶ 140.) Coleman's position as the person responsible at Daley Center for implementation of the Post Orders and oversight of the guards' enforcement of them is sufficient to ascribe knowledge and responsibility to Securitas for the guards' unconstitutional actions.

### 4.     Failure to Train

Courts have held municipalities liable under §1983 for inadequately training their officers when the failure to train amounts to deliberate indifference to the rights of persons with whom those employees come into contact. *Canton*, 489 U.S. at 388 ("the failure to provide proper training may fairly be said to represent a policy for which the city is responsible.") Here, guards testified that they received no significant training on the First Amendment; on the Daley Plaza being a public forum; or on the legal definition of "aggressive panhandling." (SOF, ¶¶ 101–107.) Field performance itself is a strong indicator of the adequacy of training, and the evidence here shows Securitas' guards clearly and forcefully telling individuals they cannot panhandle at all on

the Plaza. (See §II(C) *supra*.) In addition, the testimony of the guards related to the permissibility of panhandling on the Plaza is severely inconsistent, also suggesting a lack of adequate training.[10]

It is of course no surprise that Securitas conducted no training on panhandlers' rights or that there exists video evidence of the guards' clearly and forcefully enforcing a "no-panhandling" policy. The reason is that Securitas' policy was in fact to remove all panhandlers from the Plaza. It is only in response to this lawsuit that Securitas asserts that it had an oral post order that modified the written policy. This claim, as shown below, is nothing but an after-the-fact, made-up assertion. See discussion at §III(D)(2), *infra*.

Despite the evidence to the contrary, Coleman contends that Securitas did train its guards adequately because they instructed guards that they do not have the power to arrest anyone and cannot "remove" anyone from the Plaza. (SOF, ¶¶ 76, 79.) Even crediting as true Coleman's assertions, though there exists documentary evidence to the contrary,[11] Securitas' training was still obviously inadequate and defective for several reasons. For one, Truman, Kelly and Waters did not receive the message. They thought they had authority to remove some or all panhandlers from the Plaza. (SOF, ¶¶ 80–98.) Moreover, simply telling guards that they may not make arrests is not all that would go into proper training about the appropriate scope of guards' powers. There are many other police functions beyond arrest that guards who are not sworn police officers cannot constitutionally carry out—for instance determining who may be present on public

---

[10]     See Ex. 12, Plaintiff's Expert report by Dick Sem, p. 9–10. ("[T]he inadequacy of Securitas' training is demonstrated by the security officers' and supervisors' widely varying understanding of what panhandling and aggressive panhandling means and what their related responsibilities are.").

[11]     See Ex. 17, Chapter 16 of the Post Orders ("Members of the security department do not have police powers, but *can enforce and arrest* for misdemeanor and felony offenses that occur on Richard J. Daley Center property.") (emphasis added).

property, telling people what expressive activities are allowed or prohibited on public property, and "dispersing" people from public property.[12]

### 5.    Causation

The final prong of the *Monell* claim is that the entities' official policy was the "moving force" behind the violation of the plaintiff's constitutional rights. *Connick v. Thompson*, 131 S. Ct. 1350, 1368 (2011); *Owen v. City of Independence*, 445 U.S. 622 (1980) (a municipality is liable for damages flowing from constitutional violations that it caused through the execution of its policy or custom because "elemental notions of fairness dictate that one who causes a loss should bear the loss.") Here, the unconstitutional official policies of Securitas, including its adoption of unconstitutional express written Post Orders instructing guards to "remove any panhandlers" and its failure to train Defendants Truman and Kelly about the proper exercise of their authority on the Plaza, directly caused the violations of Plaintiffs' First Amendment rights.

### D.    The Inadequacy of Securitas' Defenses to *Monell* Liability

In defending this case, Securitas has put forth four primary defenses: (1) it cannot be held liable under *Monell* because it lacks authority to make policy; (2) it is not liable because it is obligated to follow orders from its clients MBRE and PBC; (3) it never actually followed the

---

[12]    Securitas' position is that since their guards are trained that they do not have arrest powers, the guards are not engaged in policing activities when they prevent people from exercising their constitutional rights on the Plaza. This is based on a self-serving "arrest-based" model of policing. In fact, policing involves all sorts of activities other than arresting people. See Michael Greenberg, *'Broken Windows' and the New York Police*, The New York Review of Books, Nov. 6, 2014, http://www.nybooks.com/articles/archives/2014/nov/06/broken-windows-and-new-york-police/). Securitas' own marketing materials acknowledge that policing activities include numerous activities beyond making arrests, and indeed Securitas sells its services by encouraging clients to hire them to perform "ancillary" policing functions. (SOF, ¶ 121, citing Ex. 29(C) Securitas' Whitepaper: "The Benefits of Privatization.") ("Indeed, few policy experts advocate the wholesale substitution of private security for sworn police. Instead, most believe the lion's share of policing, including criminal investigations and apprehension, should remain the sole domain of the public sector. At the same time, there is widespread agreement that certain time-consuming (and largely ancillary) functions are more cost-effectively handled by the private sector.")

33

orders to remove panhandlers and instead implemented a different, contradictory oral Post Order; and (4) neither its guards nor Securitas acted under color of law. As shown below, none of these arguments is borne out by the evidence or supported by law.

### 1. Securitas' Assertion That It Possessed No Policymaking Authority At Daley Plaza Is Not a Defense to *Monell* Liability And Is Belied By the Contract Itself

First, Securitas argues that it cannot be liable under *Monell* because it lacks the authority to "make policy" for Daley Center. See, SOF ¶ 142 (Coleman: "Securitas does not make the policies for Daley Center."); see also Dkt. #156, Securitas' Response to Plaintiff's Motion to Compel at 17 ("Securitas USA has maintained that it does not make policy at Daley Plaza and that it has no authority to make policy.") In fact, Securitas' voluntary adoption of the Post Orders amounts to policymaking such that *Monell* liability should be imposed on Securitas. See *Rodriguez*, 577 F.3d at 827 ("a private entity [cannot] be burdened with the responsibilities of the state ... unless the entity assumes that responsibility voluntarily.")[13]

### a. Securitas Voluntarily Entered Into A Contract that Required It to Implement and Enforce the Post Orders

Courts have explained that "policy" is a voluntary choice between available courses of action. *Oklahoma City v. Tuttle*, 471 U.S. 808, 823 n.6 (1985) ("policy is a course of action consciously chosen from among various alternatives.") Here, Securitas chose to enter into a contract with MBRE and the PBC that imposed upon it the authority and responsibility to carry out the Post Orders. (See discussion in §II(G) *supra*.) Securitas had the power to negotiate what its duties would be under the contract. There was no coercion involved; they did not have a

---

[13]    Securitas contends that one of the reasons it cannot be said to be the policymaker is that it did not write the Post Orders, and it is therefore the "wrong defendant." See Dkt #208, Defendant Securitas' Response to Plaintiffs' Motion for Leave to File Seventh Amended Complaint, at 9-10 (accusing Plaintiffs of having "failed to join necessary parties.") Regardless of who wrote the Post Orders, as the analysis herein shows, it is beyond dispute that Securitas voluntarily adopted and implemented the policies at issue.

noose around their necks. Rather, Securitas voluntarily (and for consideration) accepted the contract terms. *Petruska v. Gannon University*, 462 F.3d 294, 310 (3d Cir. 2006) ("contractual obligations are entirely voluntary.") Accordingly, adoption of the Post Orders can be said to be Securitas' policy. See, *Taylor v. Plousis*, 101 F. Supp. 2d 255, 263 n.4 (D.N.J. 2000) ("Private entities, unlike municipalities, pick the activities in which they wish to engage, and imposing liability does not subject taxpayers to liability for mandatory activities."); see also *Rodriguez*, 577 F.3d at 827 ("One of the principal ways, indeed the principal way, by which a private entity would undertake such responsibility is by entering into a contractual relationship.")

### b. Securitas Had an Independent Legal Obligation to Carry Out Its Delegated Duties in a Lawful Manner

Even crediting as true Securitas' position that it was simply carrying out duties given to it by some other entity, it is still liable under §1983 for choosing to carry out those duties in an unlawful manner. This is true for two reasons: (1) an entity that undertakes authority to carry out state functions has an independent legal duty to comply with the law when doing so; and (2) without the imposition of §1983 liability on private companies carrying out government functions, the government could get away with unconstitutional actions by simply handing those duties down to a private contractor. *See Lebron v. Amtrack*, 513 U.S. 374, 397 (1995) ("It surely cannot be that government, state or federal, is able to evade the most solemn obligations imposed in the Constitution by simply resorting to the corporate form.").

Here, Securitas must be held liable because, in carrying out the Post Orders, it acted unlawfully in two distinct ways: (1) it voluntarily chose to take on the duty to "remove any panhandlers" from the Plaza, a course of action that runs afoul of the First Amendment; and (2) it

voluntarily chose to take on a duty that was fundamentally beyond the appropriate scope of a private security contractor's authority.[14]

### c. Securitas Had a Contractual Obligation to Carry Out Its Delegated Duties in a Lawful Manner, But Chose to Ignore Such Duties

Securitas' Contract with MBRE and PBC also imposed duties that contradicted the order to "remove any panhandlers." Specifically, the Contract required Securitas to (a) ensure that all contract duties were performed in a legal manner (SOF, ¶114); (b) inform MBRE if the post orders could be improved (SOF, ¶¶ 72, 111); (c) know the relevant law (SOF, ¶ 112); (d) report if they encounter post orders that contradict the law; and (e) "analyze and revise general and Post Orders and other directives as needed." (SOF, ¶¶ 68, 70, 141.) In opting to enforce the no-panhandling policy, Securitas made a choice to ignore these obligations. It could have refused to enforce the panhandling policy, citing its obligation under the terms of the Contract, but instead it chose to implement and enforce the Post Order's directive to "remove any panhandlers." In making this choice, Securitas acted voluntarily and is thus liable for its actions.

### d. Regardless of What Decision-Making Powers Were Retained By Its Client, Securitas Was Delegated the Authority to Prevent Panhandling Activities On Daley Plaza and Adopted and Exercised Such Authority

---

[14] This point deserves further explanation. The legal reality is that there is no restriction on the government's ability to delegate public functions to private entities. The only limit on a governmental entity delegating a public function is that the delegated power has to be performed in a constitutional manner. That is, the public function test doesn't limit the functions the government can delegate; it "constitutionalizes" them. Here, Securitas could not remove panhandlers from the Plaza in a constitutionally permissible way because it is not vested with the public power to do so. Scholars have addressed the question of what duties are inherently governmental and thus non-delegable. See, Paul R. Verkuil, *Public Law Limitations On Privatization of Government Functions*, 84 N.C.L. Rev. 397, 425-434 (2006) (arguing that the duties that should be regarded as non-delegable are those that inhere in offices for which there is a requirement to take an oath or carry a badge). Another scholar has dubbed the problem as "over-outsourcing." See Peter W. Singer, *The Dark Truth about Blackwater*, (October 2, 2007) (http://www.brookings.edu/research/ articles/2007/10/02militarycontractors). Here, it is appropriate to ask: what must Securitas do to avoid liability for removing individuals who seek to panhandle on Daley Plaza? The answer is simple: they should get out of the business of removing them.

With regard to Securitas' claim that it has no policymaking authority at Daley Plaza, it must be emphasized that in government/private entity relationships, as here, where certain governmental duties have been outsourced to private actors, the practical reality is that authority is diffused between the private entities and the governmental bodies. No government entity is inclined to grant a private company *carte blanche* to make each and every policy decision in situations where public functions have been privatized. No one is arguing that Securitas was responsible for making every major decision related to the security operations at Daley Plaza. But acknowledging this reality is not the same as saying Securitas did not have any policymaking or policy-implementing authority in the relevant areas at issue.

Here, the scope of Securitas' authority is constrained by the terms of their Contract and the duties set forth therein. As explained above, Securitas was delegated the authority to "remove any panhandlers" from Daley Plaza. It is irrelevant that MBRE or PBC may have retained other decision-making authority, such as the ability to make major purchasing decisions. See *Valentino v. Village of South Chicago Heights*, 575 F.3d 664, 675 (7th Cir. 2009) (The question "is not whether an official is a policymaker on all matters for the municipality, but whether he is a policymaker 'in a particular area, or on a particular issue.'"); *Vodak v. City of Chicago*, 639 F.3d 738, 748 (7th Cir. 2011) ("one can be an official policymaker in one domain but not in another").

Moreover, the type of power delegated here, by its very nature, requires the guards to make discretionary decisions, including whom to remove and in what manner to remove them. See Dominique Custos And John Reitz, *Public-Private Partnerships*, 58 Am. J. Comp. L. 555, 576 (2010): ("Contracting out complex services to the public that would otherwise be provided by government constitutes a delegation of governmental authority," adding that "the strategy of gaining cost savings through contracting out depends on giving contractors substantial discretion

with regard to how they render the service.")

Securitas' expert witness Frank Murphy attempts to minimize the significance of the authority delegated to Securitas to "remove any panhandlers" by failing to even mention the relevant Post Order in his expert report. (See Ex. 19.) He justified this omission by testifying that the task was not "relevant" because it was not the guard's "primary role." (Ex. 11, Dep of Murphy at 73:4–25.) But courts have explained that it doesn't matter whether a function carried out by a private actor was the private actors' "primary role." Rather, the inquiry is whether the duty in question is fairly characterized as a state function. See *Cummings v. Quakenbush*, 2013 U.S. Dist. LEXIS 147259 at 26 ("It should not matter that the entirety of Defendants' contract with the state was not dedicated to performing affirmative constitutional obligations of the state"); see also *West v. Atkins*, 487 U.S. 42, 56 (1988) ("[I]t is the physician's function while working for the State, not the amount of time he spends in performance of those duties or the fact that he may be employed by others to perform similar duties, that determines whether he is acting under color of law.")

### 2.     Securitas' Assertion that It Was "Just Following Orders" Is Not A Defense to *Monell* Liability

Closely related to Securitas' claim that it should not be held liable because it did not have policymaking authority, Securitas also asserts that it should not be liable because it was just following the orders given to it by MBRE. (SOF, ¶ 143) ("Is it fair to say that Securitas is tasked with enforcing the policies that are given to it by MBRE? A. I will say more that's follow, not enforce ... we are expected to follow these post orders."); see also Dkt. #156 at 16 ("Tee Coleman's] responsibility as site supervisor is to implement [The Post Orders] and have his security guards follow them.") As shown below, it is only by peddling a fundamentally false concept of its role and activities on the Plaza that Securitas can make this claim.

First, there can be no question that certain security services at Daley Center were privatized (a.k.a. "outsourced") to Securitas. Both MBRE's Head of Security Ed Carik and Securitas' own expert witness Frank Murphy agreed that security was "outsourced" to Securitas. (SOF, ¶ 116–118.) The Contract amounted to a broad delegation of authority to act as the security force on Daley Plaza, giving Securitas responsibility for, among other things, hiring, firing, training, discipline, and policing the Plaza. (SOF, ¶ 112.)

Second, the evidence shows that Securitas was not a mere puppet of MBRE, simply carrying out directives imposed from above. Rather, Securitas makes every significant decision about day-to-day security operations at Daley Center with very little oversight. Indeed, the very nature of the duties outsourced to Securitas make oversight practically impossible. Security functions require that guards make discretionary, moment-by-moment decisions about how to carry out their duties throughout the day. It would be impossible for Ed Carik, or any other MBRE employee, to effectively monitor the security activities of Securitas guards at all of the posts. Moreover, it would defeat the whole purpose of privatization to have extensive oversight, which is expensive and time-consuming. The whole point of privatization is to cut costs by limiting oversight. See Richard Frankel, *Regulating Privatized Government Through §1983*, 76 The University of Chicago Law Review 1449, 1500 (2009) (explaining that financial concerns discourage governmental oversight and that engaging in "close oversight makes it more expensive for the government to contract out a service than to perform the service itself.")

Third, Tee Coleman admits that MBRE does not engage in meaningful oversight of how Securitas performs its security duties. Coleman testified that it is Securitas' sole responsibility to implement the Post Orders, and where the Post Orders contain any ambiguity about the task assigned or how to carry out that task, Coleman is the sole individual authorized to interpret the

Orders. (SOF, ¶ 140.) Securitas thus has responsibility for both interpretation and implementation of the Post Orders.

Fourth, Tee Coleman's testimony confirms the absence of close oversight of the Post Orders' implementation by MBRE. Coleman testified that he had the duty to bring to MBRE's attention the flaws in the written Post Orders but chose not to do so because it would "look suspicious." (SOF, ¶ 144.) This shows that Coleman himself understood that MBRE did not know what was in the Post Orders and that it was up to him to inform MBRE of activities on the Plaza, including the very contents of the Post Orders.[15]

### 3. Securitas' Claim That It Had In Place An Oral Post Order that Undid The Written Policies Is Unavailing As a Defense to *Monell* Liability

Displaying a willingness to blithely contradict itself, Securitas argues that it doesn't actually follow the written order to "remove any panhandlers," but has taken it upon itself to implement a different policy. Specifically, Securitas contends that it does not kick panhandlers off the Plaza, but rather has implemented an "oral post order" that contradicts and overrides the written directive. According to Coleman, the unwritten policy is that only "aggressive panhandling" is barred on the Plaza and guards are only to tell individuals engaged in "aggressive" behaviors to "discontinue" the behavior and/or "suggest" to them that they should move to the sidewalk. (SOF, ¶¶ 75–76.) Coleman admits that this order was never reduced to

---

[15]     There are, in fact, two circumstances under which "just following orders" is a possible defense to *Monell* liability, but neither is applicable here. Both involve situations when an entity has no discretion but to follow a particular government policy. First, when a local government unit acts pursuant to a mandatory state law, it is not liable under *Monell* precisely because it does not have discretion to act otherwise. See *Bethesda Lutheran Homes & Services v. Leean*, 154 F.3d 716, 718–19 (7th Cir. 1998) (The Seventh Circuit held that "the local officials could not act otherwise without violating state or federal law. ... these officials have no discretion that they could exercise in the plaintiffs' favor."). Here, entering into a contract (which is voluntary) is different from following a state law (which is mandatory). Second, when the privatized duties are discrete and the contract is explicit about how those duties are to be carried out (*i.e.* mere ministerial tasks such as stuffing envelopes or answering telephones). Here, Securitas' contract is the opposite of discrete and explicit. It provides Securitas broad authority to carry out security functions, including granting Securitas the full and absolute authority to hire, fire, discipline, and train its guards.

writing, but contends that all guards knew of its existence and it has been in place since before he worked at Daley Center. (SOF, ¶ 73.)

> a. **Other Than Highly Self-Serving Testimony, There Is No Evidence that Securitas Had Any Oral Post Order In Effect At Daley Plaza**

There is good reason to believe that this is a completely false, *post hoc* justification, including the abundance of evidence discussed herein which indicates that Securitas and the previous security contractors at Daley Plaza instructed their guards to remove all panhandlers and the numerous incidents in which guards actually removed panhandlers without any reference to whether their activities were "aggressive."

Furthermore, there is no documentary evidence to support Coleman's assertion that Securitas ever implemented a policy under which only "aggressive" panhandling was barred. Securitas has not come forth with a single written document to support this theory despite it allegedly being operational policy at Daley Plaza since at least 2006 (when Tee Coleman became head of security there). Likewise, none of the video or audio interactions between Pindak and guards mention anything about "aggressive" panhandling being prohibited.

And finally, the notion that Securitas ever implemented this "oral post order" is further undermined by Tee Coleman's suspiciously convenient testimony that the oral post order about panhandling is the "only" oral post order Securitas has ever implemented to override or explain the written orders. (SOF, ¶ 145.)

> b. **Even Crediting As True The Existence Of This Oral Post Order, It Still Constitutes An Unconstitutional Policy**

Even if Coleman's testimony about the existence of this "oral post order" is true, it still amounts to an unconstitutional express policy for two reasons. First, permitting guards to use their discretion to remove someone who is perceived to be an aggressive panhandler is an

41

inappropriate exercise of police authority. Truman and Kelly testified that if they observe someone panhandling in what they deem to be an aggressive manner, they ask the panhandler to "leave the area" and/or "move it to the public sidewalks." (SOF, ¶ 89.) The determination of whether someone is "aggressive" is left up to their "discretion." (SOF, ¶¶ 88, 90.) Moreover, the officers have been given little to no training on the meaning of the term "aggressive," including never having seen or read Chicago's Aggressive Panhandling Ordinance. (§8-4-025 of Chicago Municipal Code). (SOF, ¶¶ 102-103.) The determination that an individual is engaging in aggressive panhandling is a police determination that involves enforcing the law. It is improper to leave such legal determination in these officers' hands.[16]

Second, if this oral post order ever in fact existed, it was an unconstitutional express policy because having an oral order that contradicts a written order is unduly confusing and presents an unacceptable risk that guards will not know which order to follow and will thus violate citizens' rights. See *Kennedy v. Los Angeles Police Department*, 901 F.2d 702, 713 (9th Cir. 1989) ("A ham-handed approach to policy making runs the serious risk of infringing upon detainees' constitutional rights.") Indeed, even Tee Coleman agreed that the conflict between the written and oral orders is confusing. (SOF, ¶ 78.) Here, the risk that guards will not know which order to follow is particularly acute because the Post Orders themselves emphasize that the written Post Orders must be followed and failing to do so would subject guards to termination or other discipline. (SOF, ¶¶ 57, 58.)

Finally, both Plaintiffs' and Defendants' expert witnesses agreed that industry standards require that Post Orders be reduced to writing. (Ex. 12, Report of Sem, p. 3; Ex. 11, Dep of

---

[16]    See Ex. 12, Plaintiff's expert report at 6–7 ("[T]elling an individual to leave the Plaza because they are deemed to be panhandling in an "aggressive manner" is beyond the scope of a security officer's proper authority. The determination that an individual is engaging in aggressive panhandling is a police determination that involves enforcing the law.")

Murphy, p. 196.) Defendants' expert further testified that if there is an oral order that contradicts a written one, the written post order would have to take precedence. Ex. 11, p. 197 ("the written one ... would outrank the verbal order.")

> **4.** **Securitas Misreads the Plain Language of the Post Orders in an Effort to Evade Liability**

Along with claiming that Securitas has implemented an "oral post order," Securitas tries to read its written Post Orders to say something different from what they actually say. Securitas has pushed the theory that, if you read the Orders "in context," they are concerned only with "aggressive" or "disruptive" panhandling. (SOF, ¶ 146.) This position is unavailing for numerous reasons. One, the only logical, commonsense way to read these orders is that they bar all panhandling on the Plaza. The written orders never make any distinction between "aggressive" and "non-aggressive" panhandling. In fact, they never mention the word "aggressive." Rather, as discussed above (see §II(D) at 8), the Orders' only mention panhandling in Chapter 10 (the directive to "remove any panhandlers") and Chapter 16 (the directive that panhandlers are deemed "undesirable and/or suspicious" and guards are to "inform the subject to leave.") See, *FutureSource LLC v. Reuters Ltd*., 312 F.3d 281, 284 (7th Cir. 2002) ("Nonsensical interpretations of contracts, as of statutes, are disfavored.")

> **5.** **Securitas' Guards Are State Actors**

Securitas' final defense is that its guards do not act "under color of law," and thus Securitas cannot be liable under §1983 for their actions. This argument too must be rejected. Securitas guards carry out the traditional public function of regulating citizen's speech on a public forum and do so pursuant to duties that have been contractually delegated to them. See more detailed discussion on state actor question set forth in §III(B)(3), *supra* at 19–26.

### E.      Securitas Should Be Found Liable Under *Respondeat Superior*

*Monell v. Department of Social Services*, 436 U.S. 658 (1978) permits suits against

municipal entities under §1983, but only when a governmental policy or custom caused the

constitutional deprivation. Thus municipal entities cannot be liable for their employees' actions

under a *respondeat superior* theory. *Id.* at 691. The Seventh Circuit has extended the exemption

from *respondeat* liability to private entities acting under color of law. See*, e.g.*, *Iskander v.*

*Village of Forest Park*, 690 F.2d 126, 128 (7th Cir. 1982).

Recently, in *Shields v. Illinois Dep't of Corr.*, 746 F.3d 782 (7th Cir. 2014), the Seventh

Circuit has called into question the persuasive force of *Iskander*. In *Shields*, the Court undertook

an extensive analysis of the many policy reasons why *Monell*'s prohibition on *respondeat*

liability should not be extended to private corporations, concluding as follows: "A close look at

the reasoning of *Monell* provides no persuasive reason to extend its holding to private

corporations." *Id.* at 792.

Ultimately, the Court in *Shields* did not overrule the existing law extending *Monell*'s

prohibition on *respondeat superior* liability to private companies because the plaintiff in that

matter had not preserved the issue and it had not been fully briefed. *Id.* at 795. And yet, while not

overruling existing law, the Court offered an "invitation" to lower courts to evaluate the

important question of "whether private corporate liability under §1983 should be evaluated in the

same manner as municipal liability." *Id.* at 801 (Tinder, J. concuring).

Given the Seventh Circuit's "invitation," Plaintiffs seek to pursue a claim under §1983

against Securitas for its employees' misconduct. In the analysis below, Plaintiffs set forth three

reasons for this court to find Securitas liable for the constitutional torts of its employees—(1) to

correct the historical errors committed by the Court in *Monell*; (2) to ensure the law promotes

incentives for private corporations to protect against their employees' committing constitutional

torts; and (3) to alleviate the defects in the *Monell* paradigm, as applied to private corporations.

    1.    **This Court Should Correct Historical Error and Conclude that**
           ***Respondeat Superior* Applies to §1983 Actions Against Private Corporations**

In *Shields*, the Seventh Circuit identified two historical errors the Supreme Court made in

*Monell* that led the Court to bar *respondeat superior* liability under §1983.[17] The first was that

the Court "failed to grapple with the fact that *respondeat superior* liability for employers was a

settled feature of American law ... [and] Congress therefore enacted §1983 against the backdrop

of *respondeat superior.*" *Id*. at 791-792. And thus when §1983 was passed in 1871, Congress

"presumably assumed that courts would apply it in claims against corporations under §1983." *Id*.

And thus, when the text of §1983 imposes liability, as it does, on a person who "shall subject, or

cause to be subjected," any person to a deprivation of constitutional right, the Seventh Circuit

contends that the term "cause" "certainly does not preclude *respondeat superior* liability." *Id*. at

793.

The second historical error was that the *Monell* Court relied on Congress' rejection of the

proposed Sherman Amendment to support its rejection of *respondeat* liability. The Sherman

Amendment would have imposed liability for the mere failure of the government to prevent harm

caused by private citizens. *Id* at 792. The *Shields* court notes that the amendment "would have

made a 'county, city, or parish' vicariously liable for acts of violence committed by private

citizens." *Id*. at 793. Given the amendment's broad scope, the *Shields* court says Congress'

rejection of it "says little about whether a municipality should be held liable for constitutional

torts committed by its own employees acting within the scope of their employment." *Id*.

---

[17]    The Seventh Circuit more gently and generously refers to these errors as "flaws on the surface of [the *Monell* court's] reasoning." *Id*. at 792.

Even in the face of these historical errors, the Seventh Circuit acknowledges that it is duty bound to follow *Monell* as far as municipal liability is concerned, but that it "need not extend that holding ... to private corporate defendants." *Id*. at 792. In accord with the Seventh Circuit's reasoning, this court, too, should, reject the extension of *Monell's* exemption from *respondeat* liability to private corporations.

2.     **The Imposition of *Respondeat* Liability Promotes Sound Public Policy**

The second reason to impose *respondeat superior* liability on private entities in §1983 actions is to promote sound public policy. The *Shields* court identified at least two fundamental ways in which imposition of *respondeat superior* liability would promote the public good.

First, subjecting private corporations to *respondeat* liability would promote private entities' taking the appropriate precautions to deter constitutional violations, for "the specter of massive liability might spur the employer to take precautions." *Id*. at 792. The Court adds, "Employers are in the better position to take cost-effective measures to avoid causing injury." *Id*. In the end, "making employers liable for their employees' torts may result in less tortious behavior." *Id*.

Second, the imposition of *respondeat* liability would serve to counter the competitive market pressures to generate profits for their shareholders at the expense of violating people's constitutional rights. *Id*. at 794. Private actors' profit-seeking mission means it becomes rational for such actors to skimp on things like training, monitoring, retaining proper records and paying adequate salaries for good employees, since by doing so the cost of delivery of their goods goes down and profits go up.[18] As the Court put it in *Shields*, "The results of the current legal

---

[18]     In accord with such identified risks, Securitas' own expert witness Frank Murphy explained that the goal of private companies like Securitas as follows: "You're trying to get it [the assigned public duties] done cheaper. Cheaper and cheaper and cheaper." Ex. 11, Dep of Murphy at 234: 4–5. He adds: "They [public entities] can't afford to keep a sheriff there when they can actually use that sheriff or police

approach are increased profits for the corporation and substandard services both for prisons and the public." *Id*.

In many respects, this is a textbook case for the principles enunciated above. Here, the evidence shows that Securitas made key operational decisions that, while no doubt cost-effective, had a critical impact on Securitas' ability to ensure the proper protection of the constitutional rights of citizens on Daley Plaza. Below are three distinct areas in which Securitas' operational deficiencies at Daley Plaza revealed themselves:

(1) Structural Deficiencies: Securitas had both an independent legal duty and a contractual duty to review its Post Orders to ensure they were in compliance with the law. In adopting the Post Orders, Securitas put its guards in a position where they were directed to perform duties beyond their lawful authority. It is unclear whether Securitas was careless or indifferent in directing their guards to perform these duties. But whatever the case is, they failed their legal and contractual obligations, and it calls for a serious re-examination of their procedures. See discussion in §III(D)(1)(b), *supra*.

(2) Training Deficiencies: Securitas did not properly train its guards to protect the legal right of individuals to panhandle. Moreover, Securitas own training materials are deeply flawed in that they encourage guards to engage in policing powers when such action is beyond the scope of their authority. See discussion in §III(C)(1), *supra*.

(3) Deficiencies With Regard to the Post Orders: The Post Orders were deficient in myriad ways, as they directed the guards to interfere with people's constitutional rights. If one credits the existence of the oral post order, Securitas flouted its basic duty to promulgate clear rules for its guards by giving them both written and oral Post Orders that were contradictory, a practice at odds with industry standards. See discussion in §IIID(3)(b), *supra*.

### 3. Securitas Should Not Be Permitted to Exploit the Flaws in the "*Monell* Paradigm" As It Is Applied to Corporate Entities

Another reason to impose *respondeat* liability on private corporations is to address what the *Shield*s Court identified as "the often arbitrary gaps in legal remedies" under §1983. *Id*. at 785. Specifically, this refers to the problem of applying the "*Monell* paradigm ... in the context of

---

officer on the street to enforce laws and to capture bad guys. So let's privatize, put a security company in here, and we can pay them less and less and less." *Id*. at 235:3–8.

a corporate contractor providing governmental services." *Id.* at 800 (Tinder, J., concurring). The Court wondered "whether a private corporation should be able to take advantage of the holding of [*Monell*]." *Id.* at 786. The Court did not answer the question, but it did strongly suggest that the *Monell* paradigm is flawed in various ways by, among other things, encouraging private corporations to structure their operations in such a way as to evade liability.[19]

For Securitas, the defects in accountability that result from the *Monell* paradigm as applied to corporate entities is not a problem; it is their hoped-for solution. Securitas' defenses seek to take advantage of defects and openings presented by the *Monell* paradigm. For example, in arguing that they did not have policymaking authority here, Securitas seeks to exploit the fact that they did not have total, absolute authority to make all decisions related to security operations at Daley Plaza. But, as explained above, the reality of government/private entity interactions is that responsibility is diffused and no private entity in such settings is given *carte blanche* to make each and every determination. In *Shield*s, the Seventh Circuit identified Wexford's efforts to evade *Monell* liability by "diffus[ing]" responsibility for Shields' medical care." *Id.* at 786. Here, Securitas seeks to evade *Monell* liability by ignoring the existence of diffused policymaking responsibility. As explained previously, the relevant inquiry is to look at the particular contract to determine what authority was in fact delegated to the private actor. Doing so here shows that Securitas was delegated the authority to regulate speech on a public forum, and that it adopted and exercised such authority.

---

[19]     The court identified just such a situation under the facts of *Shields*, noting that there the defendant Wexford "diffused responsibility" for Shields' medical care to effectively evade liability. In particular, *Shields* presented an Eighth Amendment claim for deliberate indifference to plaintiff's serious medical needs in the prison setting. *Id.* at 786–787. The Court wrote: On the facts before us, it appears that Wexford structured its affairs so that no one person was responsible for Shields' care, making it impossible for him to pin responsibility on an individual." *Id.* at 795. The Court referred to scholarly articles that discuss the problems associated with applying the *Monell* paradigm in the context of privatization. *Id.* at 795, fn. 4.

Relatedly, in arguing it is not liable under *Monell* because it was "just following orders," Securitas seeks to ignore its own choice to adopt and enforce these policies. They are attempting to portray themselves as mere functionaries in a top-down, hierarchical organization (like a police department), but the terms and conditions of privatization that occurred here belie that characterization, including the delegation to Securitas of broad authority (hiring, firing, disciplining, and subcontracting) and the absence of close oversight by any governmental body.

The *Monell* paradigm also encourages private actors to pin blame on their employees, which is exactly what Securitas has done here.[20] By placing blame on its guards, Securitas can acknowledge a harm without taking responsibility for it. It is hardly an exercise in undue cynicism to be suspicious of Securitas' efforts to lay blame on its guards: it is simply too handy for those at the top of organizational hierarchies to let those at the bottom take the legal fall. The guards are often economically vulnerable folks whose wellbeing and livelihoods are at stake and who can be easily coerced.[21]

The *Monell* paradigm also has the effect of undermining accountability in another way. Specifically, it leads to serious problems identifying the party responsible for correcting alleged misconduct. In a normal *Monell* liability situation where a police officer abuses his power, there is a chain of command that is publically available, so the public knows, at least in a general way,

---

[20]     Securitas admits that Defendant Security Officers Kelly and Truman acted inappropriately when they told Plaintiff Pindak that panhandling was not allowed anywhere on the Plaza and that he would be handcuffed if he didn't leave. (SOF, ¶ 79) (Deposition of Tee Coleman, p. 43, "they told him that there was no soliciting allowed on the Plaza, and ... that's not a true statement."). Securitas disavows that their training and faulty post orders had anything to do with the guards' actions, when in fact all the evidence suggest the guards were just being responsible employees following the written orders they were given. Realistically speaking, no guard can fairly be accused of acting improperly when they followed a written order which they were directed to follow under threat of being disciplined or punished. (SOF, ¶ 57–59.)

[21]     Securitas' effort to blame its guards is consistent with its efforts to blame everyone but themselves for what occurred on the Plaza, including seeking to foist blame on MBRE and the PBC for allegedly drafting the Post Orders and seeking to blame the sheriff whom it claims "has primary security responsibilities for the building and its grounds." (Ex. 19, Murphy Expert Report at 4, ¶8).

to whom to complain and knows that there is at least some mechanism for administrative oversight and review. But to whom is a citizen supposed to complain here? Securitas argues that entities above it are responsible for the policy and the guards' conduct. But these other entities are unknown to the public. How is a person to know that MBRE is the real estate manager of the Plaza or that the PBC owns the property? How is a person to even know there a property manager and where its offices are located? And once you figure that out, who is the person in charge? In the course of this litigation, it took Plaintiffs' counsel more than a year to figure out the various parties who operate and control Daley Plaza.

IV.     **CONCLUSION**

WHEREFORE, Plaintiffs respectfully request that this Honorable Court enter summary judgment for Plaintiffs and against Defendants Securitas, Truman and Kelly.

Respectfully submitted,


/s/ Mark G. Weinberg                           /s/ Adele D. Nicholas

Mark G. Weinberg                                Adele D. Nicholas
3612 N. Tripp Ave.                               4510 N. Paulina St.
Chicago, IL 60641                                Chicago, IL 60640
773-283-3919                                       847-361-3869