**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| KIM PINDAK, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | 10 C 6237 |
| | ) | |
| v. | ) | Judge Pallmeyer |
| | ) | Magistrate Judge Kim |
| COOK COUNTY, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AGAINST
DEFENDANTS COOK COUNTY SHERIFF TOM DART
AND SHERIFF'S DEPUTY DALIBOR JEVTIC**

# Table of Contents

I.     Introduction................................................................................   1

II.    Factual Background..................................................................   2

     A.    Parties........................................................................   2

     B.    Daley Plaza.................................................................   3

     C.    Defendant Nance and Jevtic's Duties and Role in
           Policing Daley Plaza...................................................   3

     D.    Interference with Plaintiffs' First Amendment Rights.......................   4

     E.    The Sheriff's Control of Daley Plaza................................   6

     F.    The Sheriff's Policies..................................................   8

     G.    The Defendant Deputies' Understanding of the Policy on
           Panhandling ...............................................................   8

     H.    The Sheriff's Training of Deputies................................   9

III.    Argument..................................................................................   9

     A.    Plaintiffs Have a Protected First Amendment Right to Engage in
           Peaceful Panhandling on a Public Forum ............................   10

           1.    Panhandling is Protected Speech ............................   10

           2.    Daley Plaza is a Traditional Public Forum.............................   10

     B.    Defendant Jevtic Violated Plaintiff Kim Pindak's
           First Amendment Rights..............................................   11

     C.    Sheriff Dart is Liable for the Above-Described Violations
           Pursuant to *Monell* ....................................................   12

           1.    The Evidence Compels the Conclusion that The
               Sheriff Displayed Deliberate Indifference to the Rights
               of Plaintiffs In Two Ways......................................   13

               a.    The Sheriff Displayed Deliberate Indifference To
                     The Legal Rights of Panhandlers Because It Was
                     Obvious that Training Was Needed............................   14

                     i.    The Nature of the Forum Guaranteed
                         that Sheriff's Deputies Would Confront
                         Panhandling Activity.......................................   15

                     ii.    The Performance of the Deputies' Duties
                         Guaranteed that They Would Interact
                         With Panhandlers................................................   16

iii.    The Sheriff's Department Has Primary Responsibility for the Daley Center and Its Grounds by Law ................................................. 17

b.    The Sheriff Was Deliberately Indifferent Towards the Legal Rights of Panhandlers Because It Had Full Knowledge That Failure to Train and Guide Deputies Resulted In Constitutional Violations And Chose Not To Respond to the Problem................... 19

i.    Plaintiffs' Lawsuit and the Testimony of Witnesses Therein Put The Sheriff on Notice of the Defects in its Training and Policies..................................... 20

ii.    The Sheriff Displayed Deliberate Indifference Through Its Complete Inaction in the Face of Its Knowledge of the Violations............................. 22

c.    The Sheriff's Actions Here Can Be Explained By Their Desire To Place Responsibility On The Private Security Company........................................... 24

d.    The Sheriff Had an Unconstitutional Widespread Practice of Condoning Private Security Guards' Interference with Peaceful Panhandling..................................... 27

e.    The Sheriff's Conscious Decision Not to Have A Policy Concerning the Legal Right To Panhandle on Daily Plaza Amounts to an Unconstitutional Express Policy ............................................ 30

f.    The Sheriff's Deliberate Indifference, Widespread Practice and Express Policy Were the Moving Causes Behind the Violations of Plaintiffs' Rights ................... 31

IV.    Conclusion.................................................................................................. 33

## Table of Authorities

**Case Law**

*ACLU of Nevada v. Las Vegas*, 466 F.3d 784 (9th Cir. 2006)......................................... 10

*Armstrong v. Squadrito*, 152 F. 3d 564 (7th Cir. 1998)................................................. 23, 30

*Belbachir v. County of McHenry*, 726 F.3d 975 (7th Cir. 2013).................................... 22

*Bell v. Keating*, 697 F.3d 445 (7th Cir. 2012)............................................................... 11

*Berger v. Battaglia*, 779 F.2d 992 (4th Cir. 1985)......................................................... 23, 25

*Blum v. Yaretsky*, 457 U.S. 991 (1982)......................................................................... 27

*Board of County Commissioners v. Brown*, 520 U.S. 397 (1997) ................................ 18

*Chicago v. Morales*, 527 U.S. 41 (1999)....................................................................... 27, 32

*City of Canton v. Harris*, 489 U.S. 378 (1989). ........................................................... 13–19

*Connick v. Thompson*, 131 S. Ct. 1350 (2011)............................................................. 18, 31

*Davis v. Monroe County Bd. of Ed.*, 526 U.S. 629 (1999)............................................. 29

*Fish v. Greatbanc Trust Co.*, 749 F.3d 671 (7th Cir. 2014)........................................... 23

*Global-Tech Appliances, Inc. v. SEB S.A.*, 131 S. Ct. 2060 (2011)................................ 23

*Gresham v. Peterson*, 225 F.3d 899 (7th Cir. 2000)...................................................... 10

*Grutzmacher v. Public Bldg. Com'n of Chicago*, 700 F. Supp. 1497 (N.D.Ill. 1988)....... 10

*Jones v. City of Chicago*, 856 F.2d 985 (7th Cir. 1998)................................................. 30

*Hague v. CIO*, 307 U.S. 496 (1939)............................................................................. 10

*Hodgkins v. Peterson*, 355 F.3d 1048 (7th Cir. 2004).................................................. 12

*King v. Kramer*, 680 F.3d 1013 (7th Cir. 2012)............................................................ 23

*Loper v. New York City Police Dep't*, 999 F.2d 699 (2d Cir. 1993) ............................. 10

*McCormick v. Chicago*, 230 F. 3d 319 (7th Cir. 2000) ................................................ 12

*McTigue v. Chicago*, 60 F.3d 381 (7th Cir. 1995) ....................................................... 27

*Monell v. Department of Social Services*, 436 U.S. 658 (1978)...................................... *passim*

*O'Connor v. County of Cook*, 787 N.E. 2d 185 (Ill. App. 1st, 2003).............................. 17

*Owen v. City of Independence*, 445 U.S. 622 (1980)...................................................... 31

*Petkus v. Richland County*, 767 F.3d 647 (7th Cir. 2014)............................................. 27

*Phipps v. Sheriff of Cook County*, 681 F. Supp. 2d 899 (N.D. Ill. 2009)........................ 22

*Primm v. County of DuPage*, 1993 WL 338762 (N.D.Ill. 1993)................................... 18

*Robles v. City of Fort Wayne*, 113 F.3d 732 (7th Cir. 1997).......................................... 13, 23

*Smith v. Fort Lauderdale*, 177 F.3d 954 (11th Cir. 1999) ................................................. 10

*T.E. v. Grindle*, 599 F.3d 583 (7th Cir. 2010) ................................................... 23

*U.S. v. Salinas,* 763 F.3d 869 (7th Cir. 2014)................................................... 23

*Virginia v. Am. Booksellers Ass'n,* 484 U.S. 383 (1988)................................... 11

*Vt. Right to Life Comm. v. Sorrell,* 221 F.3d 376 (2d Cir. 2000) ..................... 11

*Walsh v. Board of Commissioners of Cook County*, 397 Ill. 293 (1947).......... 17

*Warren v. District of Columbia*, 353 F.3d 36 (D.C. Cir. 2004)........................ 22

**Statutes**

42 U.S.C. § 1983................................................................................ *passim*

55 ILCS 5/3-6017................................................................. 3, 6, 17

**Other Authorities**

Richard Frankel, *Regulating Privatized Government Through §1983*,
76 The University of Chicago Law Review 1449 (2009)................................. 25

1912 Ill.Atty. Gen.Op. 254................................................................ 17

1983 Ill.Atty. Gen.Op. 49.................................................................. 17

## I.    INTRODUCTION

This is a §1983 case concerning the First Amendment right to peacefully panhandle in Daley Plaza. Plaintiffs Kim Pindak, Sam Phillips and Norman Talley are three individuals who have sought to exercise that right and have been prohibited from doing so by Cook County Sheriff's Deputies working on Daley Plaza. There are two entities responsible for monitoring the Plaza—Cook County Sheriff Thomas Dart and private security contractor Securitas Security Services USA Inc. ("Securitas")—both of which have interfered with Plaintiffs' First Amendment rights. The involvement of the Securitas Defendants is set out in full in Plaintiffs' motion for summary judgment. (Dkt. 217, filed 11/10/14.) In this summary judgment motion, Plaintiffs are seeking judgment on their *Monell* liability claim against Sheriff Dart and individual liability claim against Defendant Deputy Dalibor Jevtic.[1]

In this brief, Plaintiffs show: (1) Plaintiffs have a protected First Amendment right to peacefully panhandle on the Plaza; (2) there is undisputed evidence that Defendant Jevtic interfered with Plaintiff Pindak's First Amendment rights; and (3) Defendant Dart is subject to *Monell* liability because he failed to implement any policy about citizens' First Amendment rights on Daley Plaza, failed to appropriately train his deputies, and acquiesced in Securitas' removal of panhandlers from Daley Plaza, all of which directly led to the interference with Plaintiffs' legal rights.

---

[1]    Plaintiffs do not seek summary judgment against Defendant Deputy Laverne Nance. Plaintiffs acknowledge that the material facts concerning Nance are disputed. There is strong evidence to support the conclusion that Nance interfered with Plaintiffs' peaceful panhandling in violation of the First Amendment, including (among other things) Plaintiff Pindak's testimony that Nance told him he was "banned" from the Plaza, a video showing Nance was present during an incident in which Securitas guards removed Pindak from the Plaza, and the testimony of Securitas Security Guard Antonio Kelly who stated that he has seen Nance remove panhandlers from the Plaza "at least 25 times." (SOF, ¶ 65.) However, Nance denies that he ever interfered with panhandling. Deciding Nance's liability involves a credibility determination, which cannot be made at this stage. See, *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000) ("Credibility determinations ... are jury functions.")

## II.     FACTUAL BACKGROUND

### A.     Parties

Plaintiffs Kim Pindak, Sam Phillips and Norman Talley are individuals who regularly panhandle in the City of Chicago to help support themselves. Pindak, Phillips and Talley have sought to exercise their right to panhandle on Daley Plaza. (Statement of Facts, ¶ 1.) Pindak typically panhandles by holding out a cup and asking passersby for spare change. (SOF, ¶ 2.) Phillips typically panhandles by holding a sign that reads, "I'm Just Hungry" and holding out a cup. (SOF, ¶ 3.) Talley panhandles by engaging individuals in one-on-one conversations in which he describes his needs and requests a donation. (SOF, ¶ 91.)

Defendant Dalibor Jevtic has been a Cook County sheriff's deputy since 2003. (SOF, ¶ 15.) Throughout his 11-year career as a sheriff's deputy, Jevtic has always worked at Daley Center/Daley Plaza with the exception of one year (mid 2007 – mid 2008) when he served as an instructor at the sheriff's training academy. (*Id*.) From 2005 to 2007, it was Jevtic's primary assignment to work "outside perimeter security" on Daley Plaza. (SOF, ¶ 16.) From 2008 to the present, Jevtic has worked outside on the Plaza "intermittently" as a relief officer, filling in for other deputies when they take breaks, call-in sick, or go on vacations. (*Id.*) Jevtic's other assignment is as a courtroom deputy in the Daley Center. Before becoming a sheriff's deputy, Jevtic worked in private security from 2000 to 2003 for private security contractor Aargus Security. In that capacity, Jevtic regularly worked as part of the private security force that patrols Daley Plaza. (SOF, ¶ 23.)

Defendant Laverne Nance has been a Cook County sheriff's deputy since April 2004. (SOF, ¶ 30.) Throughout his employment as a sheriff's deputy, Defendant Nance has always worked at the Daley Center. (SOF, ¶ 31.) Since 2008, Nance has been assigned to work every

weekday as an outside security officer on Daley Plaza. (*Id*.) Defendant Nance's hours are 8:30 a.m. to 4:30 p.m. Monday through Friday. (SOF, ¶ 33.)

Defendant Thomas J. Dart is the Sheriff of Cook County. Dart is an independently elected constitutional official and is the employer and principal of the Defendant Deputies. *Moy v. Cook County,* 640 N.E.2d 926, 929 (Ill. 1994); 55 ILCS 5/3-6017.

### B.     Daley Plaza

Daley Plaza is a major open-air civic space, located in the heart of the Chicago Loop and situated on the same property as the Daley Center, which houses the State's busiest courthouse. The Plaza contains one of the City's most famous tourist landmarks—the untitled Picasso statue—along with a fountain, an "eternal flame" monument dedicated to those who died in the U.S. armed forces, and lunch tables open for the use of the general public. The Plaza is regularly used for rallies, protests, and various civic and cultural events. Panhandlers are present around the vicinity of Daley Plaza on a "daily basis." (SOF, ¶¶ 35, 55.)

### C.     Defendant Nance and Jevtic's Duties and Role in Policing Daley Plaza

Defendant Deputies Nance and Jevtic are sworn law enforcement officers with arrest powers. (SOF, ¶¶ 18, 57.) Both Nance and Jevtic described their duties when working on Daley Plaza as general public safety. Specifically, Deputy Nance testified that his duties as an outside security officer include: "remov[ing] vehicles that are parked around the building, issu[ing] parking tickets, if necessary, check[ing] the perimeter flowerpots for suspicious activity or suspicious items that may be planted in the potters," and looking out for "suspicious and unwanted activity on the Plaza." (SOF, ¶ 32.) Defendant Nance patrols the perimeter of the Plaza all day throughout his shift. (SOF, ¶ 34.)

Defendant Deputy Jevtic likewise described his duties when working outside perimeter security as ensuring "public safety" on the Plaza. Specifically, he said he has the duty "to do perimeter checks throughout the day and look for any suspicious activity," look for "any vehicles parked that were not authorized to park," and ensure "general public safety of the plaza and around the building." (SOF, ¶ 17.)

### D. Interference with Plaintiffs' First Amendment Rights

There is irrefutable, audio-recorded evidence of Defendant Deputy Dalibor Jevtic interfering with Plaintiff Pindak's First Amendment rights. A May 7, 2012, audio recording depicts Defendant Deputy Jevtic talking with Plaintiff Kim Pindak on Daley Plaza. (SOF, ¶ 19.) Jevtic was in uniform and was working as a perimeter officer on the Plaza. (SOF, ¶ 20.) Pindak said: "Earlier today one of your guys kicked me off and said that I can't panhandle. I just want to know. I can't panhandle here?" Jevtic answered: "Not on the Plaza." (SOF, ¶ 19.) Jevtic told Pindak: "There is no panhandling on the Plaza itself for anyone." (*Id.*) Jevtic further stated: "If you get a peddlers' license permit from city hall then you can peddle in certain areas that they've given restrictions on." (SOF, ¶ 21.) Pindak asked: "But you can't panhandle on the sidewalks of the Plaza either?" Jevtic responded: "No. Not on the Plaza anywhere. Across the street you can." (SOF, ¶ 22.) At the time this conversation took place, Jevtic was in a guard booth located on the northeast corner of Daley Plaza. (SOF, ¶ 20.) Jevtic admits that this audio recording accurately captured his conversation with Pindak. (SOF, ¶ 19.)

There is also significant evidence of additional interference with Plaintiffs' First Amendment rights by Sheriff's deputies. Pindak testified that shortly prior to the audio taped interaction with Jevtic, he spoke to Defendant Deputy Laverne Nance about whether panhandling was permitted on Daley Plaza, and Nance informed Pindak that he was "banned"

from the Plaza. (SOF, ¶ 13.) Private security officer Antonio Kelly, an employee of Securitas, the private security contractor that has a contract to monitor Daley Plaza, testified that he has seen Deputy Nance remove panhandlers from the Plaza "at least 25 times" and has worked with Nance to remove panhandlers in many of those instances. (SOF, ¶ 66, 68.) Likewise, private security officer Deron Truman, also an employee of Securitas, testified that he has seen both Defendant Deputies Nance and Jevtic remove panhandlers from the Plaza. (SOF, ¶ 69.) Truman stated that if a panhandler does not comply with private security guards' direction to leave the Plaza, the sheriff's deputies on the Plaza, including Defendants Nance and Jevtic, "step in" and instruct the panhandler to leave. (SOF, ¶ 70.)

The security officers' testimony about Nance removing panhandlers from the Plaza is further supported by Nance's presence in a video of a September 24, 2010 incident in which Antonio Kelly and Deron Truman tell Pindak that panhandling on the Plaza is prohibited. (SOF, ¶ 84.) In this video, Defendants Truman and Kelly are shown escorting Pindak off the Plaza. Nance asks them: "Is everything OK?" Kelly responds: "He's on his way off the Plaza. Keep walking." Nance says: "Oh, Ok." (SOF, ¶ 85.)

Plaintiff Pindak further testified that he first became aware that sheriff's deputies were banning panhandling from the Plaza in a 2008 or 2009 incident in which he was handcuffed by a sheriff's deputy and was told by a sheriff's sergeant in the lockup in Daley Center to "never to come back" to the Plaza or he would be arrested and taken to Maywood. (SOF, ¶ 10, 11.)

Plaintiff Sam Phillips identified numerous instances in which sheriff's deputies told him that he cannot panhandle on the Plaza but may remain on the corner outside the Plaza as long as he remains behind the planters around the perimeter of the Plaza or by the pole on the corner of Clark and Randolph. (SOF, ¶¶ 4, 6, 7.) Phillips testified that between 10 and 20 times when he

has walked through the Plaza, he has been told that he cannot beg there. (SOF, ¶ 5.) Plaintiff Talley has never been told to leave the Plaza by sheriff's deputies (only by private security guards). But he is afraid to panhandle on the Plaza based on a fear of arrest. (SOF, ¶ 92.)

### E. The Sheriff's Control of Daley Plaza

Under 55 ILCS 5/3-6017, Sheriff Dart is the legal custodian of all state courthouses within Cook County, including the Daley Center. (Sec. 3-6017 states: "The Sheriff ... shall have the custody and care of the courthouse and jail of his or her county.") The evidence in this case supports the conclusion that the Sheriff exercised that authority. (SOF, ¶ 80.)

Ed Carik, Chief of Security for MBRE, the property management company for Daley Center, testified that primary responsibility for security of the Daley Center belongs to the Cook County Sheriff. (SOF, ¶ 79.) ("security of the Daley Center during the day is done by the sheriff. ... the sheriff is in charge of security of the building during the day when I'm there and when most people are there, 25,000 people.") Three Cook County sheriff's deputies are assigned to work outside on Daley Plaza every weekday. (SOF, ¶ 53.) Likewise, each weekday, two marked Cook County sheriff's squad cars are stationed on Daley Plaza—one on the Clark side of the Plaza and one on the Dearborn side of the Plaza. (SOF, ¶ 54.) Cook County sheriff's deputies are sworn law enforcement officers who have broad authority to patrol Daley Plaza, make arrests if they witness or learn of criminal activity on the Plaza, investigate suspected criminal activity, and to make patrols. (SOF, ¶¶ 56 –59.) There is no evidence that Chicago police regularly patrol Daley Plaza. (SOF, ¶ 75.)

Sheriff's deputies share responsibility for certain security functions on the Plaza with guards employed by private security contractor Securitas. For instance, Securitas' security guards and the Defendant sheriff's deputies both perform patrols of Daley Plaza (SOF, ¶ 59); a

sheriff's deputy is assigned to occupy the guard booth with on Daley Plaza with Securitas

security guards on a daily basis (SOF, ¶ 60); and Securitas guards and sheriff's deputies both

monitor the closed circuit television system. (SOF, ¶ 81.)

The evidence suggests that sheriff's deputies typically defer to Securitas guards

concerning regulation of citizen activities on Daley Plaza. For instance, Defendant Deputy Jevtic

testified that when he told Plaintiff Pindak that he could not panhandle on Daley Plaza, he was

"repeating" what one of the security guards in the guard booth was telling him to say. (SOF, ¶

20.) However, sheriff's deputies retain ultimate responsibility to deal with anything perceived as

potential criminal activity on the Plaza, including "aggressive panhandling." (SOF, ¶¶ 65, 40.)

Nance and Jevtic's former supervisor, Sheriff's Sergeant Boyd, put it this way:

Q: Who was ultimately responsible for monitoring citizen activities on Daley
Plaza?

A: It would be the actual security personnel assigned to the building. ... if a
complaint had to do with an arrestable offense, then we would speak with the
citizen. ... If it was anything else to do that didn't involve an actual crime being
committed, then [security] would be the ones that would be helping them.

(SOF, ¶ 65.) Defendant Deputy Nance agreed that he had the responsibility and authority to deal

with aggressive panhandling on the Plaza. (SOF, ¶ 40.) Specifically, Nance testified as follows:

"Q: Whose responsibility is it to watch for aggressive panhandling on the plaza? A: I can. I'm

responsible for anything that's illegally -- a law has been broken." (*Id.*)

Securitas security guards confirmed this arrangement. For instance, Securitas' security

guard Truman stated that if a panhandler does not comply with the private security guards'

direction to leave the Plaza, the sheriff's deputies on the Plaza, including Defendants Nance and

Jevtic, "step in" and instruct the panhandler to leave. (SOF, ¶ 70.) Security guard Truman

testified that any criminal activity on the Plaza is "out of our jurisdiction" and calls for

involvement of the sheriff's deputies. (SOF, ¶ 41.) Deputy Jevtic also testified that when he was working as a private security officer on Daley Plaza, if there were any crime occurring that required the involvement of law enforcement, he would contact the sheriff's deputies working on the Plaza. (SOF, ¶ 42.)

### F. The Sheriff's Policies

Sheriff Dart designated First Assistant Deputy Chief Kevin Connolly as its 30(b)(6) witness concerning the sheriff department's policies and training. (SOF, ¶ 43–44.) Connolly stated that the Sheriff has no policies concerning whether panhandling is allowed on Daley Plaza. (SOF, ¶ 49.) Deputy Sheriff Jevtic agreed that the Sheriff had no policy about panhandling on the Plaza. (SOF, ¶ 49.) Deputy Chief Connolly also stated that the Sheriff has no policies concerning the meaning of a "public forum" (SOF, ¶ 50) and "no policies, written or unwritten, concerning the permissibility of any First Amendment activities on Daley Plaza." (SOF, ¶ 47.)

### G. The Defendant Deputies' Understanding of the Policy on Panhandling

Defendant Jevtic testified that it was his understanding that "the building" sets policy about panhandling on Daley Plaza. (SOF, ¶ 25.) His understanding was that panhandling was not permitted on Daley Plaza or the surrounding sidewalks. (SOF, ¶ 25.) ("Q: So was it your understanding at the time that you had this conversation with Kim Pindak that panhandling was not permitted anywhere on the plaza, right? A: Correct, correct. Yes. Q: And it was also your understanding that panhandling was not permitted on the sidewalks directly abutting the plaza. A. Yes.") Defendant Jevtic testified that he believes a panhandler must obtain a "permit or license from the Mayor's Office or City Hall" before panhandling on the public way. (SOF, ¶ 29.) Defendant Nance believed panhandling was legal, but didn't know whether a license was required to engage in peaceful panhandling on the Plaza or elsewhere. (SOF, ¶ 36.)

8

### H.    The Sheriff's Training of Deputies

Everyone affiliated with the Sheriff who testified in this case agreed that sheriff's deputies working on Daley Plaza receive no training whatsoever about whether panhandling is legal. (SOF, ¶¶ 52; 72–74.) Deputy Chief Connolly testified that deputies do not even receive any training about the permissibility of expressive activities on the Plaza. (SOF, ¶ 51.)

Even following the sheriff's department's becoming aware of the audio recording of Defendant Deputy Jevtic telling Plaintiff Pindak that panhandling is not allowed on the Plaza, no one has ever instructed Jevtic that panhandling is in fact allowed on the Plaza. (SOF, ¶ 26.) Likewise, Jevtic has never been warned or disciplined for the incident involving Pindak; nor has anyone even told him that his statement that panhandling is not allowed on Daley Plaza was wrong. (SOF, ¶¶ 27–28.) Nance likewise testified that none of his supervisors ever talked to him about whether panhandling is permitted on the Plaza. (SOF, ¶ 46.)

In addition, Defendant-Deputies Nance and Jevtic have received no training on the legal meaning of "aggressive panhandling." (SOF, ¶ 37.) Jevtic has never seen the City of Chicago's aggressive panhandling ordinance. (SOF, ¶ 39.) Nance has only seen the aggressive panhandling ordinance because he conducted his own independent research into the matter. (SOF, ¶ 38.)

## III.    ARGUMENT

Plaintiffs have brought two counts against the County defendants: (1) violation of the individual Plaintiffs' First Amendment rights by Defendant Deputies Jevtic and Nance; and (2) *Monell* liability against Sheriff Tom Dart because the Sheriff's official policies were the moving cause behind those violations. For the reasons explained below, Plaintiffs are entitled to summary judgment against Defendants Jevtic and Dart. Plaintiffs first set forth the law applicable to the First Amendment right to engage in peaceful panhandling on a public forum.

Next, Plaintiffs discuss the individual Defendants' interference with Plaintiffs' rights. And finally, Plaintiffs discuss why Sheriff Dart is liable pursuant to *Monell*.

### A. Plaintiffs Have a Protected First Amendment Right to Engage in Peaceful Panhandling on a Public Forum

#### 1. Panhandling is Protected Speech

Courts have routinely recognized that panhandling is speech protected under the First Amendment. See, e.g., *Gresham v. Peterson*, 225 F.3d 899, 904 (7th Cir. 2000) ("While some communities might wish all solicitors, beggars and advocates of various causes be vanished from the streets, the First Amendment guarantees their right to be there, deliver their pitch and ask for support."); *ACLU of Nevada v. Las Vegas*, 466 F.3d 784, 792 (9th Cir. 2006) ("It is beyond dispute that solicitation is a form of expression entitled to the same constitutional protections as traditional speech."); *Smith v. Fort Lauderdale*, 177 F.3d 954, 956 (11th Cir. 1999) ("[L]ike other charitable solicitation, begging is speech entitled to First Amendment protection."); *Loper v. New York City Police Dep't*, 999 F.2d 699, 704 (2d Cir. 1993) ("It cannot be gainsaid that begging implicates expressive conduct or communicative activity.")

#### 2. Daley Plaza is a Traditional Public Forum

Under the First Amendment's forum-based approach, restrictions on speech are subject to the highest scrutiny when they regulate speech on traditional public forums, such as public sidewalks, parks or public plazas. *Hague v. CIO*, 307 U.S. 496, 515 (1939) (Public streets and parks have "immemorially been held in trust for the use of the public.") Here, there is no question that Daley Plaza is a traditional public forum on which speech activities are entitled to the highest degree of protection. See, *Grutzmacher v. Public Bldg. Com'n of Chicago*, 700 F. Supp. 1497, 1500 (N.D.Ill. 1988) ("The Plaza has always been and obviously was intended to be a superior type of traditional public forum within the meaning of First Amendment

10

jurisprudence.") Accordingly, interference with peaceful panhandling on the Plaza runs afoul of the First Amendment.

### B. Defendant Jevtic Violated Plaintiff Pindak's First Amendment Rights

The May 7, 2012 audio recording described above depicts Defendant Deputy Jevtic telling Plaintiff Pindak in no uncertain terms that panhandling is prohibited on Daley Plaza. Jevtic says there is "no panhandling on the Plaza itself for anyone" and states that the prohibition includes the public sidewalks around the Plaza. (SOF, ¶ 19.) At the time of this incident, Jevtic was on duty, in uniform, and was occupying the guard shack on the Plaza. (SOF, ¶ 20.) As a result of this interaction with Jevtic (and previous similar incidents in which both sheriff's deputies and private security guards told him panhandling was prohibited), Plaintiff Pindak believed that panhandling on Daley Plaza could subject him to arrest or other criminal penalties. (SOF, ¶ 88, 89.) Thus, Pindak did not feel free to exercise his First Amendment protected right to peacefully panhandle on the Plaza.[2]

It is well established in First Amendment jurisprudence that a plaintiff can challenge a law or government action that has a "chilling effect" on his or her exercise of protected First Amendment rights. Plaintiffs must show only "an actual and well-founded fear" of injury resulting from the exercise of their First Amendment rights to state an actionable claim. *Vt. Right*

---

[2]    The evidence here suggests that Defendant Jevtic's actions on May 7, 2012 were not an isolated incident, but rather were consistent with a long-established practice of sheriff's department employees interfering with panhandlers' legal rights. Private security guards who regularly work on the Plaza testified that they have seen sheriff's deputies removing panhandlers from the Plaza dozens of times. (SOF, ¶¶ 66, 69.) Pindak came to the Plaza with an audio recording device on May 7 because earlier that same day, Defendant-Deputy Nance told him that he was "banned" from the Plaza. (SOF, ¶ 13.) Pindak initially became interested in bringing a lawsuit to protect his legal right to peacefully panhandle on Daley Plaza because of a 2008 or 2009 incident in which a sheriff's sergeant (believed to be Sergeant Thomas Boyd) told him that panhandling on the Plaza would subject him to arrest and transport to Maywood. (SOF, ¶ 10–12.) Defendants dispute that they ever interfered with peaceful panhandling outside of the audio recorded incident, and thus these additional incidents are not the subject of this motion for summary judgment.

*to Life Comm. v. Sorrell,* 221 F.3d 376, 382 (2d Cir. 2000) (quoting *Virginia v. Am. Booksellers Ass'n,* 484 U.S. 383, 393 (1988)). Put another way, an unconstitutional "chilling effect" occurs when government actions or regulations discourage expression protected by the First Amendment by placing people in fear that exercise of their First Amendment rights will result in some harm. *Hodgkins v. Peterson*, 355 F.3d 1048, 1056 (7th Cir. 2004). An arrest is not required for there to be actionable interference with a person's rights. Rather, courts agree that a "realistic threat of arrest is enough to chill First Amendment rights." *Id*. at 1056; *Bell v. Keating*, 697 F.3d 445, 453 (7th Cir. 2012) ("arrest, prosecution, and conviction are tangible harms, and so is abandoning one's constitutional right of free speech in order to avert those harms.")

Based on the undisputed evidence offered in the audio recording and the resulting interference with Plaintiff Pindak's First Amendment rights, Defendant Deputy Jevtic is liable under §1983. But Jevtic is not solely responsible for the constitutional harm. In reality, Deputy Jevtic's hands were tied by a policy and practice of the Sheriff that left him in the dark about the First Amendment rights at stake here. As shown below, Jevtic's interference with Plaintiffs' rights was the direct result of the Sheriff's failure to train him properly and/or give him any guidance as to panhandlers' rights.

### C.     Sheriff Dart is Liable for the Above-Described Violations Pursuant to *Monell*

Under *Monell*, a municipality is not automatically liable for the constitutional torts of its employees unless it can be shown that the municipality's policy was the underlying cause of the violation. *Monell v. Dep't of Social Services*, 435 U.S. 658 (1978). There are at least four ways to establish *Monell* liability under §1983: (1) the defendant had an express policy that, when enforced, causes constitutional deprivations; (2) the defendant had widespread practice that, although not authorized by written law or express policy, is so permanent and well settled as to

constitute a custom or usage within the force of law; (3) plaintiff's constitutional injury was caused by a person with final policymaking authority; or (4) the defendant acted with "deliberate indifference" to the rights of plaintiffs or others by failing to train, discipline and/or supervise its employees. *McCormick v. Chicago*, 230 F. 3d 319, 324 (7th Cir. 2000); *City of Canton v. Harris*, 489 U.S. 378 (1989).

Here, Plaintiffs claim that Sheriff Dart is subject to *Monell* liability in three distinct ways: (1) through deliberate indifference to the legal rights of individuals to panhandle on Daley Plaza, which exhibited itself though the Sheriff's acknowledged and persistent failure to train its guards on the legal rights of individuals to panhandle on the Plaza; (2) through its widespread practice and/or custom of condoning and/or acquiescing in private security guards' interference with individuals' First Amendment rights on the Plaza; and (3) though its conscious and deliberate decision not to set forth a policy pertaining to the legal rights of individuals to panhandle on the Plaza, which amounts to an express policy.

### 1. The Evidence Compels the Conclusion that The Sheriff Displayed Deliberate Indifference to the Rights of Plaintiffs In Two Ways

In *City of Canton v. Harris*, 489 U.S. 378 (1989), the Supreme Court identified two distinct ways a city can display deliberate indifference. First, a municipality is liable when the need to train officers about the constitutional limitations on their actions is "so obvious" that failure to do so amounts to "deliberate indifference." *Id*. at 390. And second, even where the need to train is not obvious from the outset, a municipality can be "deliberately indifferent" if it fails to provide further training after learning of the existence of constitutional violations that it then chooses to ignore. *Id.* at 390 n.10; *Hirsch v. Burke*, 40 F. 3d 900, 904 (7th Cir. 1994) (municipality is liable where "the failure to provide further training was tantamount to a deliberate or conscious decision on the part of the defendants to allow the violations.")

In a situation where the government entity has knowledge, a finding of "deliberate indifference" is derived from the governmental entities' "failure to act in the face of 'actual or constructive notice' that such a failure is likely to result in constitutional deprivations." *Robles v. City of Fort Wayne*, 113 F.3d 732, 735 (7th Cir. 1997).

In the analysis below, Plaintiffs show that under both of these tests, the Sheriff displayed deliberate indifference by failing to train its guards regarding the legal rights of individuals to panhandle on Daley Plaza.

>    a.    **The Sheriff Displayed Deliberate Indifference Towards the Legal Right of Individuals to Panhandle on Daley Plaza Because It Was Obvious that Training Was Needed**

Under the law, a municipality is liable for failure to train its officers when it is "obvious" that training is necessary based on the officers' duties. In *City of Canton*, the Supreme Court observed that the standard of obviousness is met where, "in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *Id.* at 390. The *Canton* Court explained that where there were "recurrent" situations that an employee was "certain to face," then training was required, *id.* at 396, emphasizing that officers must be trained to "respond properly to the usual and recurring situations." *Id.* at 391. See also *Robles*, 113 F.3d at 735 ("the inadequacy of police training may serve as the basis for §1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact.") (quoting *Canton* at 388.)

Here, it was obvious that the sheriff's deputies stationed on Daley Plaza would and did come into contact with individuals who panhandle on a "daily basis." (SOF, ¶ 35, 55.) Given this,

in failing to train deputies on the legal rights of panhandlers, the Sheriff was completely non-responsive to the real-life circumstances that deputies were "certain to face." Here, deputies stationed on Daley Plaza were certain to confront panhandling activity based on at least three factors: the forum itself, the deputies' duties and the Sheriff's legal obligations to control the Plaza.

### i. The Nature of the Forum Guaranteed that Sheriff's Deputies Would Confront Panhandling Activity

The Daley Plaza is one of the busiest open public spaces in the City, attracting over 30,000 pedestrians a day. (SOF, ¶ 86.) In such an open urban space, it was inevitable that panhandlers would be present and seek to exercise their legal rights. The deputies' own testimony confirms this. (SOF, ¶ 55) (stating that panhandlers are on the plaza "every day.") Moreover, given that many citizens perceive panhandlers' speech activities as harassing or offensive, it was a certainty that the speech activities of panhandlers would prompt citizen complaints, raising issues related to panhandlers' legal right to panhandle and the manner in which they are permitted to do so. Therefore it was inevitable that deputies stationed on the Plaza would be forced to address the issue.[3]

The high likelihood that individuals tasked with monitoring the Plaza would be required to interact with panhandlers is further supported by the written policies setting forth the duties of the private security guards who work at the Plaza. As discussed in Plaintiffs' motion for summary judgment regarding the Securitas defendants (Dkt. 217), the Post Orders setting forth the responsibilities of the Securitas guards directly address the issue of panhandling in two separate places—Chapter 10 and Chapter 16. Chapter 10 of the Post Orders explicitly instructs

---

[3]     It was equally likely that individuals who seek to exercise their legal right to panhandle (such as Plaintiff Pindak) would inquire of deputies about any restrictions on their doing so. Indeed, after being told by Defendant Deputy Nance that he was "banned" from the Plaza, Pindak did precisely that—he approached Defendant Deputy Jevtic and asked whether what Nance said was correct. (SOF, ¶ 19–22.)

the officers assigned on the Plaza to "remove any panhandlers." Chapter 16 of the Post Orders, titled "Dealing with and Handling Undesirables," defines panhandlers as "disruptive," "undesirable," and "suspicious" and instructs guards to "inform the subject to leave the property" if such a person is observed on the Plaza. (SOF, ¶ 90.) It simply would not make sense for the Post Orders to identify this as a particular duty of the private security guards if the issue of panhandling were not a matter of obvious concern on the Plaza.

ii.     **The Very Performance of the Deputies' Duties Guaranteed That They Would Interact With Panhandlers**

Three uniformed sheriff's deputies and two marked sheriff's squad cars are assigned to the Plaza every weekday. (SOF, ¶¶ 53–54.) Deputies assigned to work on the Plaza testified that they had the duty to patrol the Plaza, look for any suspicious activity, enforce the law if they witness any violations, and perform general security functions. (SOF, ¶¶17; 56–59.) The audio evidence confirms that deputies working on the Plaza enforce what they believe to be lawful restrictions on panhandling, and Defendant Nance admits that the responsibility for watching out for aggressive panhandling falls to the sheriffs. (SOF, ¶ 40.) ("Q. Whose responsibility is it to watch for aggressive panhandling on the plaza? A: I can. I'm responsible for anything that's illegally -- a law has been broken.") The testimony of security guards Truman and Kelly confirms that deputies regularly engage in regulation of panhandling on the Plaza. (SOF, ¶¶ 66, 69, 70) (testifying that they have witnessed Nance and Jevtic removing panhandlers from the Plaza.) Moreover, Kelly testified that of the 25 times that he has witnessed Defendant Deputy Nance removing panhandlers from the Plaza, he was actively working with Nance to remove the panhandler in about half of the instances. (SOF, ¶ 68.)

Yet, despite these realities, the Sheriff chose not to provide deputies working on the Plaza

with any training or policies about whether panhandling is lawful. Incredibly, this void in their training put deputies in a position where they felt it was necessary to undertake their own research about the legal restrictions on panhandling. Defendant Nance testified that he "did his own research" on the City of Chicago's municipal panhandling ordinance. (SOF, ¶ 38.) Such self-education led to significant deficiencies in the deputies' understanding of the law concerning panhandling. Although he read the municipal panhandling ordinance, Nance was uncertain whether panhandlers needed to obtain a license to engage in peaceful panhandling (they do not). (SOF, ¶ 36.) Jevtic, meanwhile, understood that the building could and did prohibit panhandling on the Plaza and the adjacent public walkways and thought that panhandlers needed to obtain a permit to engage in peaceful panhandling in "designated areas." (SOF, ¶¶ 21–22, 29.)

### iii. The Sheriff's Department Has Primary Responsibility for the Daley Center and Its Grounds By Law

Under 55 ILCS 5/3-6017, Sheriff Dart is the legal custodian of all state courthouses within Cook County, including the Daley Center. Specifically, Sec. 3-6017 states: "The Sheriff ... shall have the custody and care of the courthouse and jail of his or her county." Courts have interpreted this statute broadly, holding that county sheriffs' statutory responsibility for county courthouses applies not only the courthouses themselves, but also the surrounding grounds and related facilities. *O'Connor v. County of Cook*, 787 N.E. 2d 185, 189 (Ill. App. 1st, 2003) ("The Sheriff [has] exclusive custodial control over ... not only the courthouse and jail, but also the grounds surrounding and belonging to these physical buildings."); citing *Walsh v. Board of Commissioners of Cook County*, 397 Ill. 293, 74 N.E.2d 503 (1947) (sheriff's custodial duties extend over those areas "in and about" the courthouse, including its "grounds.") Along with the sheriff's responsibility for "custody and care" of courthouses and their grounds "comes the authority to issue reasonable rules for maintaining the safety and decorum" of courthouses. *Ryan*

*v. County of DuPage*, 45 F. 3d 1090, 1092 (7th Cir. 1995); citing *Primm v. County of DuPage*,

1993 WL 338762, *4 (N.D.Ill.1993) ("[the Sheriff] may impose reasonable security measures

designed to control access to the building.") Indeed, in enacting ILCS 5/3-6017, it was the

legislature's intention to vest with the county sheriff "the responsibility for the safety and

security of the courthouse." 1912 Ill.Atty. Gen.Op. 254, 255; 1983 Ill.Atty.Gen.Op. 49, 50-51.[4]

Given the above, the Sheriff effectively abdicated its law enforcement responsibility in

opting to not to train its deputies on the legal rights of panhandlers. This was the very situation

identified in *Canton* where training was necessary because encountering panhandlers was

inevitable "in light of the duties assigned to specific officers" and such encounters were sure to

be "recurrent." *Canton* at 390, 396; see also *Connick v. Thompson*, 131 S. Ct. 1350 (2011) (given

the "known frequency" with which officers would encounter a given situation "a city's decision

not to train ... could reflect the city's deliberate indifference to the highly predictable

consequence—namely, violations of constitutional rights."); *Board of County Commissioners v.

Brown*, 520 U.S. 397, 409 (1997) ("The likelihood that the situation will recur and the

predictability that an officer lacking specific tools to handle that situation will violate citizens'

rights could justify a finding that policymakers' decision not to train the officer reflected

deliberate indifference to the obvious consequence of the policymakers' choice.")

---

[4]     At times in this lawsuit, the Sheriff has tried to claim that it does not bear primary responsibility
for policing Daley Plaza. The Sheriff attempts to foist responsibility for the security of the Plaza onto the
Chicago Police Department. See, *i.e.* Ex. 6, Dep of Connolly, p. 13 ("the Chicago Police Department, [is]
inherently charged with the overall security of public areas within the City.") This argument, however, is
belied by the testimony of witnesses in this case who regularly work at Daley Center, all of whom agreed
that Chicago police do not regularly patrol Daley Plaza. For instance, Sheriff's Sergeant Boyd, who was
one of Defendant Nance and Jevtic's supervisors, testified that in his experience Chicago police did not
"regularly" patrol Daley Plaza. (SOF, ¶ 74.) MBRE's 30(b)(6) witness Ed Carik also testified that
Chicago police are not assigned to patrol Daley Plaza. *Id*. This meant that the Sheriff was the only
policing agency to be on the plaza in any consistent manner.

**b.    The Sheriff Was Deliberately Indifferent Towards the Legal Right of Individuals Who Panhandle On Daley Plaza Because It Had Full Knowledge That Failure to Train Deputies Resulted In Constitutional Violations But Chose Not To Respond to the Problem**

The second way a governmental entity can display deliberate indifference is by having knowledge of a problem and displaying complete inaction in response to it. See *Canton*, 489 U.S. at 396 (O'Connor, J., concurring in part and dissenting in part) ("Where a 1983 plaintiff can establish that the facts available to city policymakers put them on actual or constructive notice that the particular omission is substantially certain to result in the violation of the constitutional rights of their citizens, the dictates of *Monell* are satisfied.") This is exactly what occurred here.

Since at least the initial filing of this lawsuit in 2010, the Sheriff has had knowledge that its failure to train and/or guide its deputies regarding the legal rights of panhandlers on Daley Plaza has resulted in ongoing violations of citizens' constitutional rights. But despite this knowledge, the Sheriff has displayed complete indifference to the consequences of its policy, failing to take any steps to correct the problem. There is no evidence that it has enacted a policy; provided training; or even communicated with the deputies in question about their actions. (SOF, ¶ 46, 52) (stating that no one has talked to Nance or Jevtic about whether panhandling is lawful.)

In the analysis below, Plaintiffs lay out the two ways that the Sheriff had notice and knowledge of the constitutional harms that were a direct result of their failure to train its officers. Plaintiffs then show that the Sheriff failed to respond in any manner to this knowledge and that such inaction amounted to deliberate indifference. Plaintiffs show that the inaction here can be attributed to the Sheriff's desire to rid the Plaza of panhandlers without taking responsibility for doing so. And finally, Plaintiffs demonstrate that the Sheriff's inaction was the moving cause behind the violations of Plaintiffs' rights.

i. **Plaintiffs' Lawsuit and the Testimony of Witnesses Therein Put the Sheriff On Notice of the Defects In Its Training and Policies**

(a) **The Lawsuit**

On September 29, 2010, Plaintiff filed a lawsuit that gave the Sheriff notice that deputies were unconstitutionally interfering with people's right to peacefully panhandle on the Plaza. Plaintiff's initial complaint alleged (1) that "[o]ver the course of the last two years, Plaintiff has routinely been ordered by Cook County Sheriffs off the grounds of Daley Plaza for the act of peaceful panhandling," Dkt. No. 1, "Complaint" at ¶10; (2) the Sheriff "has failed to adequately train its police officers to protect the legal rights of panhandlers," *id*. at ¶ 14; and (3) that "[a]s a direct result ... Plaintiff Pindak is in fear of arrest and deterred from exercising his Constitutionally-protected free speech rights." *Id.* at ¶ 19.

On February 1, 2012, Plaintiffs deposed the Sheriff's Rule 30(b)(6) witness Kevin Connolly, who testified that he understood the nature of the Plaintiffs' allegations to be "that the Sheriff's Department is being accused of stopping someone from panhandling in the Daley Plaza, and there was a videotape of Sheriff's Department personnel stopping the plaintiff from panhandling within Daley Plaza." (SOF, ¶ 45.)

On May 24, 2012, Plaintiffs filed their Third Amendment Complaint, in which Plaintiffs added more detailed factual allegations, specifically identifying dates and times when sheriff's deputies told Plaintiff Pindak he could not panhandle on the Plaza. In particular, the Third Amended Complaint sets forth that on the morning of May 7, 2012 at 10:30 a.m. one of the deputies told Plaintiff Pindak that he could not panhandle on the Plaza and that he was "banned" from it. Dkt. No. 61, at ¶¶16–17. Then, later that same afternoon, another sheriff's deputy stationed in a booth on the Plaza told Plaintiff Pindak that no one is permitted to panhandle on

the Plaza and identified his boss as "Tom Dart." *Id*. at ¶¶21-22. Photographs of the deputies in question (Nance and Jevtic) were attached to Plaintiffs' motion for leave to file the Third Amended Complaint on May 21, 2012. See, Dkt. No. 58-2.

### (b)     The Testimony of Witnesses

It is not just the filing of the lawsuit that gave the Sheriff knowledge of the defects in their training and policy. The testimony of the witnesses also made clear the extent of the problem. Securitas' guard Antonio Kelly testified that he had seen Defendant Deputy Nance remove panhandlers from Daley Plaza "at least 25 times." (SOF, ¶ 66.) Similarly, Securitas' guard Deron Truman testified that he has seen sheriff's deputies, including Nance and Jevtic, remove panhandlers on numerous occasions. (SOF, ¶ 69–70.) In addition, the undisputed testimony of the Securitas defendants establishes that Securitas guards regularly removed people from the Plaza for panhandling and that sheriff's deputies knew of the practice and did nothing to stop it. Deputy Jevtic testified that he understood it to be building policy to ban panhandling on the Plaza for more than 13 years, and when he encountered Plaintiff Pindak, he deferred to the Securitas guards who told him that panhandling was still prohibited. (SOF, ¶ 20, 24.) This testimony gave the Sheriff ample knowledge of two problems associated with its lack of training: (1) that its own deputies had a misapprehension of the law and were interfering with the rights of individuals to panhandle; and (2) that Securitas guards were routinely and unlawfully removing panhandlers from the Plaza and had been for at least 13 years and that sheriff's deputies did nothing to stop the practice.[5]

---

[5]      Of course, even without this lawsuit or the above-described testimony, the reality is that the Sheriff knew full well that Securitas was banning panhandlers from the Plaza. This is confirmed most directly by the testimony of Deputy Jevtic, who said that his understanding was that building policy was always to ban panhandling since he worked for Aargus in 2000. (SOF, ¶ 24–25). It would have been impossible for the Sheriff not to know of private security's policies, based on the relationship between the two entities. That is because the two entities in many respects worked side-by-side: they sit in the same

### ii. The Sheriff Displayed Deliberate Indifference Through Its Complete Inaction In the Face of Its Knowledge of the Ongoing Violations

In response to this knowledge, the Sheriff did nothing—it did not enact a policy; provide training; or bother to tell the deputies who work on the Plaza that panhandling is in fact lawful. The Sheriff exhibited nothing but inaction in the face of the evidence that its training and policies were leading to violations of citizens' constitutional rights. This is confirmed by the testimony of the witnesses and the absence of written evidence to the contrary. Concerning any change in its training practices or written policies, the Sheriff has provided no documents that suggest the implementation of any changes. (The Defendants would have been obligated to produce such documents, if they existed, pursuant to their discovery obligations under Rule 26(e)).

Further, concerning the deputies' testimony, both deputies testified that no one even talked to them about this lawsuit and/or whether panhandling was allowed. (SOF, ¶ 26–28, 46.) The lack of communication here is particularly telling because both Nance and Jevtic exhibited misunderstandings of the law in their deposition testimony. Jevtic's understanding is that a panhandler must obtain "a permit or a license from the Mayor's Office or City Hall if you solicit in the City public ways." (SOF, ¶ 29.) Jevtic also thought panhandling was prohibited on the Plaza and the surrounding sidewalks. (SOF, ¶ 25.) Nance was uncertain whether a permit was required. (SOF, ¶ 36.) Such failure to speak to the deputies, discipline them or even bother to correct their misunderstandings of the law is revealing, since it suggests a custom by the Sheriff of endorsing the unconstitutional conduct exhibited by their actions and testimony.[6]

---

private booth on the Plaza (SOF, ¶ 60); they undertake patrols together (SOF, ¶ 59); they monitor in the video control room together (SOF, ¶ 81); indeed, they remove panhandlers together (SOF, ¶ 68).

[6]      In some cases, liability will attach even when the Defendant entity responds to notice of a constitutional violation but where that response proves to be inadequate. See *Phipps v. Sheriff of Cook*

Under the law, the Sheriff's inaction constitutes deliberate indifference.[7] As the Seventh Circuit has explained, "If the County is 'faced with actual or constructive knowledge that its agents will probably violate constitutional rights, [it] may not adopt a policy of inaction.'" *King v. Kramer*, 680 F.3d 1013, 1021 (7th Cir. 2012) (quoting *Warren v. District of Columbia*, 353 F.3d 36, 39, 359 U.S. App. D.C. 179 (D.C. Cir. 2004)); see also *T.E. v. Grindle*, 599 F.3d 583, 590 (7th Cir. 2010) (affirming denial of summary judgment for school principal who failed to take action in response to complaints indicating teacher was sexually abusing students). Here, the fact that the Sheriff has known for at least four years that its deputies were violating panhandlers' legal rights and has chosen to do nothing establishes deliberate indifference. *Armstrong v. Squadrito*, 152 F. 3d 564, 577 (7th Cir. 1998) (when "extended opportunities to do better are teamed with protracted failure even to care, indifference is truly shocking.")

---

*County*, 681 F. Supp. 2d 899, 918-919 (N.D. Ill. 2009). But here, there was no effort, not even a half-hearted effort, to address the violations caused by the Sheriff's inadequate policies.

[7] Although the applicable standard in this case is "deliberate indifference" (*Bryan Cty. v. Brown*, 520 U.S. 397, 407 (1997)) it nonetheless bears noting that the Sheriff's inaction may be said to go beyond deliberate indifference to meet the higher threshold necessary to establish "willful blindness." Deliberate indifference is derived from a governmental entities' "failure to act in the face of 'actual or constructive notice.'" *Robles*, 113 F.3d at 735. "Constructive knowledge" occurs where a person or entity "should have known" something. *Fish v. Greatbanc Trust Co.*, 749 F.3d 671, 684 (7th Cir. 2014). By contrast, "a willfully blind defendant is one who takes deliberate actions to avoid confirming a high probability of wrongdoing and who can almost be said to have actually known the critical facts." *Global-Tech Appliances, Inc. v. SEB S.A.*, 131 S. Ct. 2060, 2070-71, 179 L. Ed. 2d 1167, 1177 (2011). Here, the testimony shows that the Sheriff "'deliberately avoided acquiring knowledge ... by cutting off his curiosity through an effort of the will.'" *U.S. v. Salinas*, 763 F.3d 869, 880 (7th Cir. 2014). For example, the Sheriff chose to simply ignore the fact that Securitas guard Kelly testified that he removed panhandlers from the Plaza with Defendant Nance. (SOF, ¶ 68.) In response to this testimony, the Sheriff never bothered to even talk to the deputies or investigate the matter. (SOF, ¶¶ 46, 52.) Further evidence of the Sheriff's willful blindness can be found in the false representations made to the Court in this case. In the Sheriff's second Motion to Dismiss (Dkt. 100), the Sheriff's counsel represented to the Court as follows: "the Sheriff's department does not patrol the Plaza" (Dkt. 100, p. 2) a misrepresentation that was directly contradicted by the Defendant Deputies in their sworn testimony. (SOF, ¶ 34) ("Q. So from pretty much the time that you report to work at 8:30 till 4:30 you are patrolling around the perimeter of the plaza. A. That is correct.") This failure to even investigate the accuracy of Plaintiff's allegations equates with a deliberate avoidance of acquiring knowledge.

Moreover, training the guards properly was a relatively easy fix. The fact is that there were only a few guards who worked outside on Daley Plaza, and they only needed simple guidance about the law on panhandling. In such a situation, it has been said that the ease of correction and the failure to undertake it can be revealing of deliberate indifference. See *Belbachir v. County of McHenry*, 726 F.3d 975 (7th Cir. 2013) ("[W]hen an adverse consequence is very great, the failure to take a simple, inexpensive, obvious, and indeed prescribed measure to avert it is inexcusable," adding "[I]f the danger (known to a defendant) can be averted at slight cost, the failure to try to avert it is willful.") *Id*. at 981-982.

Because the Sheriff has failed to do anything, the obvious risks associated with the Sheriff's lack of training and guidance on the legal right to panhandle in Daley Plaza continue to this very day: (1) deputies are left to their own devices to determine what to do about panhandlers in the Plaza, which has resulted in deputies' misunderstanding the law and interfering with panhandlers' legal rights; and (2) deputies bury their heads in the sand concerning the actions of the private security guards on the Plaza who have been directed by their employer to "remove any panhandlers." (SOF, ¶ 90.)

### c. The Sheriffs' Actions Here Can Be Explained By Their Desire To Place Responsibility On The Private Security Company

So the obvious question is why—why has the Sheriff engaged in systemic, long-standing inaction here? Perhaps the failure can simply be ascribed to incompetence or lack of oversight, but the better answer is that the policy is a deliberate effort to pass off responsibility for getting rid of panhandlers to the private security company that patrols Daley Plaza, which is presently Securitas. Here's the problem: the Sheriff seeks to keep Daley Plaza free of what they deem to be unsightly people—vagrants, panhandlers and solicitors. But panhandling is constitutionally protected speech, and the Sheriff is not legally permitted to remove panhandlers or to chill their

protected speech. What to do? The answer, it seems, has been to let others do the dirty work. In this case, the Sheriff has passed the buck to the private security company Securitas. This solved a problem for the Sheriff: it could get rid of panhandlers and disclaim responsibility for doing so.[8]

The pieces certainly fit neatly together to support such a claim: On the one hand, as the 30(b)(6) testimony of Deputy Chief Kevin Connolly makes clear, the Sheriff has disclaimed responsibility for anything related to panhandling on the Plaza. (See SOF ¶¶ 47–49.) On the other hand, Securitas, the private security contractor working the Plaza, has specifically been designated the responsibility to regulate panhandling on the Plaza. (SOF, ¶ 90.) In other words, the void created by the Sheriff's lack of training was filled by Securitas' designated duties. In particular, the evidence shows that Securitas and other private contractors have banned panhandling on the Plaza for at least 13 years. (SOF, ¶ 25.) Further, the evidence shows that Securitas and other private contractors were specifically delegated by contract the authority to "remove any panhandlers, sleeping vagrants and unauthorized solicitors" from the Plaza. (SOF, ¶ 90.) This basic arrangement was confirmed by the testimony of Sergeant Thomas Boyd, who was a supervising sergeant at Daley Plaza from 2003–2012. (SOF, ¶ 63.) He indicated that it was the practice of the sheriff's deputies to focus on arrests, leaving everything else in the hands of Securitas. (SOF, ¶ 65.) Tee Coleman also confirmed this testimony. He emphasized that, although private security guards do not have the authority to make arrests, Securitas and its

---

[8]      Of course, it is not outlandish that the Sheriff would desire not to have panhandlers in the Plaza. Daley Plaza is in the heart of the Loop; it is filled with beautiful public art (*e.g.,* the fountain and the Picasso); it is truly one of the great open spaces in the City. See *Berger v. Battaglia*, 779 F.2d 992, 1001 (4th Cir. 1985) ("Government's instinctive and understandable impulse to buy its peace to avoid all risks of public disorder by chilling speech assertedly or demonstrably offensive to some elements of the public is a recurring theme in first amendment litigation.") Daley Center also happens to be the location of the offices of the Sheriff.

forerunners have had a policy of confronting what they deem to be "aggressive panhandlers" since before he began working there in 2006. (SOF, ¶ 91.)

From both a liability and political standpoint, this arrangement made good sense. For by keeping their guards untrained and by failing to set forth any policy related to the legal right to panhandle on Daley Plaza, the Sheriff could evade liability while still achieving its unstated goal of keeping the Plaza free of panhandlers. If it had promulgated a policy to rid the Plaza of panhandlers it would subject itself to *Monell* liability for having an express unconstitutional policy; but if it had properly trained its guards on the legal rights of panhandlers and/or enunciated a policy on the matter, it would have been acting at odds with its unspoken objective. The intentional ignorance created by the Sheriff allowed for a sort of innocent violence. That is, the Sheriffs could have another entity do the work and, if exposed, could say, "It's not our responsibility."[9]

Scholarly literature suggests that one of the risks of privatization is that, as here, it can be used to "allow[] the government to deny knowledge of any wrongdoing if the misconduct is made public." See Richard Frankel, *Regulating Privatized Government Through §1983*, 76 The University of Chicago Law Review 1449, 1500 (2009). Indeed, Professor Frankel warns that public agencies can become dependent on private contractors to do what they cannot do, subjecting themselves to a form of capture. *Id.* at 1501 ("[G]overnment agencies may be prone to

_____

[9]     The arrangement on the Plaza worked in no small part thanks to what might be called "the threat value of arrest." That is, private security guards threatened individuals who were peacefully panhandling with arrest or told them that their conduct was "illegal." In actuality, the private security guards did not (and do not) possess arrest powers or the ability to make legal determinations, but Plaintiffs did not know this. Fearing arrest, Plaintiffs stopped their activities and left the Plaza, oftentimes never to come back. (SOF, ¶ 92.) Indeed, Securitas' 30(b)(6) witness Tee Coleman admitted that private citizens on the Plaza "always appear to think that a security officer has the same power as a police officer." (Ex. 8, Dep of Coleman II, p. 38.) It turns out that an unenforceable threat by security guards untrained in the law is an effective way to intimidate individuals from engaging in activity that certain authorities want to prevent (lawful though it may be). It amounts to a law enforcement con game.

a contracting form of agency capture.")[10]

Of course, it was and is improper for the Sheriff to "shuck off" its responsibilities and vest state power in private hands. As the Seventh Circuit recently explained in *Petkus v. Richland County*, 767 F.3d 647 (7th Cir. 2014), that which a government agency cannot do lawfully itself, it cannot authorize private persons to do in its stead. *Petkus*, 767 F.3d at 652 ("Police cannot hire the Hell's Angels to conduct highway patrol and, though failing to train or supervise them, shuck off responsibility when one of the Angels beats a speeder into a bloody pulp with a tire iron.") citing *Blum v. Yaretsky*, 457 U.S. 991, 1003–05 (1982).

### d. The Sheriff Had an Unconstitutional Widespread Practice of Condoning Private Security Guards' Interference with Peaceful Panhandling

Courts have explained that an entity is liable for its employees' unconstitutional acts under *Monell* if those acts were consistent with a widespread custom or practice "so permanent and well settled as to constitute a custom or usage with the force of law." *McTigue v. Chicago*, 60 F.3d 381, 382 (7th Cir. 1995). Here, there was a longstanding and well-established custom and/or practice of Sheriff's deputies to defer to and/or condone and/or acquiesce in the practice by the private security contractors' on Daley Plaza of removing panhandlers from the Plaza. This is not a situation where there was a single instance of one poorly trained sheriff's deputy who acted badly. No, this is a situation where the Sheriff's practice, policy and culture was to defer to

---

[10] Professor Frankel's article offers various reasons why an agency like the Sheriff might seek to shuck off this responsibility to a private contractor here. One is to avoid "adverse political consequences." *Id.* 1492-93 ("Public officials ultimately are answerable to their constituents, and ... government violations of civil and constitutional rights can have adverse political consequences that elected officials would rather avoid."). A second is because it is more difficult to monitor the activities of a private contractor than a public agency due to the nature of FOIA laws and the difficulty of obtaining information related to the activities of a private contractor as compared to a public agency. *Id.* at 1493 ("[T]he reputations of private entities that perform public functions are better insulated from public scrutiny than the reputations of government actors.")

and acquiescence in the actions of the private security guards to "remove any panhandlers" from Daley Plaza. (SOF, ¶ 90.)

Here, private security contractors have been removing panhandlers from the Plaza right under the nose of the Sheriff and its deputies for over a decade. Defendant Deputy Jevtic, who has worked on the Plaza as both a private security guard and as a sheriff's deputy, knew that private contractors have prohibited panhandling on Daley Plaza since 2000 or earlier. (SOF, ¶ 25.) Deputy Jevtic's own actions reveal that it was the Sherriff's practice to defer to the authority of the private security guards on the Plaza as concerns the ability of individuals to panhandler there. When Defendant Deputy Jevtic told Plaintiff Pindak that he could not panhandle on Daley Plaza, he testified that he was just "repeating" what one of the security guards in the guard booth was telling him to say. (SOF, ¶ 20.)

Moreover, the evidence shows that Securitas and other private contractors were specifically delegated by contract the authority to "remove any panhandlers, sleeping vagrants and unauthorized solicitors" from the Plaza. (SOF, ¶ 90.) Significantly, in its Summary Judgment motion in this case, the Sheriff admits it deferred to the authority of the private security guards on the Plaza and did not "infringe on [those] responsibilities." See Dkt. #233 at 6 ("The primary responsibility for monitoring activity and events on Daley Plaza, aside from situations that the arrest of an individual for a violation of state law, is with the private security personnel," further admitting that it does not "infringe on the responsibilities of...[the] private security guards (i.e., Securitas).")

In terms of the Sheriff's actual knowledge about the private security company's practice of removing "any" panhandlers from the Plaza, it must be said that, even apart from the aforementioned admissions made by Deputy Jevtic of such knowledge, it would constitute a

titanic surrender to the implausible to think that the Sheriff was somehow unaware of the actions of the private security guards on the Plaza. After all, the evidence establishes that private security guards and sheriff's deputies patrol the Plaza together (SOF, ¶ 59); sit in the same private booth together (SOF, ¶ 60); and have removed panhandlers from the Plaza together. (SOF, ¶ 68.)

If there were any doubt possible that the Sheriff did not possess knowledge of the private contractors' practice of removing panhandlers from the Plaza, such doubt certainly evaporated after the institution of this lawsuit in 2010. Indeed, at the outset of the lawsuit, the Sheriff's counsel received video of security guards Truman and Kelly removing Plaintiff Pindak from the Plaza while Defendant Deputy Nance watched. (SOF, ¶¶ 84, 85.) Despite such knowledge, the Sheriff never interfered or intervened with the private security contractors' actions and opted instead as a practice to turn a blind eye and acquiesce in Securitas' guards' removal of panhandlers from the Plaza.[11]

Even if the Sheriff's deputies were not directly involved in removing panhandlers from the Plaza (though the testimony indicates that on many occasions they were), that does not shield the Sheriff from liability under *Monell*. Courts have found that a widespread practice of acquiescence in others' interference with constitutional rights is also a basis for *Monell* liability. See, *Davis v. Monroe County Bd. of Ed.*, 526 U.S. 629 (1999) (school board was liable when it

---

[11]    In *Monell* liability cases, the distinctions between policies, practices and customs are not always neat and tidy; there are significant overlap between and among these categories. See, *e.g.*, *Calhoun v. Ramsey*, 408 F.3d 375, 380 (7th Cir. 2005 ("[W]e think that it is more confusing than useful to distinguish between claims about express policies that fail to address certain issues and claims about widespread practices.")  Having noted this, another way to view the Sheriff's liability here (apart from it being a widespread practice of acquiescence) is as a failure to train deputies to intervene in the unconstitutional actions of the private security guards on the Plaza. It cannot reasonably be said that the sheriff's deputies did not have every opportunity to inform the private security guards of their improper actions in removing panhandlers, for, as noted, the sheriffs and the private guards worked in close proximity on the Plaza, sitting in the same private booth and taking patrols together. In other words, the Sheriff had the authority, knowledge and opportunity to intervene but failed to do so.

failed to act in response to known student-on-student harassment that had the result of "caus[ing] students to undergo harassment or mak[ing] them more vulnerable to it."); *Jones v. City of Chicago*, 856 F.2d 985, 992-93 (7th Cir. 1998) ("Even without direct participation, however, supervisors may be liable if they 'know about the conduct, and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see."); see also *Armstrong*, 152 F.3d at 581 ("a deliberate choice to avoid an obvious danger ... is actionable under 42 U.S.C. § 1983 if the choice results in harm to a protected interest, even though the defendant obtusely lacks actual knowledge of the danger.")

<blockquote>
e.    **The Sheriff's Conscious Decision Not to Have A Policy Concerning the Legal Right To Panhandle on Daily Plaza Amounts to an Unconstitutional Express Policy**
</blockquote>

The Supreme Court has distinguished between a county's "deliberate or conscious choice" not to have a policy, "which can fairly be characterized as a municipal policy, and the city's occasional negligent administration of an otherwise sound program." *Armstrong v. Squadrito*, 152 F.3d 564, 578 (7th Cir. 1998). In *Armstrong*, the court noted that the plaintiff's complaint about a jail's "will call" policy—a policy under which the jail could not identify those detainees without court dates unless the jail checked each individual's file, resulting in detainees being held for far longer than constitutionally permissible—was a complaint about "a nonpolicy—a conscious choice not to have a policy," or a failure to make policy in a situation that demanded policy. *Id.* at 578; *see also Jones v. City of Chicago*, 787 F.2d 200, 204 (7th Cir. 1986) ("In situations that call for procedures, rules or regulations, the failure to make policy itself may be actionable.").

Here, the Sheriff consciously and willfully decided not to have a policy related to the legal rights of individuals to panhandle on Daley Plaza. First Assistant Deputy Chief Kevin

Connolly, designated as Sheriff's 30(b)(6) witness concerning the Sheriff department's policies and training on Daley Plaza, stated that the Sheriff had no policies concerning whether panhandling is allowed on the Plaza. (SOF, ¶ 51.)

The practical effect of the Sheriff's "no-policy policy," coupled with their failure to provide their deputies with any training concerning the legal rights of individuals to panhandle on a public forum, is that it eliminated the ability of the deputy sheriffs on the Plaza to exercise responsible professional judgment. For without a policy, the sheriff deputies had no guidance or direction; and without training, they could not make proper legal determinations or exercise professional judgment, which is by definition "informed." There is a professional obligation to know the law, but the Sheriff made a conscious decision to place its deputies on Daley Plaza without any guidance and/or training relating to the right to panhandle, thereby displaying a total disregard for these individuals' legal rights. The Sheriff's conscious decision to put its guards into the field under these conditions amounted to an express and unconstitutional policy.

   f.    **The Sheriff's Deliberate Indifference, Widespread Practice and Express Policy Were the Moving Causes Behind the Violations of Plaintiffs' Rights**

The final prong of the *Monell* claim is that the entities' official policy was the "moving force" behind the violation of a plaintiff's constitutional rights. *Connick v. Thompson*, 131 S. Ct. 1350, 1368 (2011); *Owen v. City of Independence*, 445 U.S. 622 (1980) (a municipality is liable for damages flowing from constitutional violations that it caused through the execution of its policy or custom because "elemental notions of fairness dictate that one who causes a loss should bear the loss.") Here, the constitutional harms that have occurred were the direct result of the Sheriff's deliberate indifference to panhandlers' legal rights; widespread practice of turning a

31

blind eye to Securitas' interference with panhandlers' rights; and conscious decision not to have any policy relating to the right to panhandle on the Plaza.[12]

First, if one accepts that the very purpose of the Sheriff's lack of training and policy was purposefully to shuck off responsibility for regulating panhandling activity on the Plaza to Securitas (see §III(C)(1)(c) *supra*), then causation is obvious: the ignorance was deliberate and part and parcel of an arrangement to get rid of panhandlers from Daley Plaza.

But even if one choses instead to ascribe the void in training to mere incompetence on the Sheriff's part, the causation requirement is still met. For the obvious consequence of the void in training was to foster ignorance, and such ignorance created the very conditions that led to violations of panhandlers' rights. The Sheriff put its guards in a position where they were completely in the dark regarding panhandlers' legal rights; the Sheriff's policies created an environment where there was no basis for asking the proper questions and/or acting in the proper fashion.

 This case is similar to the situation in *Thomas v. Cook County Sheriff's Dep't*, 604 F.3d 293, 305 (7th Cir. 2009), a case involving a failure to provide necessary medical treatment in Cook County Jail, where it was found that medical technicians could not respond adequately to an inmate's medical needs because of the shortcomings of the County's policies and procedures—shortcomings that reflected deliberate indifference by the County. *Id*. at 305.  As in

---

[12]     The constitutional harm is twofold: there is direct interference with panhandlers' rights and a chilling effect on panhandlers' speech. The Sheriff's failure to institute any policy or give deputies any training has created confusion among the deputies about whether panhandling is allowed and whether a permit is required. (See, SOF, ¶¶ 21, 25, 29.) This confusion results in a lack of notice about what conduct will be prohibited. See *Chicago v. Morales*, 527 U.S. 41, 56 (1999) ("Vagueness may invalidate a criminal law for either of two independent reasons. First, it may fail to provide the kind of notice that will enable ordinary people to understand what conduct it prohibits; second, it may authorize and even encourage arbitrary and discriminatory enforcement.") Here, the lack of notice has served to keep Plaintiffs from feeling free to exercise their rights on the Plaza. (SOF, ¶¶ 87–89.)  Had the Sheriff trained its deputies properly, this confusion would not have occurred.

*Thomas*, so too here. The shortcoming in the Sheriff's policy and procedures here — namely, its failure to train its guards and/or offer its guards any policy guidance—resulted in a misapprehension of the law on the part of the deputies concerning panhandlers' legal rights and led to their removing panhandlers from the Plaza in violation of their legal rights. It also led to the deputy sheriffs condoning and acquiescing in the actions of the private security guards who by contract monitored the Plaza and who were directed to "remove any panhandlers." (SOF, ¶ 90.)

## IV.    CONCLUSION

WHEREFORE, Plaintiffs respectfully request that this Honorable Court enter summary judgment for Plaintiffs and against Defendants Dart and Jevtic.

Respectfully submitted,

/s/ Mark G. Weinberg                    /s/ Adele D. Nicholas

Mark G. Weinberg                       Adele D. Nicholas
3612 N. Tripp Ave.                     4510 N. Paulina St.
Chicago, IL 60641                      Chicago, IL 60640
773-283-3919                           847-361-3869