**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| KIM PINDAK, NORMAN TALLEY and SAM PHILLIPS, | ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | No. 10 C 6237 |
| THOMAS J. DART, Sheriff of Cook County, COOK COUNTY, ILLINOIS; SECURITAS SECURITY SERVICES USA, INC., an Illinois Corporation; and DERON TRUMAN, ANTONIO KELLY, LAVERNE NANCE, and DALIBOR JEVTIC, | ) ) ) ) ) ) ) ) | Judge Rebecca R. Pallmeyer |
| Defendants. | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

This case is a First Amendment challenge to restrictions imposed by private security officers and Cook County Deputy Sheriffs on panhandling activities in Daley Plaza. Plaintiffs Kim Pindak, Norman Talley, and Sam Phillips are three individuals who regularly panhandle to supplement their income and who have attempted to panhandle on Daley Plaza. Plaintiffs allege that Cook County Deputy Sheriffs and private security guards employed by Securitas Services, Inc. have repeatedly interfered with Plaintiffs' constitutional rights by barring them from panhandling on Daley Plaza. They filed this § 1983 suit seeking compensatory and punitive damages; a declaration that Securitas' and the Sheriff's policy of removing panhandlers is unconstitutional; and an injunction barring Defendants from interfering with lawful panhandling on the Plaza. Plaintiffs named Securitas guards Antonio Kelly and Deron Truman (Count II), and Deputy Sheriffs Dalibor Jevtic and Laverne Nance (Count V) as Defendants. Plaintiffs also contend that Securitas, Inc. (Count I) and Thomas Dart, in his official capacity as Cook County Sheriff (Count IV), are liable as entities under *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978), because they have established policies or customs of removing peaceful panhandlers from Daley Plaza. Finally, Plaintiffs assert that, even if Securitas is not

directly liable under *Monell*, it should nonetheless be vicariously liable for the actions of its employees based on a theory of *respondeat superior* (Count III).

The parties have filed cross-motions for summary judgment. Plaintiffs seek summary judgment [217] against Kelly, Truman, and Securitas ("Securitas Defendants"). In a second motion, Plaintiffs move for summary judgment [257] against Deputy Jevtic and Sheriff Dart. Plaintiffs do not seek summary judgment against Deputy Nance.[1]

Defendants also move for summary judgment. Securitas Defendants seek summary judgment [254] on Counts I, II, and III (the only counts pertaining to those Defendants), urging that Securitas Defendants do not act "under color of state law" and are therefore not subject to § 1983 liability. Even if they could be held liable under § 1983, Securitas Defendants contend, Plaintiffs have not identified sufficient evidence showing (1) that Kelly and Truman actually prohibited Plaintiffs from panhandling on the Plaza; or (2) that Securitas had a policy or custom that would create entity liability under *Monell.* Finally, Securitas contends that it may not be held vicariously liable because Seventh Circuit case law precludes a *respondeat superior* theory of liability in § 1983 actions.

As explained in detail below, the court concludes that Securitas guards do act under color of state law when they regulate speech activities on Daley Plaza, a public forum, and that the undisputed evidence establishes that Truman and Kelly interfered with Plaintiffs' attempts to panhandle on the Plaza. Though the court is sympathetic to Plaintiffs' request to hold Securitas vicariously liable for the actions of its employees, it ultimately agrees with Securitas that

---

[1] The parties initially filed motions for summary judgment [217], [222], [228], and [231] in November 2014. After filing those motions, however, the court permitted Plaintiffs to file a seventh amended complaint and allowed the parties to update and re-file their motions for summary judgment in light of the new complaint. (*See* 11/20/2014 Minute Entry [239].) Two motions were replaced based on the seventh amended complaint: Plaintiffs re-filed their motion for summary judgment [257] against Sheriff's Defendants, superseding their initial motion [228] and Securitas Defendants re-filed their motion [254] superseding their initial motion for summary judgment [222]. The earlier motions [222] and [228] are, accordingly, stricken.

*respondeat superior* liability is barred by Seventh Circuit precedent. Plaintiffs may still be able to prevail on their *Monell* claim against Securitas, however, as material disputes of fact remain regarding whether Securitas had a policy or custom of interfering with panhandling on the Plaza. Securitas' motion is accordingly granted with respect to Plaintiffs' *respondeat superior* claim (Count III), but otherwise denied. Plaintiffs' motion against Securitas is granted with respect to Plaintiffs' claims for individual liability (Count II), but denied with respect to its claims for entity liability against Securitas (Counts I and III).

Sheriff Dart and Deputies Nance and Jevtic ("Sheriff's Defendants") also seek summary judgment [231], arguing that Plaintiffs have not identified any evidence (1) that Deputies Nance and Jevtic actually prohibited Plaintiffs from panhandling; or (2) that the Sheriff's Department has a policy or custom sufficient to support *Monell* liability. Sheriff's Defendants also assert that they are entitled to qualified immunity. The Sheriff's Defendants' motion is denied: An audio recording of Deputy Jevtic declaring to Pindak that panhandling is prohibited provides undisputed evidence that Deputy Jevtic interfered with Pindak's rights. Material disputes of fact preclude summary judgment for Deputy Nance or Sheriff Dart, and the court concludes that Sheriff's Defendants are not entitled to qualified immunity. As noted, Plaintiffs have moved for summary judgment against Defendants Jevtic and Dart [257]. That motion is granted with respect to Pindak's claims against Deputy Jevtic (Count V) and denied with respect to Plaintiffs' allegations against Sheriff Dart (Count IV).

## BACKGROUND

### I.    Security at the Daley Center

The Daley Center is a 30-story office building and an iconic landmark in the heart of Chicago. The building houses the Circuit Court of Cook County, among other tenants, and hosts approximately 30,000 visitors each day. (Securitas Defs.' Stmt. of Uncontested Facts [256], hereinafter "Securitas SOF" ¶ 10; Pls.' Resp. to Def. Securitas' L.R. 56.1(a) Stmt. of Facts [261], hereinafter "Pls.' Resp. to Securitas SOF" ¶ 10; Pls.' Stmt. of Add'l Mat. Facts in Resp. to

Sheriff Defs.' Mot. for Summ. J. [269], hereinafter "Pls.' SAF" ¶ 86; Sheriff's Defs.' Resp. to Pls.' Stmt. of Add'l Mat. Facts [274], hereinafter "Sheriff's Resp. to Pls.' SAF" ¶ 86.) It is undisputed that the Plaza is a public forum: It stretches across the block in front of the courthouse; is home to an eternal flame in honor of those who died in the U.S. armed forces, a large Picasso sculpture, a fountain, and outdoor seating; and is a frequent location for political rallies, demonstrations, and various cultural events. (Securitas SOF ¶ 8; Pls.' Resp. to Securitas SOF ¶ 8; Pls.' Mot. for Summ. J. against Securitas, Truman, and Kelly [217], hereinafter "Pls.' Securitas Mem.," 4.)

The building opened in 1966 as the Chicago Civic Center and was renamed ten years later, in honor of the first Mayor Daley, Richard J. Daley. (Securitas SOF ¶ 6; Pls.' Resp. to Securitas SOF ¶ 6.) The Daley Center was built by the Public Building Commission of Chicago ("PBC"), a municipal corporation created pursuant to the Illinois Public Building Commission Act. (Securitas SOF ¶¶ 1–2; Pls.' Resp. to Securitas SOF ¶¶ 1–2); 50 ILCS 20/14. PBC is the legal owner and a tenant of the Daley Center and since 1988 has maintained regulations and procedures for the use of the Daley Center lobby and Plaza. (Securitas SOF ¶¶ 9, 11; Pls.' Resp. to Securitas SOF ¶ 9, 11); *see* 50 ILCS 20/14(a), (f) (delegating to all Public Building Commissions in Illinois the power to "select, locate and designate" buildings for municipal and county use and "to provide rules and regulations for the operation, maintenance and management of" such buildings.). PBC also contracts with MB Real Estate Services, LLC ("MBRE") to manage the Daley Center and Plaza. (Securitas SOF ¶ 15; Pls.' Resp. to Securitas SOF ¶ 15.)

### A. Cook County Sheriff

By state statute, the Cook County Sheriff is responsible for providing security at all Cook County courthouses, and the Sheriff therefore provides security services for the Circuit Court of Cook County within the Daley Center. (Securitas SOF ¶ 13; Pls.' Resp. to Securitas SOF ¶ 13; Sheriff's Resp. to Pls.' SAF ¶¶ 79–80); 55 ILCS 5/3-6017. Two Sheriff's deputies are assigned

to outside posts on Daley Plaza—one on the east side and one on the west—and a third deputy provides lunch relief and fills in when one of the first two is absent.  (Sheriff's Defs.' Am. Stmt. of Mat. Facts [235], hereinafter "Sheriff's SOF" ¶ 21; Pls.' Resp. to Def. Sheriff's Stmt. of Facts [270], hereinafter "Pls.' Resp. to Sheriff's SOF" ¶ 21; Pls.' SAF ¶ 53; Sheriff's Resp. to Pls.' SAF ¶ 53.)  Two marked Cook County Sheriff's squad cars are also stationed at Daley Plaza.[2]  (Pls.' SAF ¶ 54; Sheriff's Resp. to Pls.' SAF ¶ 54.)

Defendants Deputy Laverne Nance and Deputy Dalibor Jevtic are both assigned to the Daley Center.  Deputy Nance has been a Sheriff's Deputy since 2004 and has been assigned to an outside post at Daley Plaza since 2008.  (Sheriff's SOF ¶¶ 77–78; Pls.' Resp. to Sheriff's SOF ¶¶ 77–78.)  Deputy Nance works 8:30 a.m. to 4:30 p.m. Monday through Friday and typically patrols on the west side of the Plaza, near Clark Street.  (Pls.' SAF ¶ 33; Sheriff's Resp. to Pls.' SAF ¶ 33; Dep. of Antonio Kelly, Ex. 7 to Pls.' Securitas Appendix [219-7], hereinafter "Kelly Dep.," 76:13–17; Dep. of Deron Truman, Ex. 8 to Pls.' Securitas Appendix [219-8], hereinafter "Truman Dep.," 21:5–9.)  Before Deputy Jevtic became a Sheriff's Deputy in 2003, he worked as a private security guard on Daley Plaza for Aargus Security Systems, Inc., one of

---

[2]     Relying on the testimony of Kevin Connelly, the Assistant Chief Deputy for the Cook County Sheriff's Department, Sheriff's Defendants assert that the "Sheriff's Department is not responsible for security in Daley Plaza."  (Sheriff's SOF ¶¶ 8–9; Dep. of Kevin Connelly, Ex 6 to Pls.' Sheriff Appendix [230-6], at 13:18–14:1.)  When asked if the Sheriff's Department is responsible for security on Daley Plaza, Connelly answered "No, we are not," explaining that "[t]he City of Chicago, the Chicago Police Department, it's inherently charged with the overall security of public areas within the City of Chicago." (Connelly Dep. at 13:18–14:1.)  Connelly's testimony is inconsistent with the Illinois statute noted in the text above, which vests the Sheriff's Department with responsibility for the Circuit Court of Cook County. The Sheriff's Defendants also acknowledge that three Sheriff's Deputies are assigned to provide security on Daley Plaza.  (Sheriff's SOF ¶ 21.)  Finally, Thomas Boyd, the Sheriff's Sergeant assigned to the Daley Center from 2003 to 2012, testified that the Chicago Police Department has primary enforcement responsibility for organized demonstrations or events on the Plaza (Dep. of Thomas Boyd, Ex. 9 to Pls.' Sheriff Appendix [230-9], at 50:23–51:4), but does not "regularly" patrol Daley Plaza.  (*Id.* at 34:13–16.)  In light of the statute and Sheriff's Defendants' admission, Connelly's testimony does not create a dispute of fact.

Securitas' predecessors.[3]  (Sheriff's Resp. to Pls.' SAF ¶ 23.)  Deputy Jevtic became a Sheriff's Deputy in 2003 and was assigned to an outside post on Daley Plaza from 2005 to 2007.  (Sheriff's SOF ¶ 88; Pls.' Resp. to Sheriff's SOF ¶ 88.)  Since 2008, however, Jevtic has been assigned to a courtroom in the Daley Center and works outside only intermittently when another deputy is sick or on vacation.[4]  (Sheriff's SOF ¶¶ 90–91; Pls.' Resp. to Sheriff's SOF ¶¶ 90–91; Sheriff's Resp. to Pls.' SAF ¶ 16.)  The deputies stationed outside are responsible for conducting perimeter checks, monitoring the flower pots for suspicious items, looking for suspicious activity, removing parked cars, issuing parking tickets, and maintaining general public safety on the Plaza.  (Sheriff's SOF ¶ 89; Pls.' Resp. to Sheriff's SOF ¶ 89.)

**B.  Private security**

In addition to the services provided by the Cook County Sheriff's Department, MBRE and PBC have hired private security to work at the Daley Center and Daley Plaza.  (Securitas SOF ¶ 18; Pls.' Stmt. of Undisputed Facts in Supp. of Pls.' Mot. for Summ. J. against Securitas [218], hereinafter "Pls.' Securitas SOF" ¶ 8; Securitas Defs.' Resp. to Pls.' Stmt. of Uncontested Facts [263], hereinafter "Securitas Resp. to Pls.' SOF" ¶ 8.)  Securitas, the largest private security company in the United States, began providing security services at Daley Plaza in October 2010 after it acquired Security Management and Investigations, Inc. ("SMI").  (Pls.' Securitas SOF ¶¶ 7, 109; Securitas Resp. to Pls.' SOF ¶¶ 7, 109.)  Securitas took over SMI's obligations under a January 2010 contract between SMI and PBC "acting by and through its manager and agent [MBRE]."  (2010 Service Contract, Ex. 24 to Pls.' SOF [220-11], hereinafter "2010 Contract," 1; Pls.' Securitas SOF ¶¶ 7, 110; Securitas Resp. to Pls.' SOF ¶¶ 7, 110.)  The 2010 contract was

---

[3]  *See infra* Section I.B for more details regarding the previous private security contractors.

[4]  The parties have not identified the second deputy now assigned to Daley Plaza on a regular basis with Deputy Nance.

amended on October 27, 2011[5] to change the name of the contracting party from "SMI" to "Securitas," but the terms were otherwise unaltered. (Securitas SOF ¶ 26; Pls.' Resp. to Securitas SOF ¶ 26.) In 2013, after the 2010 contract expired, Securitas entered into a new contract to provide security services at the Plaza, from March 1, 2013 through February 28, 2016. (2013 Service Contract, Ex. 38 to Pls.' SOF [221-13], hereinafter "2013 Contract," 1; Pls.' Securitas SOF ¶¶ 6–7; Securitas Resp. to Pls.' SOF ¶¶ 6–7.) The contract imposes generally the same duties and obligations as the 2010 contract, but only Securitas and MBRE are parties to the 2013 agreement. (Pls.' Securitas SOF ¶¶ 6–7; Securitas Resp. to Pls.' SOF ¶¶ 6–7; 2013 Contract at 1.)

The 2010 contract described SMI as an "independent contractor" and defined its obligations (which Securitas later assumed) by reference to an October 1, 2009 Request for Proposals ("RFP").[6] (Service Contract, Ex. 24 to Pls.' Appendix [220-11], hereinafter "2009 Contract" § 6; Securitas SOF ¶ 25; Pls.' Resp. to Securitas SOF ¶ 25; Pls.' Securitas SOF ¶ 110; Securitas Resp. to Pls.' SOF ¶ 110.) The RFP sets forth the hours that the security contractor (now Securitas) will provide services and contains drawings dictating the location of security posts. (Oct. 1, 2009 Request for Proposal, Ex. 25 to Pls.' Appendix [220-12], hereinafter "RFP," 12–14; Drawings of Security Post Locations, Ex. L to Securitas SOF [256-34]; Securitas SOF ¶ 25; Pls.' Resp. to Securitas SOF ¶ 25.)

Two security guards work on Daley Plaza during the work week. The two guards currently filling those positions are Antonio Kelly and Deron Truman. Kelly is a licensed private security guard who has worked at the Daley Center since 2004. (Securitas SOF ¶ 47; Pls.' Resp. to Securitas SOF ¶ 47.) In 2004 he was employed by Aargus Security, SMI's

---

[5] The parties have not explained why there was a one-year delay between the date Securitas began providing security services and the date the contract was amended to change the name of the contracting party from SMI to Securitas.

[6] Securitas remains an independent contractor under the 2013 contract. (2013 Contract § 8.)

predecessor, but in 2005 he became an SMI employee when SMI took over Aargus' contract; Kelly continued to work at the Daley Center and Plaza. (Securitas SOF ¶ 47; Pls.' Resp. to Securitas SOF ¶ 47.) Then, on January 18, 2011, after Securitas purchased SMI, he became a Securitas employee. (Securitas SOF ¶¶ 47–48; Pls.' Resp. to Securitas SOF ¶¶ 47–48.) Deron Truman is also a licensed private security guard. He began working at the Daley Center and Plaza in 2005 for SMI and became a Securitas employee on January 17, 2011. (Securitas SOF ¶¶ 61–62; Pls.' Resp. to Securitas SOF ¶¶ 61–62.)

Kelly and Truman work Monday through Friday in the guard booth located on the east side of Daley Plaza. (Pls.' Securitas SOF ¶ 16; Securitas Resp. to Pls.' SOF ¶ 16.) Kelly's shift runs from 6:00 a.m. to 2:30 p.m., while Truman works from 9:00 a.m. to 5:30 p.m., working together with Kelly during the time that their work hours overlap. (Pls.' Securitas SOF ¶¶ 12, 17; Securitas Resp. to Pls.' SOF ¶¶ 12, 16–17.) The Securitas guards wear five-pointed metal star badges, yellow shirts with patches on the sleeves bearing the word "security," BDU[7] pants, military style boots, and utility belts with equipment including radios and flashlights. (Truman Dep. at 30:11–31:6; *see also* Kelly Dep. at 33:8–34:16; Photo of Kelly on Duty, Ex. 30 to Pls.' Appendix [221-5].) Truman and Kelly also carry handcuffs. (Pls.' Securitas SOF ¶ 123; Securitas Resp. to Pls.' SOF ¶ 123.) Kelly and Truman have the option to wear bullet proof vests, and Kelly often does so. (Pls.' Securitas SOF ¶ 122; Securitas Resp. to Pls.' SOF ¶ 122.)

Captain Melvin Waters[8] is Truman and Kelly's immediate supervisor. (Pls.' Securitas SOF ¶ 20.) He has worked at the Daley Center, under the various security contractors, for more

---

[7]     No party has defined the acronym "BDU" but the court understands it to refer to "battle dress uniform."

[8]     "Captain" refers to Waters' rank within Securitas' military-style hierarchy; Waters is not a captain in the U.S. Military. (Pls.' Securitas SOF ¶ 124; Securitas Resp. to Pls.' SOF ¶ 124.) Plaintiffs have not named Captain Waters as a defendant in this case.

than 20 years, and is currently employed by Securitas' subcontractor Star Detective Agency.[9] (Pls.' Securitas SOF ¶¶ 18–20; Securitas Resp. to Pls.' SOF ¶¶ 18–20.) Captain Waters also wears a star and nameplate, but he wears a white shirt with stripes on the sleeves and a variety of metal pins indicating his rank within the company. (Pls.' Securitas SOF ¶ 124; Securitas Resp. to Pls.' SOF ¶ 124.) Waters testified that he is frequently mistaken for a police officer while working at the Daley Center. (Pls.' Securitas SOF ¶ 130; Securitas Resp. to Pls.' SOF ¶ 130.) Toriono ("Tee") Coleman, Securitas' Security Manager at the Daley Center, also commented on the apparent confusion, stating "people . . . always appear to think that a security officer has the same power as a police officer." (Pls.' Securitas SOF ¶ 131; Securitas Resp. to Pls.' SOF ¶ 131.)

### C.    The relationship between Securitas and the Cook County Sheriff

Securitas, MBRE, and the Cook County Sheriff all have input into security decisions that affect the Daley Center (Pls.' SAF ¶ 82; Sheriff's Resp. to Pls.' SAF ¶ 82), but there is no formal coordination or contract between Securitas and the Cook County Sheriff. (Securitas SOF ¶ 14; Pls.' Resp. to Securitas SOF ¶ 14.) The Sheriff has no supervisory authority over Securitas employees, and Securitas guards do not report to personnel in the Sheriff's Department. (Sheriff's SOF ¶ 3; Pls.' Resp. to Sheriff's SOF ¶ 3.) Sheriff's Defendants maintain that Sheriff's deputies and Securitas guards have different assignments and duties, follow different orders, and do not coordinate their activities. (Sheriff's SOF ¶¶ 4–6.) For example, Thomas Boyd, a Sheriff's Sergeant responsible for supervising the deputies working at the Daley Center from

---

[9]    Star Detective Agency is not a defendant in this case and the parties have not described the relationship between Star and Securitas beyond stating that Star is a "subcontractor" for Securitas. (*See* Pls.' Securitas SOF ¶ 18; Securitas Resp. to Pls.' SOF ¶ 18.) Waters' deposition testimony suggests, however, that Securitas' contract with PBC requires hiring a minority-owned company, and Star Detective Agency is that company. (Dep. of Melvin Waters [220-1] at 145:3–24.) The 2013 contract states that Securitas "shall make best effort [sic] to commit to supply 25% certified Minority Business Enterprise." (2013 Contract at § 22.07.) The 2009 RFP also states that proposals that "include utilization of qualified minority and women subcontractors shall provide added value to their submission." (RFP at 4.)

2003 through 2012, testified that there were no joint meetings involving the Sheriff's Department and private security companies. (Dep. of Thomas Boyd, Ex. 9 to Pls.' Sheriff SOF [230-9], hereinafter "Boyd Dep.," 37:3–13; Pls.' SAF ¶ 63; Sheriff's Resp. to Pls.' SAF ¶ 63.) Deputies Nance and Jevtic testified that the deputies do not take orders from the Securitas guards or from MBRE. (Dep. of Laverne Nance, Ex. 3 to Pls.' Sheriff Appendix [230-3], hereinafter "Nance Dep.," 101:1–13; Dep. of Dalibor Jevtic, Ex. 4 to Pls.' Sheriff Appendix [230-4], hereinafter "Jevtic Dep.," 99:10–17.) Nor do the deputies give orders to the Securitas guards. (Jevtic Dep. at 99:18–21.) Finally, Deputy Jevtic, who has worked both as a private security guard and as a Sheriff's Deputy, explained that the deputies "have our own orders" and that deputy "assignments are different than" the private security guards' assignments. (*Id.* at 32:20–33:1.) The differences between the two group's assignments may not be sharp ones. When he worked as a security officer for Aargus, Jevtic worked "inside the security guard shack," screening access to the loading dock; as a Sheriff's Deputy, Jevtic was at times assigned to one of the "outside security posts," but at other times is "roving around the whole building." (Jevtic Dep. at 34:15–20, 39:16–19.) He also observed other security officers performing perimeter checks during his tenure with Aargus, however. (*Id.* at 38:9–17.)

Indeed, Defendants acknowledge that, though there is no formal coordination, the Securitas guards' duties do overlap with the Sheriff's deputies' and that the guards and deputies work together "unofficially." (Truman Dep. at 18–24.) A Sheriff's deputy is assigned to occupy the guard booth with the Securitas guards. (Pls.' Securitas SOF ¶ 24; Securitas Resp. to Pls.' SOF ¶ 24; Kelly Dep. at 20:12–16; Dep. of Toriono Coleman Dep., Sept. 11, 2013, Ex. 5 to Pls.' Securitas Appendix [219-5], hereinafter "Coleman Dep. I," 98:8–10; Truman Dep. at 29:24–30:7.) There is a closed-circuit television system with cameras recording inside the Daley Center and three cameras on the sides of the building recording the activities on Daley Plaza, (Dep. of Edward Carik, Ex. 10 to Pls.' Securitas Appendix [219-10], hereinafter "Carik Dep.," 65:21–66:9.) Both Sheriff's deputies and Securitas guards monitor a closed circuit television

system during the day, but Securitas alone is responsible for monitoring the cameras overnight. (Carik Dep. at 65:9–66:18; Dep. of Toriono Coleman, Mar. 18, 2014, Ex. 6 to Pls.' Securitas Appendix [219-6], hereinafter "Coleman Dep. II," 146:3–9; Pls.' SAF ¶ 81; Sheriff's Resp. to Pls.' SAF ¶ 81.) During the day, the guards and deputies have different monitoring responsibilities, however: the deputies monitor the lobby and the lockup in the building, where prisoners are held, while Securitas guards monitor people coming into the building through the parking garage and the loading dock. (Carik Dep. at 115:19–116:16; Coleman Dep. II at 150:6–23.)

There is some disputed evidence of other informal coordination, as well. Kelly testified that the Securitas guards perform patrols together with the Sheriff's deputies. (Kelly Dep. at 36:9–11.) According to Truman, however, both the deputies and guards patrol the Plaza, but do so independently. (Truman Dep. at 36:18–37:13.) Deputies Nance and Jevtic, similarly, assert that any joint patrols are merely coincidental. (*See* Nance Dep. at 109:9–13; Jevtic Dep. at 77:15–20.) Sheriff's Deputies may also, unofficially, defer to Securitas' guidance and directions. The Sheriff's Defendants contend, for example, that Securitas has "ultimate responsibility for monitoring citizen activity and for any events on Daley Plaza." (Sheriff's SOF ¶ 10; Pls.' SAF ¶ 65; Sheriff's Resp. to Pls.' SAF ¶ 65.) Deputy Jevtic testified that in responding to Pindak's question on May 7, 2012, by saying that panhandling was not allowed on the Plaza, Jevtic was simply "repeating to [Pindak] what [the Securitas guard] said." (Jevtic Dep. at 57:21–24.) Truman also explained that if the Sheriff's deputies "see that [a] person does not want to comply with us asking as security officers" for the person to leave, the deputies "at times, may step in and assist . . . they would ask the person to leave the plaza." (Truman Dep. at 45:20–46:5.)

## II.    Plaintiffs' panhandling activities on Daley Plaza

Plaintiffs are individuals who panhandle regularly at several locations in the City of Chicago. All three have sought to panhandle on Daley Plaza. (Pls.' Securitas SOF ¶ 1; Securitas Resp. to Pls.' SOF ¶ 1.) Kim Pindak typically holds out a cup and asks people walking by for spare change. (Pls.' Securitas SOF ¶ 2.) Samuel Phillips holds a cup and a sign

that reads "I'm Just Hungry." (Pls.' Securitas SOF ¶ 3; Securitas Resp. to Pls.' SOF ¶ 3.) Norman Talley prefers to engage people in one-on-one conversations and then ask for donations. (Pls.' Securitas SOF ¶ 4.)

### A. Pindak

Plaintiffs allege that Securitas guards and Sheriff's deputies have repeatedly prevented each of them from panhandling on Daley Plaza. The first incident Plaintiffs describe occurred in 2008 or 2009: Pindak was attempting to panhandle on the Plaza when an unidentified Sheriff's deputy placed him in handcuffs and took him to the lockup on the lower level of the Daley Center. (Pls.' Stmt. of Facts in Supp. of Mot. for Summ. J against Sheriff's Defs. [258], hereinafter "Pls.' Sheriff SOF" ¶ 10.) There, a heavyset sergeant (also unidentified) told Pindak "never to come back" to the Plaza and warned him that if he attempted to panhandle there again, he would be arrested and taken to "Maywood," presumably referring to the Cook County Sheriff's Police Headquarters. (Pls.' Sheriff SOF ¶ 11; Dep. of Kim Pindak, Nov. 20, 2013 [230-2], hereinafter "Pindak Dep. II," 81:20–24.)

Pindak has also made multiple video and audio recordings documenting his interactions with the guards and deputies. The earliest is a video recorded on October 6, 2009, which shows Captain Melvin Waters telling Pindak that the Daley Center is "private property," that the building does not permit panhandling, and that Pindak was permitted to beg only on the public sidewalk, away from the Plaza. (Pls.' Securitas SOF ¶ 29; October 6, 2009, Ex. 20 to Pls.' Appendix [220-7]; Dep. of Melvin Waters, Ex. 14 to Pls.' Appendix [220-1], hereinafter "Waters Dep.," 76:10–14 (recognizing his own voice on the video).) Waters testified that he asked Pindak to leave the Plaza because "the procedure[] . . . was me walking somebody to the corner, telling them what they couldn't do. At that time, that's what I was told to do," by Ed Carik, the Security Director for MBRE, and Tee Coleman, Securitas' Security Manager at the Daley Center. (Waters Dep. at 80:6–14, 81:7–10; Pls.' Securitas SOF ¶ 97; Securitas Resp. to Pls.' SOF ¶ 97.) According to Waters, "building management," (presumably Carik, the Security

12

Director for MBRE), enforced a policy prohibiting panhandling on the Plaza until July 2013, when the policy changed, and Waters and the security guards "were told," he doesn't specify by whom, "that [they] couldn't ask anybody to leave." (Waters Dep. at 112:12, 186:1–9; Pls.' Securitas SOF ¶¶ 94–95, 98; Securitas Resp. to Pls.' SOF ¶¶ 94–95, 98.)

On September 24, 2010, Pindak went to Daley Plaza, and with the help of his friend Jeff Kramer, recorded another video to use as evidence in this lawsuit, filed five days later.[10] (Pls.' Securitas SOF ¶¶ 25, 27.) The video shows Kelly announcing that panhandling is prohibited on the Plaza "this year, the following year, and the year after that," and warning that if Pindak did not leave, Kelly was "going to put handcuffs on" him. (Pls.' Securitas SOF ¶ 25; Sept. 24, 2010 Video, Ex. 21 to Pls.' Appendix [220-8], hereinafter "9/24/2010 Video," 0:32–0:42.) Truman joins the conversation, adding "there is no soliciting on the Plaza," and stating that Pindak must go "outside the Plaza" to the street corner. (Pls.' Securitas SOF ¶ 26; Securitas Resp. to Pls.' SOF; 9/24/2010 Video at 0:38–0:56.) Truman and Kelly then begin to escort Pindak off the Plaza, and while they are walking, they approach Deputy Nance, who asks, "is everything OK?" Kelly responds: "He's on his way off the Plaza," and directs Pindak to "keep walking." Deputy

---

[10]    The Securitas Defendants contest the admissibility of the video—without citing any authority—because it "is an edited video containing approximately 90 seconds of footage when . . . Pindak has testified that when the video was taken he was at Daley Plaza for approximately 15 minutes before the video depicting his exchange with Kelly occurred." (Securitas Resp. to Pls.' SOF ¶¶ 25–26.) There is little evidence to suggest that the video was improperly edited: Pindak did not know the specifics of how the video was made or whether he was actually recorded for the full 15 minutes (Pindak Dep. I at 35:18–23), and Plaintiffs' counsel avers that the entire video was produced. (Pindak Dep. 1 at 32:13–14; Pls.' Securitas Reply at 6–7.) In any event, an edited video remains admissible:

> the fact that the videotape may have been edited is not necessarily error, since parties have a responsibility not to overburden the court with useless information. Just as reams of documents may be edited, so too a videotape may be edited, provided of course that it is properly authenticated and otherwise reliable.

*Oriental Health Spa v. City of Fort Wayne*, 864 F.2d 486, 491 (7th Cir. 1988); *see also Snyder v. Tiller*, No. 3:08-CV-00470, 2010 WL 3522580, at *8 (N.D. Ind. Aug. 30, 2010) ("the editing of a video to remove extraneous material does not affect the video's admissibility.").

Nance simply replies "Oh, Ok." (9/24/2010 Video at 1:22–1:32; Nance Dep. at 97:8–16, 98:8–11; Pls.' SAF ¶¶ 84–85; Sheriff's Resp. to Pls.' SAF ¶¶ 84–85.) Based on Kelly's threat to "put handcuffs on" him, Pindak "believe[d] that [Kelly] was capable of making such an arrest." (Dep. of Kim Pindak I, Ex. 1 to Pls.' Appendix [219-1], hereinafter "Pindak Dep. I," 42:10–14.)

More than a year later, on May 7, 2012, Pindak returned to the Plaza and made an audio recording. Pindak does not remember whether he had been panhandling immediately before the recording was made, and believes that he first approached the guard booth to ask whether panhandling was permitted on the Plaza. (Sheriff's SOF ¶¶ 48–51; Pls.' Resp. to Sheriff's SOF ¶¶ 48–51.) In response to the question, Deputy Jevtic can be heard on the recording telling Pindak, "there is no panhandling on the Plaza itself for anyone," and explaining that panhandling is prohibited "anywhere" on the Plaza, but "across the street you can." (May 7, 2012 Audio Recording, Ex. 22 to Pls.' Appendix [220-9], hereinafter "5/7/2012 Audio Recording," 5:48–6:05.) As noted earlier, Jevtic admits making these statements, but asserts that he was merely repeating statements being made by a Securitas guard, who was in the booth with him. (Sheriff's SOF ¶ 104; Pls.' Resp. to Sheriff's SOF ¶ 104; Jevtic Dep. at 54:3–13, 56:7–11, 57:21–58.) Deputy Jevtic also explained that the directions he gave Pindak were consistent with what he learned during his tenure working as a private security guard for Aargus; at that time, he was told (he does not recall by whom) that panhandling was prohibited on the Plaza. (Pls.' SAF ¶ 24; Sheriff's Resp. to Pls.' SAF ¶ 24; Jevtic Dep. at 54:15–22.)

Other than his recorded conversation with Pindak, Jevtic has had little interaction with panhandlers. He has given Phillips a few quarters on occasion, and bought him a cheeseburger once, but has had no other communications with him. (Sheriff's SOF ¶ 106; Pls.' Resp. to Sheriff's SOF ¶ 106.) No Securitas guard has ever brought a panhandler to him, nor has Jevtic witnessed Securitas guards bringing a panhandler to another deputy. (Sheriff's SOF ¶ 109; Pls.' Resp. to Sheriff's SOF ¶ 109.) Nor has he ever witnessed a Sheriff's deputy remove a panhandler from Daley Plaza or direct a panhandler to leave. (Sheriff's SOF ¶ 110; Pls.' Resp.

to Sheriff's SOF ¶ 110.)  In short, Deputy Jevtic explained that "I've never had to take any action because of somebody's panhandling.  I never had to interfere with anything like that."  (Jevtic Dep. at 57:13–17.)

Though there is no recording to corroborate his testimony, Pindak asserts that at some point before his conversation with Deputy Jevtic on May 7, 2012, he had a conversation with Deputy Nance, in which Nance told Pindak that Pindak was "banned" from Daley Plaza. (Sheriff's SOF ¶¶ 35–39, 43; Pls.' Resp. to Sheriff's SOF ¶¶ 35–39, 43; Sheriff's Resp. to Pls.' SAF ¶ 13.)  Pindak was confused about the actual date of his conversation with Nance: it may have been earlier in the day on May 7, 2012, or it may have been a couple of weeks prior. (Sheriff's SOF ¶ 35; Pls.' Resp. to Sheriff's SOF ¶ 35; Pindak Dep. II at 49:16-50:2, 118:20–119:4.)  Pindak also did not remember how the conversation started, or whether he was actually panhandling that day, but he believes that he approached Nance to ask whether panhandling was permitted on the Plaza.  (Sheriff's SOF ¶¶ 36–37; Pls.' Resp. to Sheriff's SOF ¶¶ 36–37.) Nance admits that he has seen Pindak panhandling on Daley Plaza at least ten times, but maintains that he has never confronted Pindak about his behavior.  (Sheriff's SOF ¶¶ 79–80; Pls.' Resp. to Sheriff's SOF ¶ 79.)  According to Nance, he has had only one conversation with Pindak, several years ago, perhaps between 2009 and 2011, when Pindak and another panhandler wanted to occupy the same spot on the sidewalk.  (Nance Dep. at 52:23–53:12.)  All Nance recalls about that interaction is that he "went and spoke with the other gentleman and it was just . . . a disagreement. That's the bottom – that was the case."  (*Id.* at 52:18–22.)  Nance denies seeing any Sheriff's deputy tell someone they could not panhandle on the Plaza, and maintains that he has never been asked by a Securitas guard to assist with removing a panhandler.  (Sheriff's SOF ¶¶ 84, 86; Pls.' Resp. to Sheriff's SOF ¶ 84.)

## B.    Phillips

Phillips has testified about similar interactions with security guards and Sheriff's deputies on the Plaza.  Phillips regularly panhandles on the public sidewalk at the corner of Clark and Randolph streets, holding a sign that says "I'm just hungry."  (Pls.' Securitas SOF ¶ 38; Securitas Resp. to Pls.' SOF ¶ 38.)  According to Phillips, in 2009 a Sheriff's deputy told him he could not panhandle at that corner, but later, another official, described as a "heavyset sergeant," told him he was permitted to panhandle on the corner, so long as he remains "by that pole" and stands on the corner.  (Dep. of Samuel Phillips, Ex. 3 to Pls.' Securitas Appendix [219-3], hereinafter "Phillips Dep.," 68:20–69:22.)  He testified that, during the summer of 2012, when he tried to walk through the Plaza, deputies and guards told him he could not beg there. In response, Phillips testified, he would leave immediately.  (Pls.' Securitas SOF ¶ 40; Securitas Resp. to Pls.' SOF ¶ 40; Sheriff's Resp. to Pls.' SAF ¶ 5; Phillips Dep. 72:17–73:20; 81:3–82:8.) According to Phillips, this happened "on a daily basis,' a total of 10 to 20 times, before Phillips stopped trying to go into the Plaza at all, choosing instead to remain on the corner of Clark and Randolph streets.  (Phillips Dep. at 71:24–8, 72:19–20.)

Defendants note that Phillips could not provide the names of any individuals who told him he could not beg in the Plaza, and was unable to differentiate between the number of times the Sheriff's deputies were involved versus the security guards.  (Securitas SOF ¶ 112; Pls.' Resp. to Securitas SOF ¶ 112; Sheriff's SOF ¶¶ 66–67; Phillips Dep. at 81:8–12, 85:12–13.) Phillips did explain, however, that he could distinguish between Securitas guards and Sheriff's deputies, and "they don't have to be in uniform" because he has "seen them all these times, [and] know[s] exactly who they are."  (Phillips Dep. at 52:20–53:1.)  Though he did not know the names of the Securitas guards, Phillips did testify that the "short guard" was the first one who told him he had to leave the Plaza.  (Phillips Dep. at 75:3–11.)  He went on to explain that "the shorter one, he [sic] more muscular than the tall one.  There's not but two of them that work there.  There was [sic] three, but he took a test and he became a sheriff."  (Phillips Dep. at

75:22–76:1.)  He also explained that he would be able to identify the short guard if he saw a picture of him.  (Phillips Dep. at 76:19–20.)  Moreover, he explained that the people who first told him to leave wore "[a] yellow shirt and black pants with 'Security' on it," apparently a reference to Securitas personnel.  (Phillips Dep. at 81:1–2.)  Other times, however, Cook County deputies were involved.

### C.  Talley

Talley makes allegations against Securitas guards only.  (Sheriff's SOF ¶¶ 73–76; Pls.' Resp. to Sheriff's SOF ¶¶ 73–76.)  Talley testified that in summer of 2012, he was panhandling on Daley Plaza for about an hour when Kelly approached him.  Talley recalled that Kelly said that he had been observing Talley for some time, told Talley that panhandling was not allowed on the Plaza, and warned that if he kept panhandling, Talley "will be arrested."  (Dep. of Norman Talley, Ex. 4 to Pls.' Securitas Appendix [219-4], hereinafter "Talley Dep.," 116:16–117:9.)  Securitas Defendants deny that Kelly made these statements, but provide no citations to the record to support that assertion.  (*See* Securitas Resp. to Pls.' SOF ¶¶ 36–37.)  Talley explained that he could discern the difference between a Chicago Police Officer, a Cook County Sheriff's Deputy, and a private security officer (Talley Dep. at 74:17–75:3), and he knew Kelly was not a police officer or a Cook County Sheriff.  (*Id.* at 96:20–23.)  Nonetheless, he

> simply assumed that [Kelly] worked in some kind of police capacity for the Daley Center . . . He wore a uniform that he wears. It is an authoritative uniform, such as police or sheriffs would wear . . . I knew that he was of – I could consider him as some type of law enforcement that worked there on the Daley Plaza.

(Dep. of Talley at 93:19–95:4.)

### D.  Plaintiffs' claims

As a result of these interactions, Plaintiffs maintain that they have been deterred from panhandling on the Plaza.  Pindak testified that he did not feel free to panhandle after his conversation with Deputy Jevtic and that he "felt there was a possibility that I would eventually get arrested."  (Pindak Dep. II at 217:11–23.)  He goes "out of [his] way to avoid the Plaza as

much as possible."  (Pindak Dep. II at 219:2–4.)  He has returned to the Plaza about 25 times, but the visits were only for a few minutes while he was "[t]rying to see if someone would help me along the way and get out of there."  (Pindak Dep. II at 209:24–210:10.)   He primarily went around Christmas when "people are more generous and security is more lenient."  (Pindak Dep. II at 209:8, 213:16–17, 219:6–7; Sheriff's SOF ¶¶ 29–31, 33; Pls.' Resp. to Sheriff's SOF ¶¶ 29–31, 33.)  Talley would like to panhandle on the Plaza because there are more people coming and going than on State Street where he would otherwise panhandle, and he believes he would collect up to $20 more a day on Daley Plaza.  (Talley Dep. at 128:19–23, 130:2–14.)  But after his interaction with Kelly, Talley never returned to panhandle at the Plaza because he "didn't want to be locked up."  (Talley Dep. at 130:5–132:11; Pls.' Securitas SOF ¶¶ 45–46; Securitas Resp. to Pls.' SOF ¶¶ 45–46.)   Similarly, Phillips keeps his panhandling to the corner at Randolph and Clark, on the sidewalk, and avoids walking through the Plaza.  (Phillips Dep. at 69:8–22.)  He explained, "I never tried to panhandle on the plaza.  Because . . . every time you go in there, they bum-rush you, and I just tried to stay out of any trouble," clarifying that "they" referred to the "[g]uards in the booth . . . or the two guards that be in the car over there."  (Dep. of Phillips, p. 101:22–102:5.)

Securitas Defendants have acknowledged that panhandlers are, at least sometimes, removed from the Plaza.  Though Nance has denied it, Kelly has seen Nance remove aggressive panhandlers at least 25 times in the last ten years.  (Kelly Dep. at 76:18–77:18.)  Of these 25 times, Kelly was actually working with Nance in half of those instances, and in the other half, he witnessed Nance's conversation with a panhandler from "about 10 feet away."  (Kelly Dep. at 97:3–99:5.)  Truman explained that when someone is aggressively panhandling and not complying with the guards' request to leave, the deputies will "step in and assist" by "ask[ing] the person to leave the plaza."  (Truman Dep. at 46:20–47:5.)

### III.   Securitas policy related to panhandling on the Plaza

The parties dispute whether Kelly and Truman's actions were taken to execute Securitas policies.  The responsibilities of Securitas and its employees at the Daley Center are outlined in a document called the "Post Orders."  Post orders, generally, are written documents that describe the responsibilities of the security guards stationed at each security post.  (Pls.' Securitas SOF ¶ 48; Securitas Resp. to Pls.' SOF ¶ 48.)  The specific Post Orders for Daley Center and Daley Plaza consist of 23 chapters covering a wide range of topics such as "Building Access," "Uniform Specifications," "Flag Protocol," "Accident Investigation," and, at issue in this case, "Dealing with and Handling Undesirables."  (Table of Contents to Post Orders, Ex. 39 to Pls.' SOF [221-14], hereinafter "Post Order TOC"; Pls.' Securitas SOF ¶¶ 48, 147; Securitas Resp. to Pls.' SOF ¶¶ 48, 147.)

A copy of the Post Orders is kept in the booth where Kelly and Truman work.  (Pls.' Securitas SOF ¶ 60; Securitas Resp. to Pls.' SOF ¶ 60.)  There is no dispute that Securitas is tasked with following and enforcing these orders and that guards may be disciplined for disobeying them, but the parties dispute who originally authored the Post Orders.  (Pls.' Securitas SOF ¶¶ 57–59; Securitas Resp. to Pls.' SOF ¶¶ 57–59.)  The RFP incorporated into Securitas's contract with MBRE specifies that Securitas must "[u]nderstand and implement the Post Orders," and is required to "provide information to [MBRE] if the Post Orders can be improved," but it does not describe the source of the Post Orders.  (RFP at 12–14; Securitas SOF ¶ 25; Pls.' Resp. to Securitas SOF ¶ 25; Pls.' Securitas SOF ¶ 111; Securitas Resp. to Pls.' SOF ¶ 111.)  As the Security Manager for Securitas, Tee Coleman is the Securitas employee responsible for interpreting the Post Orders, and he testified that, though he has no formal legal training, he has an obligation to report to MBRE if he encounters an order that does not comply with the law.  (Pls.' Securitas SOF ¶¶ 140–41; Securitas Resp. to Pls.' SOF ¶¶ 140–41; *see also* 2010 Contract at § 17.04 (requiring Securitas to "comply with all applicable laws," and prohibiting Securitas from "tak[ing] any action . . . which would violate any applicable law.")

Coleman also admitted that the Post Orders are the only written policy concerning panhandling at Daley Plaza. (Coleman Dep. I at 105:23–106:2.) But Coleman maintains that, since he began working at the Daley Center in 2006, there has also been an "oral Post Order" in effect that distinguishes between aggressive and peaceful panhandlers, but he does not know who originally issued that oral order.

### A. Written Post Orders

The Post Orders refer to panhandlers in two places: Chapter 10 instructs the guards working at "Ramp 1 & 2," where Truman and Kelly are assigned, to "perform hourly Plaza patrols" and "[r]emove any panhandlers, sleeping vagrants, or unauthorized solicitors." (Post Orders, Chapter 10, Ex. 16 to Pls.' Appendix [220-3], hereinafter "Ch. 10 Post Order," 2; Coleman Dep. II at 107:10–16.) Chapter 16 of the Post Orders, titled "Dealing with and Handling Undesirables," explains that "[w]hile a security officer is on post [or] conducting patrols . . . he or she may encounter an undesirable or suspicious person." (Post Orders, Chapter 16, Ex. 17 to Pls.' Appendix [220-4], hereinafter "Ch. 16 Post Order," 1.) The Order continues by defining an "undesirable or suspicious person" as "anyone who is seen or appears to be conducting disruptive activity (loitering, stealing, panhandling, etc.) unrelated to normal business operations." (*Id.*) Tee Coleman, the Security Manager for Securitas, testified that the chapter covers panhandlers without distinguishing between aggressive and peaceful panhandling. (Coleman Dep. I. at 61:10–21, 106:13–24.) If a guard sees an "undesirable," the Post Order instructs the guards to first observe the individual, question the individual about his or her purpose, and then to "inform the subject to leave the property or the local police will be contacted if they do not comply with your request. **Do not threaten anyone that they will be arrested.**" (Ch. 16 Post Order at 2) (emphasis in original.)

The parties dispute who authored the Post Orders. Securitas insists that neither SMI nor Securitas authored them (Securitas SOF ¶ 30), and the RFP, issued by MBRE, provides some support for that assertion. It states that, once MBRE has selected a security service, MBRE will

provide the security service with the "Post Locations, Post Orders and Instructions."  (RFP at 18.)  The RFP further specifies, however, that Securitas is responsible for "understand[ing] and implement[ing] the Post Orders," and is required to "provide information to [MBRE] if the Post Orders can be improved," implying that Securitas might also have a role in drafting or updating the language in the Post Orders.  (Pls.' Securitas SOF ¶ 111; Securitas Resp. to Pls.' SOF ¶ 111.)

Neither Ed Carik, the Security Director for MBRE, nor Coleman, the Security Manager for Securitas, knows who initially wrote the Post Orders.  (Coleman Dep. 41:1–11; Carik Dep. at 45:13–46:6; Securitas SOF ¶ 36; Pls.' Resp. to Securitas SOF ¶ 36.)  Coleman testified that the Post Orders existed when he arrived at the Daley Center in 2006, but that Securitas and MBRE had "updated some additions" to the Post Orders when the closed-circuit television system was installed at the Daley Center in 2012.  (Coleman Dep. II at 19:12–20:2.)  At that time, the general manager of MBRE, Orestes Ruffin, e-mailed Coleman and "basically spelled out what is what, what should be done" to update the Post Orders.  (*Id.* at 20:9–13.)  Coleman reviewed Ruffin's proposed changes,[11] and submitted them to Ed Carik, the Security Director for MBRE, and Ruffin gave final approval.  (*Id.* at 20:14–16.)  Then, Coleman ultimately typed up the language he received from Ruffin and added it to the collection of Post Orders.  (*Id.* at 20:17–21:6.)  Carik, however, characterizes the Post Orders as "the security company's post orders," and believes that no one at MBRE, including himself, is responsible for updating or approving changes to those orders.  (Carik Dep. at 46:17–47:4, 48:8–12; *see also id.* at 49: 15–17 (Q: Does MBRE give any post orders to the security company? A: Not that I'm aware of.")  Rather,

---

[11]    The parties have not included the chapter of the Post Orders concerning the closed circuit television (*see* Post Order TOC (listing "Section 11: Video Command Center")), or copies of Ruffin's e-mail proposing the changes.  The court does not know what the changes entailed or how much input Coleman had.  For instance, it is not clear from Coleman's testimony whether Coleman made edits or had substantive input to the changes or if Ruffin's proposed language was simply inserted into the Post Orders.

he testified that Tee Coleman and Securitas have "complete authority to update [and] change the post orders." (*Id.* at 49:8–11; *see also id.* at 47:5–7.)

Plaintiffs assert that the Post Orders show on their face that Securitas drafted them in conjunction with MBRE. (Pls.' Securitas SOF ¶ 67.) The court is less certain. The introduction to the Post Orders states "[t]his security manual has been compiled for the Richard J. Daley Center," but does not specify who actually drafted it. (Post Orders Intro, Ex. 18 to Pls.' Appendix, [220-5], 1.) The introduction states, further, that the "security procedural manual will be updated on a quarterly basis," again without specifying by whom. (*Id.*) The introduction does identify the "Security Manager," in this case Tee Coleman, as the individual to whom "[a]ny suggestions or improvements" should be sent. (*Id.*) Notably, the Post Order lists, among Coleman's own responsibilities, "develop[ing] and implement[ing] . . . comprehensive security policies and post procedures" at Daley Plaza, and training the staff on those procedures. (Post Orders Ch. 6, "Code of Conduct & General Orders – Security Manager," Ex. 33 to Pls.' Appendix [221-11], 2-3.) Moreover, Plaintiffs assert that Securitas' own materials confirm that Securitas regularly drafts the Post Orders in collaboration with its clients. For example, a Securitas training presentation explains that the "Post Orders consist of standards and procedures created by Securitas and the Client." (Securitas Training PowerPoint "Twenty Hour Introduction," Ex. 36 to Pls.' Appendix [221-11], hereinafter "Training Introduction," 46.) A typed note for the presenter of the materials, however, asks "WHO PUTS POST ORDERS TOGETHER?" (*Id.*) Nothing in the record explains when this presentation was developed, who originally prepared the presentation, or who typed the note.

**B.      "Oral Post Order"**

Tee Coleman testified that since he began working at the Daley Center in 2006, there has always been in place an "oral post order" that overrides the written directive to "remove any panhandlers." (Coleman Dep. II at 99:5–10, 102:4–17, 111:21–112:8.) According to Coleman, MBRE typically issues oral post orders "based on what's happening in the building," and are

uses such orders to instruct "to do this for today and then tomorrow we go back to doing what we regularly due [sic]." (Coleman Dep. II at 100:19–101:6.) No one keeps any record of the oral post orders, and Coleman acknowledged that the oral order about panhandling is the only oral post order that "revise[s] or explain[s] the instructions that are in the written post orders[.]" (Coleman Dep. I at 102:18–21, 103:18–20.) According to Coleman, the unwritten policy establishes that only "aggressive panhandling" is prohibited, but that peaceful panhandling is allowed. (Coleman Dep. I at 28:2–23; Coleman Dep. II at 102:4–17.) He explained that in July 2013, MBRE "asked for [Securitas] to do a particular training class," to address "the misconception [that] always had been, you know, what's the difference between panhandling and aggressive panhandling. And in the past, that hadn't been distinguished, so we needed to make that distinguishment [sic] for the guards so they knew . . . what was the difference." (Coleman Dep. I 68:14–24.) Though he recognized that the Post Orders still instruct the guards to "remove any panhandlers," Coleman insists that that instruction "should not be in there because they don't have the authority to remove anyone." (Coleman Dep. II at 121:22–122:14.) He asserts that, "once we put that [July 2013 training] into place," the written instructions "never got changed." (Coleman Dep. I at 69:1–5.) Coleman explains that the guards do not have authority, as the written order states, to "remove" panhandlers, but rather he instructs guards only tell the individual to cease the aggressive activities and to "suggest" that "it might be easier if you go out to the perimeter along the sidewalks." (Coleman Dep. I at 50:3–13; *see also* Coleman Dep. II at 121:5–10 (guards are instructed only to ask someone to leave, but cannot enforce that request if a person refuses).) The distinction between asking and requiring someone to leave may be immaterial: Coleman admitted that no one has ever refused to leave when asked. (*Id.* at 121:11–12.) Moreover, he conceded that the guards were wrong to remove Pindak in the videotaped incidents. (Coleman Dep. II at 96:22–97:5.) Securitas acknowledges that Truman and Kelly were never disciplined for the videotaped incidents (Pls.' Securitas SOF ¶ 135; Securitas Resp. to Pls.' SOF ¶ 135), but contends that union rules prevent discipline

because the incidents occurred before Securitas took over for SMI. (Securitas Resp. to Pls.' SOF ¶ 135.)

Kelly also testified regarding the distinction between aggressive and peaceful panhandlers. He explained that MBRE instructed him to "keep[] aggressive panhandlers off the actual plaza and mov[e] them onto the . . . City sidewalk." (Kelly Dep. at 13:13–24.) "If [panhandling is] going on peacefully and no one approaches us to complain about it, we don't touch it," Kelly continued, but "if we get any type of complaint whatsoever on a panhandler, we ask them to move, whether they're being peaceful or aggressive." (Kelly Dep. at 18:20–19:5.)

Truman, on the other hand, gave conflicting testimony regarding the oral post order. He has received an oral post order regarding panhandling, from Tee Coleman, who Truman claims "gets his orders from MB[RE];" Truman did not explain how he knows that MBRE is the source of these orders. (Truman Dep. at 13:11–19.) When asked whether that oral order permitted panhandling on the Plaza, Truman explained "[w]e've been told not," and continued, explaining that panhandling has been prohibited on the Plaza "[a]s long as [he] recall[s]," and the policy has not changed. (Truman Dep. 12:22–23; *see also id.* 13:22–14:9.) Truman made no reference to any distinction between aggressive and peaceful panhandling, claiming instead that all panhandling is prohibited: When he patrols the perimeter, for instance, Truman "checks to make sure nothing unusual is going on the plaza . . . Things like panhandling, soliciting, any confrontations on the plaza. You know, anything that could be considered unwanted or criminal activity." (Truman Dep. at 11:11–12:1; *see also id.* at 12:22–13:6) ("Q. And when did Mr. Coleman tell you that panhandling was not permitted on the plaza? A. Well, I can't say exactly the precise dates, but I can say it's been several times in the past. We've heard it in passing.") He also believed that his statement to Pindak in the September 24, 2010 video ("there is no soliciting on the Plaza") was accurate because "we're told you – you can't be begging or trying to sell anything on the plaza without a permit. So that's what I was trying to explain to him, that we have to take it along the corner, not on the plaza." (Truman Dep. at 44:6–17.) Truman later

testified, however, that he actually understood that he was only instructed to remove "aggressive" panhandlers. (*See* Truman Dep. at 41:10–42:10; 54:3–17.)

Kelly and Truman both admitted they had never received training regarding the definition of "aggressive" panhandling and that it has been left up to their discretion. (Kelly Dep. at 21:21–23:19, 49:8–24; Truman Dep. at 42:6–11.) Truman testified that the definition of aggressive was left to him and included anyone who was "bothering customers and clients, disturbing regular activity along the plaza, not cooperating if we ask them to leave the plaza." (Truman Dep. at 41:12–42:5.) When Pindak refused to leave the Plaza in the videotaped incident, Truman characterized his behavior as "pretty much being aggressive . . . he's also refusing to leave, as we told him to leave . . . [a]nd he wants to debate the issue." (Truman Dep. at 50:5–14.) Kelly, similarly, understands aggressive panhandling to mean "someone being a public nuisance," which might include "asking for money several times after being told no, or swearing at a person after they say no." (Kelly Dep. at 15:2–12; Pls.' Securitas SOF ¶ 91; Securitas Resp. to Pls.' SOF ¶ 91.)

Securitas is obligated under its contract to provide all the relevant training for its security guards at the Daley Center. (Pls.' Securitas SOF ¶ 100; Securitas Resp. to Pls.' SOF ¶ 100.) As the Security Manager, Coleman is responsible for coordinating that training, and according to Coleman, Securitas "do[es] a training class quarterly" for all the Daley Center guards, which lasts two to four hours. (Coleman Dep. at 17:7–10, 25:11–19.) Though the contract requires training, it does not specify the topics, and Coleman testified that he and Carik determine the topics for those trainings together. (*Id.* at 26:8–11.) Those topics have included proper search techniques, CPR, and "asbestos training." (*Id.* at 26:16–22.) The only training that Securitas contends touches on panhandling is the "Customer Service" class offered at these quarterly training sessions. (Pls.' Securitas SOF ¶¶ 104–06; Securitas Resp. to Pls.' SOF ¶¶ 104–06.) Coleman states that the guards are instructed in that class that "we only usually deal with what we call aggressive panhandlers," because Daley Plaza is a public space. (Coleman Dep. I at

27:13–28:3; see also *id.* at 28:18–29:5.)　　None of the slides in that training mention panhandling, however, and the only relevant slide instructs guards to keep the Plaza "not cluttered" with people.　(Customer Service Presentation, Ex. 27 to Pls.' Appendix [221-2] at 9; Pls.' Securitas SOF ¶ 137, Securitas Resp. to Pls.' SOF ¶ 137.)　Defendants assert, without citation to the record, that "the class is taught in an interactive style with a live instructor who receives questions over a four-hour period of time and provides scenarios for the class to solve."　(Securitas Resp. to Pls.' SOF ¶ 106.)　Kelly's take-away from that class was that panhandling "wasn't allowed, pretty much."　(Kelly Dep. at 49:14–22.)　In July 2013, Securitas updated its training to include a course titled "Limits of Authority."[12]　(Pls.' Securitas SOF ¶ 107; Securitas Resp. to Pls.' SOF ¶ 103.)　In that class, the guards now review the text of the City of Chicago's municipal panhandling ordinance which prohibits only aggressive panhandling and restricts panhandling only in certain locations.[13]　(Limits of Authority Presentation, Ex. 28 to Pls.'

---

[12]　　Securitas denies that the training was updated and claims that the presentation Plaintiffs reference "reflected the training that was delivered in past Limits of Authority Training Classes," and that Limits of Authority class "was taught by Raymond Pohl."　(Securitas Resp. to Pls.' SOF ¶ 107.)　But Securitas provides no citations to the record to support this assertion, and in a previous paragraph admitted that "at the request of MB Real Estate/Orestes Ruffin the municipal ordinance pertaining to aggressive panhandling was discussed in training classes in 2013."　(Securitas Resp. to Pls.' SOF ¶ 103.)　Because Securitas has failed to provide citations to the record to support its denial, Plaintiffs' statement is deemed admitted.

[13]　　The ordinance defines panhandling, in relevant part, as "any solicitation made in person upon any street, public place or park in the city, in which a person requests an immediate donation of money or other gratuity from another person."　Chicago Municipal Code § 8-4-025(a).　The ordinance prohibits panhandling in certain locations—such as near bus stops and on public transportation.　*Id.* § 8-4-025(b)(1).　More relevant here, the ordinance restricts the manner in which an individual may panhandle. Specifically, an individual may not request money:

(2)　　In a manner that a reasonable person would find intimidating, including any of the following actions when undertaken in a manner that a reasonable person would find intimidating:

(A)　　Touching the solicited person without the solicited person's consent;

(B)　　Panhandling a person while such person is standing in line and waiting to be admitted to a commercial establishment;

(continued . . . )

Appendix [221-3].)  The written Post Orders, however, remain unchanged.  (Pls.' Securitas SOF ¶ 77.)

Finally, Securitas employees appear to be uncertain about whether the oral or written Post Order takes priority.  Waters testified that unless there is another written document, then Chapter 16 of the Post Orders governed his conduct.   (Pls.' Securitas SOF ¶ 99.)   Coleman testified, without elaboration, that it depended on the particular situation.  (Coleman Dep. at 103:4.)

## IV.    Cook County Sheriff's policy related to panhandling on the Plaza

The Sheriff's Defendants maintain that the Sheriff's Department does not impose any restrictions on panhandling on Daley Plaza and that no panhandler has ever been arrested for panhandling.  (Sheriff's SOF ¶¶ 13, 22; Connelly Dep. at 20:17–20; Boyd Dep., at 26:6–15, 47:9:–48:3; Jevtic Dep., 83:20–22, 98:10–12; Nance Dep. at 68:24-69:23.)  They also maintain that panhandlers are on the Plaza "virtually every day."   (Sheriff's SOF ¶ 14; Pls.' Resp. to Sheriff's SOF ¶ 14.)   Plaintiffs admit that the Sheriff's Department has no formal policies concerning demonstrations, leafletting, or other First Amendment activities, such as panhandling, on the Plaza (Pls.' SAF ¶¶ 47–50; Sheriff's Resp. to Pls.' SAF ¶¶ 47–50), but assert the Department has adopted a policy of deference to Securitas, and in doing so has

---

(C)     Blocking the path of a person being solicited, or the entrance to any building or vehicle;

(D)     Following behind, ahead or alongside a person who walks away from the panhandler after being solicited;

(E)     Using profane or abusive language, either during the solicitation or following a refusal to make a donation, or making any statement, gesture, or other communication which would cause a reasonable person to be fearful or feel compelled; or

(F)     Panhandling in a group of two or more persons.

*Id.* § 8-4-025(b)(2).

acquiesced in Securitas' removal of panhandlers from the Plaza. (Pls.' Mem. in Supp. of Mot. for Summ. J. against Sheriff's Defs. [257], hereinafter "Pls.' Sheriff Mem.," 1.)

Moreover, Plaintiffs contend that the Sheriff's Department has willfully avoided training its deputies on the rights of panhandlers. While Plaintiffs cite the testimony of Kevin Connelly, the First Assistant Chief Deputy, claiming the Sheriff's deputies assigned to the Plaza do not receive any training specifically regarding First Amendment activities on the Plaza (Connelly Dep. at 26:12–17; Pls.' SAF ¶ 51; Sheriff's Resp. to SAF ¶ 51), Plaintiffs acknowledge elsewhere that First Amendment training is in fact provided to the Sheriff's deputies, during the annual in-service training, during the Sheriff's Academy, and as part of their annual recertification. (Sheriff's SOF ¶ 23; Pls.' Resp. to Sheriff's SOF ¶ 23.) Citing the testimony of Thomas Boyd, a Sheriff's Sergeant, who worked at the Daley Center from 2003 through 2012, Plaintiffs more precisely argue that while deputies received First Amendment training concerning scenarios such as detaining protesters, that training did not touch on panhandling. (Boyd Dep. at 28:20–29:15.)

Deputy Nance, Deputy Jevtic, and Sergeant Boyd each confirmed that they received no training regarding the legality of panhandling. (Pls.' SAF ¶¶ 52, 70; Sheriff's Resp. to Pls.' SAF ¶¶ 52, 70.) No one has ever informed Deputy Jevtic that panhandling is allowed on the Plaza, and his understanding is that, from at least 2000 until the time of his deposition in 2013, panhandling has been prohibited. (Pls.' SAF ¶¶ 25–26; Sheriff's Resp. to SAF ¶¶ 25–26.) Deputies Nance and Jevtic have not received any training on the meaning of "aggressive panhandling." (Pls.' SAF ¶ 37; Sheriff's Resp. to Pls.' SAF ¶ 37.) Jevtic has never seen the City of Chicago panhandling ordinance, and Nance has only seen it because he did his own research. (Pls.' SAF ¶¶ 38–39; Sheriff's Resp. to Pls.' SAF ¶¶ 38–39.) Nance testified that as of November 2013, no one had talked to him about whether panhandling was permitted on the Plaza. (Pls.' SAF ¶ 46; Sheriff's Resp. to Pls.' SAF ¶ 46.) Finally, Deputy Jevtic was never

disciplined for his May 2012 interaction with Pindak. (Pls.' SAF ¶ 27; Sheriff's Resp. to Pls.' SAF ¶ 27.)

On September 29, 2010 Pindak filed his initial complaint, pursuant to 42 U.S.C. § 1983, naming Sheriff Dart as a defendant. (Compl. [1].) Pindak filed his First Amended Complaint on February 15, 2012, adding Securitas and its guards as defendants. (First Am. Compl. [37].) Talley and Phillips joined as Plaintiffs on June 6, 2013. (Sixth Am. Compl. [113].)

## DISCUSSION

Four motions for summary judgment are pending, one filed by Securitas Defendants, one by Sheriff's Defendants, and two by Plaintiffs. To establish § 1983 liability against an individual, a plaintiff must show that the defendant (1) acted under color of state law, and (2) violated the plaintiff's rights under the Constitution or laws of the United States. *Armato v. Grounds*, 766 F.3d 713, 719–20 (7th Cir. 2014). In addition to those two elements, in order for a plaintiff to establish liability of an entity—whether municipal or private—the plaintiff must show that the injury resulted from a policy, custom, or widespread practice of that entity. *See Shields v. Ill. Dept. of Corr.*, 746 F.3d 782, 796 (7th Cir. 2014).

Securitas Defendants assert that they are not liable under § 1983 because they were not acting "under color of state law." Even if they could be held liable under § 1983, they contend, Plaintiffs have identified no evidence showing that (1) Kelly or Truman actually prevented Plaintiffs from panhandling on the Plaza, or (2) Securitas had a policy or widespread practice in place. Finally, Securitas urges that even if Kelly and Truman violated Plaintiffs' rights, Securitas may not be held vicariously liable for the actions of its employees.

Sheriff's Defendants do not contest that they acted under color of state law, but urge that Plaintiffs cannot establish (1) that Deputies Nance and Jevtic interfered with Plaintiff's panhandling or (2) that the Sheriff's lack of policies and training was so deficient that it constitutes a policy for *Monell* purposes. Sheriff's Defendants also contend that, even if Plaintiff could make such a showing, the individual defendants are entitled to qualified immunity.

Plaintiffs respond that Securitas and its guards were acting under color of state law because they (1) were engaging in a government function by regulating speech in a public forum, and (2) appeared like police officers in uniforms, thus cloaking themselves with government authority. The video and audio evidence of Truman, Kelly, and Jevtic removing Pindak from the Plaza, Plaintiffs continue, conclusively establishes that each of those Defendants directly interfered with Pindak's First Amendment right. Securitas Defendants have also failed to present any competing evidence to dispute Phillips and Talley's testimony, Plaintiffs maintain, and there is overwhelming evidence that Securitas had a policy and widespread practice of removing panhandlers from the Plaza. Finally, they urge that the evidence conclusively establishes that the Sheriff's Department tacitly endorsed Securitas' policy by failing to adopt its own policies or train its deputies on the legality of panhandling. This evidence precludes summary judgment for Defendants and, Plaintiffs urge, entitles them to summary judgment.[14]

The court addresses the arguments pertaining to individual liability first and then turns to consider entity liability for Securitas and Sheriff Dart.

## I.    Summary judgment standard

The court will grant a motion for summary judgment only when "there is no genuine dispute as to any material fact" such that "the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The court "constru[es] all facts, and draw[s] all reasonable inferences from those facts, in favor of the nonmoving party." *Garofalo v. Vill. of Hazel Crest*, 754 F.3d 428, 430 (7th Cir. 2014) (quoting *Laskin v. Siegel*, 728 F.3d 731, 734 (7th Cir. 2013)). Where, as here, the court considers cross-motions for summary judgment, the court must adopt "a dual, Janus-

_____

[14] Plaintiffs have not sought summary judgment on their claims against Deputy Sheriff Nance, acknowledging that Deputy Nance's testimony that he has never removed or interfered with a panhandler creates a dispute of fact precluding summary judgment. (Pls.' Sheriff Mem. at 1, n.1.)

like perspective," interpreting any disputed facts in favor of each nonmovant. *Hotel 71 Mezz Lender LLC v. Nat'l Ret. Fund*, 778 F.3d 593, 603 (7th Cir. 2015) (internal quotations omitted). If the moving party meets its initial burden to show that the evidence is insufficient as to a material element, the non-moving party must then "come forward with specific facts showing there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986). Under local rules, a party opposing summary judgment is required to respond to each numbered paragraph of the moving party's statement of fact and, in the case of any disagreement, provide "specific references to the affidavits, parts of the record, and other supporting materials relied upon[.]" N.D. Ill. Local R. 56.1(b)(3)(B). The result of noncompliance is significant: "All material facts set forth in the statement required of the moving party will be deemed to be admitted unless controverted by the statement of the opposing party." *Id.* 56.1(b)(3)(C). "If parties fail to comply with local rules, they must suffer the consequences, harsh or not." *Petty v. City of Chicago*, 754 F.3d 416, 420 (7th Cir. 2014) (internal quotations omitted). If the moving party's evidence supports judgment in its favor and the evidence supporting the non-moving party's claim is insufficient for a reasonable jury to return a verdict in its favor, the court will grant summary judgment. *Id.*

## II.    Individual liability

Defendants do not contest that Plaintiffs have a First Amendment right to panhandle on Daley Plaza. (Securitas Reply Mem. [271], hereinafter "Securitas Reply," 6); *See Gresham v. Peterson*, 225 F.3d 899 (7th Cir. 2000) ("While some communities might wish all solicitors, beggars, and advocates of various causes be vanished from the streets, the First Amendment guarantees their right to be there, deliver their pitch and ask for support.") (citing *Village of Schaumburg v. Citizens for a Better Environment*, 444 U.S. 620, 632 (1980)).[15]    Rather,

_____

[15]    Several other circuits have recognized panhandling as protected First Amendment speech. *See Reynolds v. Middleton*, 779 F.3d 222, 225 (4th Cir. 2015) ("There is no question that panhandling and solicitation of charitable contributions are protected speech.") (continued . . . )

Securitas guards Truman and Kelly urge that they were not acting under color of state law, and each individual Defendant (Truman, Kelly, Deputy Jevtic, and Deputy Nance) maintains that Plaintiffs have failed to show that they were actually prevented from panhandling. The court addresses each issue in turn.

## A. Securitas Defendants acted "under color of state law"

Securitas Defendants urge that they are entitled to summary judgment because its guards, who are employed by a private company, were not acting "under color of state law" while providing security services for Daley Plaza. The mere fact that Securitas is a private company, rather than a government agency, does not end the court's inquiry: "Anyone whose conduct is fairly attributable to the state can be sued as a state actor under § 1983." *Filarsky v. Delia*, 132 S. Ct. 1657, 1661 (2012) (internal quotations omitted). Courts have identified several circumstances in which private conduct is "fairly attributable" to the state. *See, e.g., Brentwood Acad. v. Tenn. Secondary Sch. Athletic Assoc.,* 531 U.S. 288, 295–96, (2001) (identifying "a host of facts that can bear on . . . [whether] challenged activity may be state action."); *Hallinan v. Fraternal Order of Police of Chicago Lodge No. 7*, 570 F.3d 811, 815–16 (7th Cir. 2009). Private action may be deemed governmental when private actors conspire or are jointly engaged with state actors to deprive a person of constitutional rights, *Dennis v. Sparks,* 449 U.S. 24, 27–28 (1980); *Wilson v. Price*, 624 F.3d 389, 394 (7th Cir. 2010); where the state compels the act or controls the private actor, *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982); *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 152 (1970); or when the state delegates a public

(citing *Clatterbuck v. City of Charlottesville*, 708 F.3d 549, 553 (4th Cir. 2013)); *Speet v. Schuette,* 726 F.3d 867, 878 (6th Cir. 2013) ("begging, or the soliciting of alms, is a form of solicitation that the First Amendment protects."); *ACLU of Nevada v. Las Vegas*, 466 F.3d 784, 792 (9th Cir. 2006) ("It is beyond dispute that solicitation is a form of expression entitled to the same constitutional protections as traditional speech.") (citing *Vill. of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620, 628–32 (1980)); *Smith v. Fort Lauderdale*, 177 F.3d 954, 956 (11th Cir. 1999) ("[L]ike other charitable solicitation, begging is speech entitled to First Amendment protection."); *Loper v. New York City Police Dep't*, 999 F.2d 699, 704 (2nd Cir. 1993) ("It cannot be gainsaid that begging implicates expressive conduct or communicative activity.").

function to a private entity. *West v. Atkins,* 487 U.S. 42, 55–56 (1988); *Payton v. Rush-Presbyterian-St. Luke's Med. Ctr.,* 184 F.3d 623, 628 (7th Cir. 1999).

From this precedent, Plaintiffs identify three distinct tests—whether the guards exercised delegated state authority, performed a traditional public function, or were cloaked with state authority—and contend that under any of these tests, Securitas and its guards acted under color of state law. Defendants, for their part, identify four tests—the "nexus test," "symbiotic relationship test," "joint action test," and "public function test"—and maintain that there is no evidence of state action under any of these frameworks. As our Court of Appeals has explained, attempting to identify distinct tests may not be useful: "Over time, Supreme Court and Seventh Circuit precedent have revealed that these cases do not so much enunciate a test or series of factors, but rather demonstrate examples of outcomes in a fact-based assessment." *Hallinan*, 570 F.3d at 815–16 (citing *Brentwood,* 531 U.S. at 295 and *Tarpley v. Keistler,* 188 F.3d 788, 792 (7th Cir. 1999)); *see also Listecki v. Official Comm. of Unsecured Creditors*, 780 F.3d 731, 738 (7th Cir. 2015) ("[A]t its most basic level, the state action doctrine requires that a court find such a close nexus between the State and the challenged action that the challenged action may be fairly treated as that of the State itself.") (internal quotations omitted).

Though they articulate different tests, both parties have engaged in a fact-based assessment focusing on whether the Securitas guards' uniforms and close working relationship with the Sheriff's deputies cloak the guards with state authority. Plaintiffs maintain that because the guards wear five-pointed metal star badges, bulletproof vests, BDU pants, and utility belts, and carry handcuffs, their appearance suggests that they have police power, including the power to arrest and detain. (Pls.' Securitas Mem. at 23–24.) Plaintiffs also highlight the fact that the guards and deputies share a booth, monitor the closed circuit television, and assist each other in performing patrols and removing panhandlers. (*Id.* at 25–26.) Finally, Plaintiffs emphasize the language in the Post Orders, which are incorporated into Securitas' contract, directing guards to "remove any panhandlers," urging that this language represents a delegation

of state authority to regulate speech on the Plaza.  (*Id.* at 20–21.)  Securitas responds by pointing out that Plaintiffs themselves were able to distinguish between private security guards and Sheriff's deputies.  Further, Securitas Defendants challenge Plaintiffs' characterization of the working relationship between the guards and the deputies as a close one.  Finally, Securitas maintains that language in the Post Orders requires guards to remove the panhandlers only from the ramp leading to the parking garage, rather than from the entire Plaza and thus the Post Orders do not delegate a traditional public function.  (Securitas Defs. Resp. to Pls.' Mot. for Summ. J. [262], hereinafter "Securitas Resp.," 25–26; *see also* Securitas Defs. Mem. in Supp. of Summ. J. [255], hereinafter "Securitas Mem.," 30–31.)

The parties devote several pages to these factual disputes, but they agree that Daley Plaza is a public forum.  (Securitas Reply in Supp. of Summ. J. [271], hereinafter "Securitas Reply," 6.)  The court concludes that this undisputed fact is dispositive of the state action question.  A private action may be fairly attributable to the state when private employees "perform[] functions that would otherwise be performed by public employees."  *Belbachir v. Cnty. of McHenry*, 726 F.3d 975, 978 (7th Cir. 2013).  "Otherwise state and local government could immunize itself from liability under section 1983 by replacing its employees with independent contractors."  *Id.* at 978–79.  To identify a public function, the court must determine whether the function has been "traditionally the exclusive prerogative of the State."  *Rendell-Baker v. Kohn*, 457 U.S. 830, 842 (1982).  That test is immediately met here. As this court has previously recognized, "regulation of [Plaintiffs'] speech in a public forum is a public function." *Pindak v. Cook Cnty.*, No. 10-cv-6237, 2013 WL 1222038, at *5 (N.D. Ill. Mar. 25, 2013).

Because Securitas guards perform a traditionally public function when deciding whether or not to remove panhandlers from the Plaza, they are bound to uphold the Constitution.  In *United Church of Christ v. Gateway Economic Development Corp. of Greater Cleveland*, the Sixth Circuit considered whether the private owners of the Gateway Sports Complex—where the Cleveland's professional baseball and basketball teams play home games—could prohibit

34

religious protests and demonstrations on the sidewalk surrounding the Complex. 383 F.3d 449, 450 (6th Cir. 2004). The Appellate Court determined that the sidewalk was a public forum, and then explained that "our decision that the Gateway Sidewalk is a public forum necessarily requires that the Sidewalk be treated as state owned for the purposes of the First Amendment." *Id.* at 453–54. The court reasoned that "regulation of the public's access to a sidewalk that functions as a public sidewalk—in other words, the operation of a public forum," was a power "traditionally exclusively reserved to the state." *Id.* at 454–55. (internal quotes omitted). Thus, under the public function rubric, Gateway was a state actor when it regulated access and speech on the sidewalk. *Id.*

The Ninth Circuit reached the same conclusion in *Lee v. Katz*, when it considered whether a private lessee could restrict "street preachers" who sought to preach on the Rose Quarter Commons, "an outdoor area next to city-owned public facilities in the city of Portland." 276 F.3d 550, 551–52 (9th Cir. 2002). After deciding that the Commons was a public forum, the Appellate Court concluded that "the regulation of speech in the Commons is a public function and the [private lessee] became a State actor when the City delegated that regulation to the" private company. *Id.* at 556. Thus, the nature of the forum, rather than the identity of the owner or occupant, dictates when a private actor is considered a state actor. *Cf. Evans v. Newton*, 382 U.S. 296, 302 (1966) ("the public character of this park requires that it be treated as a public institution subject to the command of the Fourteenth Amendment, regardless of who now has title under state law."); *Marsh v. Alabama*, 326 U.S. 501, 506 (1946) (holding that where a company-owned town made property available "for use by the public," it becomes a public forum, and the private owner of that public forum must, therefore, comply with the Constitution and ensure that the "constitutional rights of those who use" the forum are protected); *Venetian Casino Resort, LLC v. Local Joint Executives Board of Las Vegas,* 257 F.3d 937, 943 (9th Cir. 2001) (holding that once an owner has "dedicat[ed] the property to public use . . . "[t]he private

owner can no longer claim the authority to bar people from using the property because he or she disagrees with the content of their speech.").

Securitas Defendants respond, arguing that they do not exercise any traditional public function because there is no regulation or contract language specifically delegating authority to regulate free speech on the Plaza.[16]  (Securitas Reply at 8.)   Securitas cites no authority, and the court has found none, suggesting that Plaintiffs must identify a contract term or regulation delegating such authority to establish that a defendant engages in a traditionally public function. In fact, case law makes clear that, while a contractual delegation may be one way to establish state action, *Shields v. Illinois Dep't of Corr.*, 746 F.3d 782, 797 (7th Cir. 2014), "no one fact can function as a necessary condition across the board for finding state action." *Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001).  Moreover, the Supreme Court has rebuffed the notion that state action doctrine turns on precise contract language, instead recognizing that "[i]t is the [defendant]'s function within the state system, not the precise terms of his employment, that determines whether his actions can fairly be attributed to the State." *Atkins*, 487 U.S. at 55–56.   In line with these principles, other courts to consider private regulation of speech have focused exclusively on determining whether the defendant operated within a public forum, rather than analyzing the specific authority delegated through the terms of a contract.   *See, e.g.*, *United Church of Christ v. Gateway Econ. Dev. Corp. of Greater Cleveland*, 383 F.3d 449, 454–55 (6th Cir. 2004) ("our decision that the Gateway Sidewalk is a public forum necessarily requires that the Sidewalk be treated as state owned for the purposes of the First Amendment. . . . Thus, for the purpose of this case, we need not decide whether

_____

[16]     Securitas also contends that the instruction in Chapter 10 to "remove any panhandlers," only permits the guards to remove panhandlers from the ramp leading to the parking garage.  (Securitas Resp. at 30–31.)  The text of the Post Order includes no such limitation, and the instruction to remove panhandlers is repeated in Chapter 16, which states guards "may encounter undesirables," which is defined to include panhandlers, "in or outside of the building."  (Ch. 16 Post Order at 1.)   No evidence supports the assertion that the policy applies only to the ramps leading to the garage, and Securitas' assertion in its brief does not create a dispute of fact.

Gateway is a state actor under the other two theories advanced by UCC."); *Rouse v. City of Aurora,* 901 F. Supp. 1533, 1535–36 (D. Colo. 1995) (evaluating plaintiffs' claim that the First Amendment applied to a privately owned shopping center sidewalk, and observing that "[t]he linchpin to this claim . . . is their allegation that the Granada Park Shopping Center is a public forum.").

Finally, Securitas argues that it is not exercising a public function because the task of removing panhandlers is not part of Securitas' "primary role." This argument is easily dispatched: "[I]t is the [private entity's] function while working for the State, not the amount of time [it] spends in performance of those duties or the fact that [it] may be employed by others to perform similar duties, that determines whether [it] is acting under color of law." *West v. Atkins*, 487 U.S. 42, 56 (1988). In sum, despite the various factual disputes—regarding the meaning of the Post Orders, the appearance of the guards' uniforms, and the relationship between the guards and the deputies—the fact that the Plaza is a public forum by itself requires the conclusion that the guards act under color of state law when deciding whether or not to remove panhandlers from the Plaza.

### B. Individual Defendants violated Plaintiffs' rights

Having determined that all of the Defendants are subject to the Constitution, the court addresses the evidence in support of Plaintiffs' claims. Plaintiffs have asserted several claims against individual Defendants:[17] Pindak alleges that on September 24, 2010, Kelly and Truman

---

[17] Securitas asserts in its motion for summary judgment that the court should grant summary judgment on claims arising outside the two-year statute of limitations. (Securitas Mem. at 20); *O'Gorman v. City of Chicago*, 777 F.3d 885, 889 (7th Cir. 2015) ("The limitations period for § 1983 claims is based in state law, and the statute of limitations for § 1983 actions in Illinois is two years.") Securitas has, however, failed to identify any untimely claims. Pindak filed his First Amended Complaint on February 15, 2012, naming Securitas and its guards for the first time. (First Am. Compl. [37]), and Talley and Phillips joined as Plaintiffs on June 6, 2013. (Sixth Am. Compl [113].) The earliest incident for which Pindak seeks relief took place on September 24, 2010, well within two years of his February 15, 2012 complaint. Talley and Phillips seek to recover based on events in summer of 2012, only one year before they were joined as plaintiffs on June 6, 2013.

(continued . . . )

interfered with his ability to freely panhandle on the Plaza and that as a result of that interaction, he has almost entirely avoided panhandling on the Plaza. Pindak also contends, based on his May 7, 2012 audio recording that Deputy Jevtic similarly prevented him from panhandling on the Plaza because he feared arrest. Pindak's final allegation is that Deputy Nance told him he was banned from the Plaza in May 2012. Phillips alleges that Truman, Kelly, and various Sheriff's deputies interfered with his panhandling repeatedly during the summer of 2012. Talley makes allegations only against Kelly: according to Talley, during the summer of 2012, Kelly threatened to arrest him if he continued to panhandle on the Plaza. The court addresses each claim in turn.

### 1.    Pindak's claim against Truman and Kelly

Pindak's allegations against Truman and Kelly are based on a videotaped interaction on September 24, 2010. That video recording contains the following interaction:

| | |
|---|---|
| Pindak: | What's up? |
| Kelly: | You need to take a walk, that's what's up. |
| Pindak: | Can I speak to your supervisor? I want to know, is it, last year they said I couldn't beg here. Is it the same this year too? |
| Kelly: | It's the same this year, the following year, and the year after that. |
| Pindak: | Show me where I can go and beg. |
| Kelly: | I'm not going show you anything. I'm just going to put handcuffs on you. |
| Truman: | Sir, you've got to take that off the plaza. OK? You can't do that here. No soliciting. |
| Pindak: | Could you point to me which direction? Could you at least do me that? |
| Truman: | (walking with Pindak) Listen, this is what I'm telling you. No soliciting on the plaza. You gotta go towards the corners, outside the plaza. OK? Outside the plaza. |
| Kelly: | You can't do that nowhere around this building. Go to the next building. |
| Nance: | Everything OK? |
| Kelly: | He's on his way off the Plaza. (to Pindak) Keep walking. |
| Nance: | Oh, OK. |

---

Securitas also repeatedly asserts that Truman is entitled to summary judgment on Talley's claims against him and asserts that Talley's inclusion of such a claim is sanctionable. (Securitas Reply at 40.) Yet, Talley has made allegations only against Kelly, and has readily admitted that Talley is not seeking damages from Truman. (*See* Seventh Am. Compl. ¶¶ 30–34; Pls.' Resp. to Securitas Mot. for Summ. J. [259], 12 ("Talley[] . . . has never alleged that Defendant Truman was the individual who told him panhandling was illegal . . . Securitas seeks summary judgment on a claim that Talley has never asserted.").)

(SOF, ¶¶ 25, 26; Sept. 24, 2010 video.)  Securitas Defendants assert that the video has been improperly excerpted, but that challenge is meritless.  Even assuming the video was in fact taped for use in this litigation and excerpted, Securitas has presented no evidence to suggest that the recording inaccurately captured the events of that day.  Securitas has not argued, for example, that Pindak was removed for reasons other than panhandling or that Pindak was actually permitted to remain on the Plaza, but that those events were not captured on the video.

This recorded dialogue alone precludes summary judgment in favor of Truman and Kelly.  It constitutes direct evidence of Kelly and Truman's interference with Pindak's attempt to exercise his First Amendment rights on September 24, 2010.  Pindak testified that after this confrontation, he was afraid to panhandle on the Plaza and largely avoided it.  (Pindak Dep. II at 217:11–23.)  That is, he asserts that Kelly and Truman's actions had a continued chilling effect on his speech, a deprivation for which he seeks damages.  (Pls.' Securitas Mem. at 18–19.)

Securitas Defendants respond that Truman and Kelly are nonetheless entitled to summary judgment because (1) after the video was taped, Pindak returned to the Plaza to panhandle, suggesting Kelly and Truman's actions did not actually deter his speech; (2) as Pindak himself testified, he was panhandling on the Plaza for about 15 minutes before the interaction with Kelly and Truman, but that 15 minutes is not depicted on the video; and (3) Pindak's testimony that he went to the Plaza to gather evidence for the case undermines his claim that he was prevented from panhandling on September 24, 2010.  Securitas Defendants have failed to identify evidence to support their first assertion, however, and the remaining two arguments are immaterial.

To support their contention that Pindak was not actually deterred from panhandling on the Plaza, Securitas Defendants cite a portion of Pindak's testimony in which he states:

> **Q.** Since September 24, 2010, have you ever returned to Daley Plaza to panhandle?
> **A.** Yes.
> **Q.** On how many occasions?

**A.** Well, I'm not certain [the] exact amount, but I've been back there a few times but not many. Like I say, primarily Christmas.

**Q.** What brought you back there?

**A.** Well, I mean, some -- even though I go out of my way to avoid it, once in a while as I was walking I would ask people and just walk right off of it. I would just walk across -- walk down the street and just get off of it. I wasn't trying to stay there, because I was worried about being hassled. I spent a lot of time away from the Plaza because of that.

**Q.** Have you ever panhandled at Daley Plaza after September 24, 2010?

**A.** Yes.

**Q.** On how many occasions?

**A.** I don't know.

**Q.** Can you give me a ballpark?

**A.** Maybe 25 times in the whole – 25 times.

**Q.** And those 25 times, you weren't trying to gather evidence for your lawsuit, you were trying to panhandle; is that correct?

**A.** Yeah, but for very few minutes. Very few minutes. Not trying to stay there and try to defy authority. Trying to see if someone would help me along the way and get out of there.

(*See* Securitas Resp. at 16, 18) (citing Pindak Dep. II at 209:2–210:10.) As the Securitas Defendants see things, this testimony establishes that "[s]ince September of 2010, Pindak's efforts to panhandle at Daley Plaza have not been hindered by Kelly, Truman or any other private security officer." (Securitas Resp. at 18.) That interpretation of Pindak's testimony is unreasonable, in this court's view. *See Hill v. Potter*, 625 F.3d 998, 1000 (7th Cir. 2010) (the court is "not required, however, to draw unreasonable inferences"). Pindak's testimony suggests exactly the opposite—he "go[es] out of [his] way to avoid" the Plaza and the 25 times he did return were only "for a very few minutes," before he would "get out of there." (Pindak Dep. II at 209:2–2010.) No reasonable jury could conclude from this evidence that Pindak felt free to exercise his First Amendment rights.

Securitas Defendants also contend that, even if Pindak did largely avoid the Plaza, that harm does not rise to an actionable level because he was not completely precluded from panhandling on the Plaza. (Securitas Resp. at 18.) But that argument contradicts well-established First Amendment principles. "[C]onstitutional violations may arise from the 'chilling' effect of governmental regulations that fall short of a direct prohibition against the exercise of first amendment rights." *Penny Saver Publications, Inc. v. Vill. of Hazel Crest*, 905 F.2d 150,

154 (7th Cir. 1990) (quoting *Laird v. Tatum*, 408 U.S. 1, 11 (1972)). "Any deprivation under color of law that is likely to deter the exercise of free speech . . . is actionable." *Power v. Summers*, 226 F.3d 815, 820 (7th Cir. 2000). The test is whether a person of "ordinary firmness" would be deterred from exercising his or her First Amendment rights. *Bart v. Telford*, 677 F.2d 622, 625 (7th Cir. 1982). An arrest is not required for there to be actionable interference with Plaintiffs' rights. Rather, courts agree that a "realistic threat of arrest is enough to chill First Amendment rights." *Hodgkins v. Peterson*, 355 F.3d 1048, 1056 (7th Cir. 2004); *see also Bell v. Keating*, 697 F.3d 445, 453 (7th Cir. 2012) ("arrest, prosecution, and conviction are tangible harms, and so is abandoning one's constitutional right of free speech in order to avert those harms."). Being threatened with handcuffs and escorted off the Plaza by two security guards easily surpasses the threshold of an action likely to deter a person of "ordinary firmness" from attempting to panhandle in the future.

Without any evidence to contradict the video, the only reasonable conclusion is that Pindak was removed from the Plaza for panhandling, or perhaps for asking whether panhandling is permissible. He is therefore entitled to summary judgment on his individual claims against Truman and Kelly for the deprivation that occurred on September 24, 2010 and for the continued chilling effect that incident had on his First Amendment right to panhandle.

### 2. Pindak's claim against Deputy Jevtic

A recording supports Pindak's claim against Deputy Jevtic, as well. In a recording made on May 7, 2012, Deputy Jevtic can be heard responding to a question from Pindak by saying "there is no panhandling on the Plaza itself . . . for anyone." (5/7/2012 Audio Recording at 5:41–5:52.) Pindak asked: "But you can't panhandle on the sidewalks either, of the Plaza?" Jevtic responded: "No. Not on the Plaza, right. Across the street you can, but not on the Plaza." (*Id.* at 5:57–6:04.) Deputy Jevtic admits he made these statements while he was on duty, in uniform, and occupying the guard booth on the Plaza with one of the Securitas guards. (Pls.' Sheriff SOF ¶¶ 19–20; Sheriff Resp. to Pls.' SOF ¶¶ 19–20.) Pindak also testified that, as a

result of this conversation with Jevtic and his earlier interactions with security guards, he believed that he would be subject to arrest if he continued to panhandle on the Plaza. (Pindak Dep. II at 218:6–23.) Pindak admits, however, that he had not been panhandling before the conversation with Jevtic, and that he went to the Plaza to collect evidence for this litigation. (Sheriff's SOF ¶¶ 49–51, 53; Pls.' Resp. to Sheriff's SOF ¶¶ 49–51, 53.)

The parties dispute whether this evidence is legally sufficient to establish that Jevtic interfered with Pindak's First Amendment rights. The Sheriff's Defendants contend that because Pindak had not been panhandling that day and approached Jevtic to initiate the conversation, Deputy Jevtic did not interfere with an actual attempt by Pindak to panhandle on May 7, 2012. Nor could a jury reasonably conclude that Deputy Jevtic's statement deterred Pindak from subsequent panhandling attempts, Sheriff's Defendants continue. (Sheriff Defs.' Reply in Supp. of Summ. J. [273], hereinafter "Sheriff's Reply," 12.) Citing *Hodgkins v. Peterson*, 355 F.3d 1048, 1056 (7th Cir. 2004), they argue that Pindak must show a well-founded fear of arrest in order to prove a chilling effect. (Sheriff's Reply at 11.) Pindak cannot make this showing, they contend, because Jevtic's statement did not contain an explicit threat to detain or arrest Pindak, and Pindak admitted that Jevtic's tone was polite. (Sheriff's SOF ¶ 52; Pls.' Resp. to Sheriff's SOF ¶ 52.) Finally, Sheriff's Defendants assert, as did the Securitas Defendants, that because Pindak has returned to the Plaza 25 times since September 24, 2010 to panhandle, his rights were not actually infringed. (Sheriff's Mem. in Supp. of Summ. J. [231], hereinafter "Sheriff's Mem.," 11; Sheriff's Reply at 12.)

Plaintiffs contend that the undisputed evidence requires judgment in Pindak's favor on his First Amendment claim: though he wasn't actively panhandling before he spoke with Deputy Jevtic, Pindak did refrain from panhandling that day, after the conversation, meaning that his rights were directly infringed on that day. (Pls.' Resp. to Sheriff's Mot. for Summ. J. [268], hereinafter "Pls.' Sheriff Resp.," 22.) Pindak avoided the Plaza after the May 7, 2012 incident, as well. As Plaintiffs observe, "[i]t would be a bold panhandler indeed who would not stay away

from the Plaza once a sheriff's deputy on the Plaza told him that it was illegal to panhandle there." (*Id.* at 23.) Finally, though Plaintiffs recognize that a "realistic threat of arrest is enough to chill First Amendment rights," *Hodgkins v. Peterson*, 355 F.3d 1048, 1056 (7th Cir. 2004), they dispute that such a threat is a necessary element of a First Amendment claim.

The court agrees with Plaintiffs. The only relevant difference between Pindak's interaction with Kelly and Truman and his interaction with Deputy Jevtic is that in the first interaction, Kelly threatened to handcuff Pindak, while Jevtic made no such threat. But a direct threat of arrest is not a necessary element of a First Amendment violation. Rather, "[a]ny deprivation under color of law that is likely to deter the exercise of free speech . . . is actionable." *Power*, 226 F.3d at 820. A directive from an on-duty, uniformed Sheriff's deputy is likely to deter free speech. Finally, as described above, the fact that Pindak was not altogether prevented from panhandling does not mitigate the harm he did suffer. Plaintiffs have presented Pindak's testimony that he was afraid of being arrested and avoided panhandling on the Plaza as a result of his interaction with Jevtic. Pindak's fear appears to be a reasonable one. Sheriff's Defendants have identified no evidence that could support an inference that Pindak was able to freely panhandle on the Plaza after his conversation with Deputy Jevtic, and Pindak is therefore entitled to summary judgment on his claim against Jevtic.

### 3. Talley's claim against Kelly

The parties largely agree on the facts surrounding Plaintiff Norman Talley's allegations. Before the summer of 2012, Talley panhandled on Daley Plaza two to three times per week for about ten years, without incident. (Securitas SOF ¶¶ 121, 124; Pls.' Resp. to Securitas SOF ¶ 121, 124.) During that time, Talley (as he put it) tried to be "slick" while he panhandled: to avoid being seen by the private security guards, Sheriff's deputies, or Chicago Police, he chose not to hold a sign or a cup. (Securitas SOF ¶¶ 122–23; Pls.' Resp. to Securitas SOF ¶¶ 122–23; Talley Dep. at 152:1–153:21.) He chose to panhandle that way because, he believed that "the guards, if they see a person panhandling, . . . they probably would try and stop them from

panhandling." (Talley Dep. at 140:14–17.) One day, during the summer of 2012, Talley had been panhandling for over an hour when Kelly approached him. (Securitas SOF ¶¶ 126, 129; Pls.' Resp. to Sheriff's SOF ¶¶ 126, 129.) Kelly told Talley that Kelly had been watching him for some time, that Talley was not permitted to panhandle on the Plaza and warned, "[i]f you panhandle here, you will be arrested." (Securitas SOF ¶ 131; Pls.' Resp. to Securitas SOF ¶ 131; Talley Dep. Ex. 4 to Pls. Appendix [219-4], hereinafter "Talley Dep.," 116:16–117:9.) Though Securitas Defendants admit that Talley so testified, they "deny that Kelly made the statements which Talley attributes to him." (Pls.' Securitas SOF ¶ 37; Securitas Resp. to SOF ¶ 37.) Securitas Defendants provide no citations to the record to support this denial, however (not even the affidavit or testimony of Kelly himself) (Securitas Resp. to SOF ¶ 37), and Talley's account is, accordingly, admitted. N.D. Ill. Local R. 56.1(b)(3)(B). Talley acknowledged that Kelly's tone was calm ("[h]e was not threatening. He did not seem to be intimidating") and his behavior was respectful. (Securitas SOF ¶ 129; Pls.' Resp. to Securitas SOF ¶ 129; Talley Dep. at 117:10–19.) Talley nonetheless left the Plaza immediately after his conversation with Kelly, and has never returned because he "didn't want to be locked up." (Talley Dep. at 117:6–9, 132:5–11; *see also id.* at 142:13–19.) Since his conversation with Kelly, during the summer of 2012, Talley has observed other people, including Pindak and Phillips, panhandle on or near Daley Plaza, on multiple occasions. (Securitas SOF ¶¶ 136–37; Pls.' Resp. to Securitas SOF ¶¶ 136–37; Talley Dep. at 73:13–20.) Talley did not state precisely how many times he witnessed Phillips, Pindak, or others panhandling, but did note it was "just periodically," and later clarified that he did not know whether they were on the Plaza or on the public sidewalk surrounding the Plaza. (Talley Dep. at 62:7–20; 144:18–24.)

This evidence is sufficient for summary judgment in favor of Talley on his claim against Kelly. Talley's testimony establishes that Kelly directly interfered with Talley's rights on the day of their conversation, and that, because Kelly threatened to arrest him, he was subsequently

deterred from panhandling on the Plaza.  These facts establish a First Amendment violation, and Defendants have provided no evidence to contradict Talley's version of events.

### 4.  Phillip's claim against Truman and Kelly

Sam Phillips alleges that in the summer of 2012, Defendants Truman and Kelly repeatedly interfered with his attempts to panhandle.  Phillips testified that on 10 to 20 occasions, when he walked through the Plaza, Sheriff's deputies and Securitas guards told him that he could not beg there.  (Pls.' Securitas SOF ¶ 40; Securitas Resp. to Pls.' SOF ¶ 40; Sheriff's Resp. to Pls.' SAF ¶ 5; Phillips Dep. 72:17–73:20; 81:3–82:8.)  He could not recall, however, how many times it was Securitas guards, rather than Sheriff's deputies, who told him to leave.  (Securitas SOF ¶ 112; Pls.' Resp. to Securitas SOF ¶ 112; Sheriff's SOF ¶¶ 66–67; Phillips Dep. at 81:8–12, 85:12–13.)  Since summer of 2012, he has stayed off the Plaza, on the public sidewalk at the corner of Clark and Randolph streets.  (Pls.' Securitas SOF ¶ 38; Securitas Resp. to Pls.' SOF ¶ 38.)

Securitas Defendants acknowledge Phillips' testimony that guards and deputies repeatedly told Phillips he could not beg on the Plaza (Securitas Resp. to Pls.' SOF ¶ 40; Securitas SOF ¶ 112), but they argue that this evidence is insufficient to establish a First Amendment violation.  They note that at his deposition, Phillips was unable to provide the names of the individuals who told him he could not beg and admitted that he continues to regularly panhandle on the corner of Randolph and Clark.  (Securitas Mem. at 21–22.)

Without identifying the guards by name, Securitas Defendants urge, Phillips cannot meet his burden of proof.  The court disagrees.  "[T]aking inferences in favor of [non-moving party] does not require accepting [that party]'s conclusion on what a piece of evidence indicates.  Rather, the court independently reviews the evidence and, *if* it creates an inference, we take that inference in the light most favorable to the nonmoving party."  *Fleishman v. Cont'l Cas. Co.*, 698 F.3d 598, 606 (7th Cir. 2012).  Even construing the facts in the light most favorable to

Securitas Defendants, there is no basis to refute the inference that it was Truman and Kelly who told Phillips to leave the Plaza during the summer of 2012.

Phillips could not identify Defendants by name, but his descriptions of their appearance and the circumstances are sufficiently specific to preclude any genuine dispute of fact. Phillips explained that he could distinguish between Securitas guards and Sheriff's officers, and "they don't have to be in uniform" because he has "seen them all these times, [and] know[s] exactly who they are." (Phillips Dep. at 52:20–53:1.) He continued, identifying the "short guard" as the first one who told him he had to leave the Plaza. (Phillips Dep. at 75:3–11.) He went on to describe the physical characteristics of the guards: "There's two that work out there, tall one and a short one. . . . the shorter one, he [sic] more muscular than the tall one. There's not but two of them that work there. There was [sic] three, but he took a test and he became a sheriff." (Phillips Dep. at 75:5–76:1.) He also explained that he would be able to identify the guards if he saw their pictures and in fact, at his deposition—taken at the Daley Center—was able to "verify [the short guard] in the booth right there." (Phillips Dep. at 76:19–20, 77:14–78:4.) He observed that the individuals who told him to leave wore "[a] yellow shirt and black pants with 'Security' on it." (Phillips Dep. at 81:1–2.) Truman and Kelly are the only two security guards who work outside on Daley Plaza on a regular basis and are the only guards who wear the uniform described by Phillips. (Pls.' Securitas SOF ¶¶ 11, 15, 122, 124; Securitas Resp. to Pls.' SOF ¶¶ 11, 15, 122, 124.) Rather than present competing evidence—such as testimony from Kelly or Truman, or countervailing descriptions of their uniforms or physical appearance— Securitas Defendants attempt to negate Phillips' testimony only by identifying minor deficiencies and discrepancies.[18] At best, Securitas Defendants "raise[] some metaphysical doubt as to a

---

[18] For example, Securitas Defendants make much of the fact that Phillips testified that he was removed from the Plaza between 10 and 20 times, but elsewhere testified that the number was 15 to 16. (Securitas Resp. to Pls.' SOF ¶ 40; Securitas Resp. at 15.) To the extent this testimony is inconsistent at all, it is not so inconsistent as to create a genuine issue of material fact.

material fact. That is not enough." *Fitzgerald v. Santoro*, 707 F.3d 725, 733 (7th Cir. 2013) (internal quotations and alterations omitted).

Nor does the undisputed fact that Phillips continues to panhandle on the sidewalks at the corner of Randolph and Clark undermine Phillips' claim. There is ample evidence to support Plaintiffs' contention that the Plaza and the sidewalks are treated as distinct spaces, and Securitas Defendants offered no evidence to the contrary. Phillips testified that deputies and guards told him that, while he could not enter the Plaza, he could remain on the sidewalk. (Phillips Dep. at 69:8–22.) Phillips perceives a difference between the sidewalk and the Plaza; he stays on the sidewalk, though he wants to panhandle on the Plaza "[b]ecause . . . every time you go in there, they bum-rush you, and I just tried to stay out of any trouble." (Pls.' Securitas SOF ¶ 134; Phillips Dep. at 101:22–102:5.)

In addition to Phillips' own testimony, Plaintiffs present evidence that other Securitas employees, including Truman and Kelly, treat the sidewalks and the Plaza as distinct spaces. As recorded on a video, in 2009, Melvin Waters directed Pindak to the corners of the Plaza, explaining that the corners are "public property," while the center is "private." (Pls.' Securitas SOF ¶ 29; 10/6/09 Video at 0:27–0:35.) Kelly testified that he is responsible for keeping "aggressive panhandlers off the actual plaza and mov[e] them onto the common area of the plaza, which would be the City sidewalk." (Pls.' Securitas SOF ¶ 89; Securitas Resp. to SOF ¶ 89; Kelly Dep. at 13:21–24.) Truman explained that the guards ask bothersome panhandlers to "leave the plaza area, you know, maybe take it along the corners where they're within City limits; you know, where they're not under our jurisdiction." (Truman Dep. at 35:23–36:3.) Tee Coleman, the Security Manager for Securitas, also distinguished between the sidewalk and the Plaza, and suggested that panhandlers should "go out to the perimeter along the sidewalks." (Coleman Dep. I at 50:8–11; Pls.' Securitas SOF ¶ 75; Securitas Resp. to SOF ¶ 75.)

Securitas Defendants assert in their brief, without any factual support, that the corner of Randolph and Clark where Phillips regularly panhandles is part of the Plaza. (Securitas Resp.

Mem. at 15.)   The court is not required to "draw inferences that are supported by only speculation or conjecture." *Collins v. Am. Red Cross*, 715 F.3d 994, 997 (7th Cir. 2013) (internal quotations omitted).   Perhaps the fact that Phillips continues to panhandle near Daley Plaza is relevant to the amount of money he lost by not being able to panhandle on the Plaza, but there is no genuine dispute that he has been relegated to the sidewalks.   Phillips is therefore entitled to summary judgment against Truman and Kelly.

### 5.   Pindak and Phillips' claim against Deputy Nance

Phillips testified that during the summer of 2012, Deputy Nance was one of the Sheriff's deputies who told him he could not beg on the Plaza.   (*See* Pls.' Sheriff's Reply at 6.)   Pindak asserts that he had a conversation with Deputy Nance, in which Nance stated that Pindak was not permitted to panhandle and was "banned" from Daley Plaza.   (Sheriff's SOF ¶¶ 35–39, 43; Pls.' Resp. to Sheriff's SOF ¶¶ 35–39, 43; Sheriff's Resp. to Pls.' SAF ¶ 13.)   Defendants highlight several flaws in Pindak's testimony: he was confused about the date of this conversation, did not remember how the conversation started, or whether he was actually panhandling that day, but he believes that he approached Nance to ask about panhandling on the Plaza.   (Sheriff's SOF ¶¶ 36–37; Pls.' Resp. to Sheriff's SOF ¶¶ 36–37.)   Moreover, Defendants direct the court to Nance's testimony that, while he has seen Pindak panhandling on Daley Plaza at least ten times, he never confronted Pindak about his behavior, has never seen a Sheriff's deputy tell anyone they could not panhandle, and has never assisted with removing a panhandler.   (Sheriff's SOF ¶¶ 79–80, 84, 86; Pls.' Resp. to Sheriff's SOF ¶¶ 79, 84.)   Kelly contradicts Nance's testimony, however, asserting that Kelly has seen Nance remove aggressive panhandlers at least 25 times in the last ten years.   (Kelly Dep. at 76:18–77:18.)   A jury may ultimately agree with Securitas' Defendants and credit Nance's testimony over Pindak's, Phillips's, and Kelly's, but the court is prohibited from weighing evidence and making credibility determinations at summary judgment.   *Washington v. Haupert*, 481 F.3d 543, 550 (7th Cir. 2007).   Defendant Nance is not entitled to summary judgment.

III.     **Entity Liability**

In addition to their claims against individual Defendants, Plaintiffs contend that the Sheriff's Department and Securitas are liable for First Amendment violations. Plaintiffs urge that Securitas and the Sheriff's Department each have a policy, custom, or widespread practice that caused Plaintiffs' constitutional deprivation, for which they may be held directly liable. Plaintiffs further urge the court to impose vicarious liability on Securitas, regardless of whether such a policy or custom exists. The court considers each argument in turn.

A.     *Monell* liability

Under *Monell v. Department of Social Services of City of New York,* 436 U.S. 658, 690 (1978), municipalities and other local governments are liable for their employees' conduct only if the employee injured the plaintiff in execution of an official policy, custom, or widespread practice. *See Collins v. City of Harker Heights, Tex.,* 503 U.S. 115, 122 (1992); *Petty v. City of Chicago*, 754 F.3d 416, 424 (7th Cir. 2014). The "official policy or practice" requirement serves to "distinguish acts of the municipality from acts of [its] employees . . . and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible." *Grieveson v. Anderson*, 538 F.3d 763, 771 (7th Cir. 2008) (internal quotations and citations omitted). "Private corporations acting under color of state law may, like municipalities, be held liable for injuries resulting from their policies and practices." *Hahn v. Walsh*, 762 F.3d 617, 640 (7th Cir. 2014) (quoting *Rice ex rel. Rice v. Corr. Med. Servs.,* 675 F.3d 650, 675 (7th Cir. 2012)).

A plaintiff may establish the existence of an official policy or custom in several ways. The plaintiff may identify an express policy responsible for the alleged constitutional injury. *King v. Kramer*, 763 F.3d 635, 649 (7th Cir. 2014). Alternatively, a plaintiff may establish a widespread practice attributable to the municipality or private entity "by showing a series of bad acts and inviting the court to infer from them that the policymaking level of government was bound to have noticed what was going on and by failing to do anything must have encouraged

or at least condoned . . . the misconduct of subordinate officers." *Hahn*, 762 F.3d at 636. "The plaintiff may also assert that the individual who committed the constitutional deprivation was an official with policy-making authority." *King*, 763 F.3d at 649. Finally, a decision not to train employees may rise to the level of an official policy or custom, but only where that failure to train amounts to "deliberate indifference to the rights of persons with whom the untrained employees come into contact." *Connick v. Thompson*, 131 S. Ct. 1350, 1359 (2011) (quoting *Canton v. Harris*, 489 U.S. 378, 388 (1989) (internal alterations omitted). But, "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Id. See also Rice ex rel. Rice v. Corr. Med. Servs.,* 675 F.3d 650, 675 (7th Cir. 2012) (deliberate indifference standard applies to failure to train claim against private corporations).

### 1. Securitas

Plaintiffs offer evidence sufficient to create a genuine dispute of fact regarding whether Securitas had an express policy or a widespread practice to remove all panhandlers from the Plaza. To show an express policy, Plaintiffs direct the court to Chapter 10 of the Post Orders, which instructs Truman and Kelly to "perform hourly Plaza patrols" and "[r]emove any panhandlers, sleeping vagrants, or unauthorized solicitors." (Ch. 10 Post Order at 2.) Chapter 16 defines an "undesirable or suspicious person" as "anyone who is seen or appears to be conducting disruptive activity (loitering, stealing, panhandling, etc.) unrelated to normal business operations." (Ch. 16 Post Order at 1.) If a guard sees an "undesirable," the Post Order instructs the guards to "inform the subject to leave the property or the local police will be contacted if they do not comply with your request." (*Id.* at 2.) The statement by Kelly in the September 24, 2010 video bolsters the inference that these Post Orders create an express policy: Kelly stated there is no panhandling on the Plaza "this year, the following year, and the year after." (9/24/2010 Video at 0:32–0:42.)

Plaintiffs may also proceed on the theory that Securitas condoned and encouraged a widespread practice. There is no "bright-line rule[] defining a widespread custom or practice . . .

except that it must be more than one instance, or even three." *Thomas v. Cook County Sheriff's Dept.*, 604 F.3d 293, 303 (7th Cir. 2009) (internal quotes and cites omitted). To establish a widespread practice, Plaintiffs must show a series of violations and establish that Securitas was "aware of the risk created by the custom or practice and . . . failed to take appropriate steps to protect the plaintiff[s]." *Id.* They have identified several instances, spanning multiple years, when Securitas guards removed panhandlers from the Plaza. The evidence includes Pindak's October 6, 2009 video of Waters removing Pindak from the Plaza; the September 24, 2010 video of Truman and Kelly removing Pindak; Pindak's testimony that he made these recordings because guards had previously told him he could not panhandle on the Plaza; Phillips' testimony that he was told 10 to 20 times in the summer or 2012 not to beg on the Plaza; Talley's testimony that in summer 2012, Kelly threatened to arrest him if he continued to panhandle; Kelly's testimony that in the last ten years he had helped Nance remove panhandlers roughly 12 or 13 times; and Waters testimony that until July 2013, he followed "the procedure" of asking panhandlers to leave because he believed that was MBRE's policy. A jury could reasonably conclude that these incidents reflect a consistent practice, of which Securitas was or should have been aware.

A jury might also reasonably find Securitas' failure to enact new Post Orders or train its employees in response to these repeated incidents reflects deliberate indifference.

> Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action. Thus, when city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program.

*Connick*, 131 S. Ct. at 1360. Plaintiffs note that Securitas' training presentations contain no information about panhandling and do not distinguish "aggressive" from peaceful panhandling. Plaintiffs note, further, that both Kelly and Truman admitted they did not receive training on what constitutes aggressive panhandling. (Pls.' Securitas Reply at 31–32.) But by summer of 2012,

when Talley and Phillips were prevented from panhandling on the Plaza, Securitas had actual notice that its employees were interfering with panhandler's rights. Securitas was named a defendant in this lawsuit by February 15, 2012, but it was not until July 2013 that Securitas undertook new training in a course titled "Limits of Authority," which reviewed the text of the City of Chicago municipal panhandling ordinance, prohibiting only aggressive panhandling. (Pls.' Securitas SOF ¶ 107; Securitas Resp. to Pls.' SOF ¶ 103; *see supra* note 13.) A jury could reasonably conclude that Securitas' failure to respond to this actual notice or to provide adequate training to its employees before the summer of 2012 showed deliberate indifference to the rights of those panhandlers on Daley Plaza.

Finally, Plaintiffs may proceed under a final policymaker approach. That approach imposes *Monell* liability where "the constitutional injury was caused by a person with final policymaking authority." *Estate of Sims ex rel. Sims v. Cnty. of Bureau*, 506 F.3d 509, 515 (7th Cir. 2007). Plaintiffs contend that Tee Coleman, the Security Manager for Securitas, caused Plaintiffs to be removed from the Plaza by communicating to his employees that panhandlers were unwanted. To establish that Coleman is a final policymaker, Plaintiffs must do more than show that he "has decisionmaking authority, even unreviewed authority" over a particular decision. *Ball v. City of Indianapolis*, 760 F.3d 636, 643 (7th Cir. 2014). Rather, "[a] municipality must have delegated authority to the individual to make policy on its behalf." *Id.* When considering a municipal or state entity, "[t]he determination of whether a person has policymaking authority is a question of state law, and is to be decided by the court," usually by reference to "laws, statutes, or ordinances," which delegate authority to a particular employee. *Valentino v. Vill. of S. Chicago Heights*, 575 F.3d 664, 675, 677 (7th Cir. 2009). As the Seventh Circuit has noted, this standard can be difficult to apply in the context of private contractors: "How does a court identify the relevant 'final policymaker' in a corporation? Is it the CEO, the board of directors, the shareholders? What if the corporation is a subsidiary of another?" *Shields*, 746 F.3d at 795 n.4. In this case, Securitas' relationship with MBRE poses particular

problems for this analysis: Plaintiffs contend that Coleman is the policymaker for Securitas because he is "the security expert at the property," is responsible for "develop[ing] and implement[ing] . . . security policies and post procedures," and "testified that he is the only person authorized to interpret the Post Orders." (Pls.' Securitas Mem. at 31.) Tee Coleman may be the apex of authority within Securitas, but Securitas responds that Coleman reports to MBRE's Security Director. Accordingly, Securitas maintains it is MBRE that has final authority over the security policies for the building. (Securitas Resp. at 33.) This conflicting evidence creates a dispute of fact regarding whether Tee Coleman has final policymaking authority. Plaintiffs will be free to present evidence supporting an inference that he had final policymaking authority to the jury.

While the court acknowledges the strength of Plaintiffs' evidence, that evidence does not entitle them to summary judgment. Securitas offers competing evidence from which a reasonable jury could conclude that Truman and Kelly's actions were not taken to implement Securitas policy. First, Securitas insists it had no role in writing the Post Orders and therefore may not be held liable for their content. It highlights the RFP, which suggests that MBRE provides the Post Orders to the private security contractor, only after the contractor is selected. (RFP at 18.) Moreover, Coleman testified that he did not write the Post Orders, and does not know who did. (Coleman Dep. 41:1–11.) As Plaintiffs note, there may be good reasons to doubt that assertion—for example, Carik testified that Securitas has "complete authority" to update the Post Orders (Carik Dep. at 49:8–11), and Securitas is obligated by the contract to ensure that the orders comply with the law—but Securitas has identified a dispute of fact regarding authorship.

Plaintiffs contend that this dispute is immaterial because even if Securitas did not write the Post Orders, it voluntarily contracted with MBRE and agreed to enforce them. The Post Orders, therefore, remain Securitas' express policy under *Monell*, Plaintiffs urge. *See Calhoun v. Ramsey*, 408 F.3d 375, 380 (7th Cir. 2005) (a policy is "a course of action

consciously chosen from among various alternatives.") (quoting *Oklahoma City v. Tuttle*, 471 U.S. 808, 823 (1985); *Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 827 (7th Cir. 2009) ("one of the principal ways, indeed the principal way, by which a private entity would undertake [responsibility for a traditional public function] is by entering into a contractual relationship. . . . In such a circumstance, the provider has assumed freely the same liability as the state.")

The court has found no cases directly addressing whether an agreement by a private contractor to follow policies written by a separate entity constitutes an "express policy" for *Monell* purposes. The Seventh Circuit has explained that "an official municipal policy is a deliberate choice to follow a course of action from among various alternatives made by officials with final policymaking authority." *Teesdale v. City of Chicago*, 690 F.3d 829, 836 (7th Cir. 2012.) The difficulty of identifying a final policymaker within a private company, thus, emerges again in this analysis. *See Shields v. Illinois Dep't of Corr.*, 746 F.3d 782, 795 n.4 (7th Cir. 2014) (explaining that "the *Monell* policy/custom rule is difficult to apply to a private corporation.") Some principles do guide the court's inquiry. Most relevant here is the admonition that an official is less likely to be considered a final policymaker when that "official is constrained by policies of other officials or legislative bodies." *Valentino v. Vill. of S. Chicago Heights*, 575 F.3d 664, 676 (7th Cir. 2009); *see also Latuszkin v. City of Chicago*, 250 F.3d 502, 505 (7th Cir. 2001.) (*Monell* liability lies only where a state actor "is the moving force behind the injury because *some policymaker* made a deliberate choice to act or not to act in a certain way.") (emphasis added). Applying this principle here, the court believes that, to hold Securitas directly liable, Plaintiffs must show that the instruction in the Post Orders to "remove any panhandlers" was a deliberate choice by a Securitas official, rather than a direction from MBRE. As the Seventh Circuit explained in *Gernetzke v. Kenosha Unified School District No. 1*, 274 F.3d 464 (7th Cir. 2001), the fact that a final policymaker delegates authority to a subordinate does not necessarily vest that subordinate with final policymaking authority for the

purposes of *Monell*: "Delegation is not direction; authorization is not command; permission does not constitute the permittee the final policymaking authority. Only the delegation ('conferral' would be a better term) of final authority makes the 'delegate' the final authority." *Id.* at 469 (internal citations omitted). There are disputes of fact regarding who wrote the Post Orders and whether Securitas has authority to update and edit them. Those disputes preclude summary judgment on the "express policy" and "final policymaker" rubrics.

Securitas has also presented evidence undermining the inference that there was a widespread policy or custom. Coleman testified that guards followed an "oral Post Order" instructing them to remove only aggressive panhandlers. (Dep. of Coleman II at 99:5–10, 102:4–17, 111:21–112:8.) Kelly testified, similarly, that peaceful panhandling occurs on the Plaza every day. (Securitas SOF ¶ 50; Pls.' Resp. to Securitas SOF ¶ 50.) Sheriff's Defendants Jevtic, Nance, and Thomas Boyd confirm that panhandlers are on the Plaza "virtually every day." (Sheriff's SOF ¶ 14; Pls.' Resp. to Sheriff's SOF ¶ 14.) Plaintiffs have also admitted that "[p]anhandlers are present on Daley Plaza on a daily basis." (Securitas SOF ¶ 71; Pls.' Resp. to Securitas SOF ¶ 71.) Talley testified that, before the summer of 2012, he panhandled for nearly a decade on the Plaza without incident and witnessed Pindak and Phillips panhandling on or near the Plaza on multiple occasions. (Securitas SOF ¶¶ 121, 124; Pls.' Resp. to Securitas SOF ¶¶ 121, 124; Talley Dep. at 73:13–20.) Finally, Ed Carik asserted that Securitas lacks authority to enforce municipal code or to dictate who can be on the Plaza. (Carik Dep. at 101:14–102:8.) A jury might infer from this testimony that the guards do follow an oral instruction to remove only aggressive panhandlers, and infer, further, that the incidents described by Plaintiffs were isolated or sporadic events, rather than evidence of a widespread practice.

Plaintiffs argue that this dispute, too, is immaterial: Even if the oral Post Order does exist, they urge, it is nonetheless unconstitutional because it vests too much discretionary authority in guards that Securitas has inadequately trained, causing Truman and Kelly to

55

deprive Plaintiffs of their First Amendment rights. Plaintiffs' argument, however, rests on disputes of fact: Coleman testified that the guards are, and historically have been, trained in the "customer service" class that "we only usually deal with what we call aggressive panhandlers." (Coleman Dep. I at 27:13–28:3; see also *id.* at 28:18–29:5.) Coleman explained that in the course of the customer service class, the guards are taught that

> the Daley Center . . . is a public building. The Plaza is a public space . . . The only time that officers should get involved with anything to do with panhandling is if they're approached and they've been told by a patron or whomever that you know, I'm being, basically, bothered by this gentleman or by this lady, you know, who won't leave me alone.

(Coleman Dep. I. at 28:6–17.) It would be reasonable for a jury to credit this testimony and conclude that Securitas had, in practice, trained the guards regarding the distinction between peaceful and aggressive panhandling. Moreover, if a jury believed that peaceful panhandling does occur daily on the Plaza, a jury might infer that Securitas' training is adequate. If a jury chose to credit that testimony, the jury could infer that the incidents described above by Phillips, Pindak, and Talley occurred in spite of Securitas' policy and training, not because of it. In sum, whether Securitas adequately trained its guards, or had an express policy or widespread practice prohibiting all panhandling, are questions of fact for the jury.

## 2. Sheriff's Department

Similar disputes of fact preclude summary judgment for either party with respect to Plaintiffs' *Monell* claims against Sheriff Dart. "Actions against individual defendants in their official capacities are treated as suits brought against the government entity itself." *Walker v. Sheahan*, 526 F.3d 973, 977 (7th Cir. 2008) (citing *Hafer v. Melo*, 502 U.S. 21, 25 (1991)). Plaintiffs contend that the Sheriff's Department is liable for its lack of policies and training, which they assert amounts to a deliberate policy of ceding authority to Securitas. (Pls.' Sheriff's Reply at 8) ("Plaintiffs do not contend that the sheriff is liable for a widespread practice of direct interference with peaceful panhandling on the Plaza.") They contend that the Sheriff is instead indirectly liable for three reasons: (1) The Sheriff showed "deliberate indifference" to Plaintiffs

rights, which resulted in "the Sheriff's acknowledged and persistent failure to train its guards" on panhandlers' rights; (2) The Sheriff had a "widespread practice and/or custom of condoning and/or acquiescing in" Securitas' interference with Plaintiffs' panhandling efforts; and (3) the Sheriff made a "conscious and deliberate decision not to set forth a policy pertaining to the legal rights of individual to panhandle." (Pls.' Sheriff's Mem. at 13.)

But each of these approaches is a different way of asserting that the Sheriff's Department failed to enact sufficient policies—whether those were its own express policies or training for the deputies—despite knowledge that the lack of such policies would result in constitutional deprivations. *Cf. Calhoun v. Ramsey,* 408 F.3d 375, 380 (7th Cir. 2005) ("we think that it is more confusing than useful to distinguish between claims about express policies that fail to address certain issues, and claims about widespread practices that are not tethered to a particular written policy."). Because each of Plaintiffs' theories rests on the inaction of the Sheriff's Department, the Sheriff's culpability is "at its most tenuous" and requires a showing that the lack of training or policies resulted from a deliberate choice on the part of the Sheriff. *Connick*, 131 S. Ct. at 1359 (quoting *Canton v. Harris*, 489 U.S. 378, 388 (1989); *See also Hahn*, 762 F.3d at 637 (to establish liability based on lack of policies, a plaintiff must show that "a series of incidents brought the risk at issue to the attention of the policymaker.") (internal quotations and alterations omitted); *Rice,* 675 F.3d at 675 ("the plaintiff must show that the failure to train reflects a conscious choice among alternatives that evinces a deliberate indifference to the rights of the individuals with whom those employees will interact.").

It is undisputed that the Sheriff did not have any training or specific policies regarding panhandling, but whether the need for training or policies was, or should have been, obvious to the Sheriff remains a question of fact. Plaintiffs offer evidence showing a series of incidents in which Sheriff's deputies participated in removing panhandlers from the Plaza: Pindak asserts that in 2009 he was handcuffed and taken into the lockup at Daley Plaza by a heavyset sergeant who told him never to come back; in 2012, Deputy Nance told Pindak he was banned

from the Plaza, and Deputy Jevtic can be heard on the audio recording telling Pindak he was not permitted to panhandle on the Plaza; Phillips testified that during the summer of 2012, deputies, including Nance, told him repeatedly that he had to stay on the sidewalks; and finally, Kelly admitted that he has seen Nance remove aggressive panhandlers at least 25 times in the last ten years. (Plaintiffs' Sheriff Reply at 7.)

This series of alleged bad acts is insufficient, by itself, to establish *Monell* liability based on the absence of training or policies. Plaintiffs must also provide evidence that the circumstances "brought the risk at issue to the attention of" Sheriff Dart. *Hahn*, 762 F.3d at 637. In *King v. Kramer*, the Seventh Circuit reversed summary judgment for defendants because several newspaper articles had addressed the problems caused by a jail's policies and the sheriff had publicly acknowledged his awareness of the troublesome policies. 680 F.3d 1013, 1021 (7th Cir. 2012). Lacking such direct evidence of the Sheriff's knowledge in this case, Plaintiffs make two alternative arguments in support of *Monell* liability. First, they contend that they are not required to show actual knowledge on the part of the Sheriff because the nature of the duties assigned to the Sheriff's deputies made the need for training obvious. (Pls.' Mem. in Supp. of Summ. J. against Sheriff Dart and Deputy Jevtic [257], hereinafter "Pls.' Sheriff Mem.," 14.) A municipality may be liable for its failure to train its employees about the "rights of persons with whom the [employees] come into contact." *Canton*, 489 U.S. 378, 426 (1989). Plaintiffs contend that in an "open urban space," such as the Daley Plaza, "it was inevitable that panhandlers would be present and seek to exercise their legal rights." (Pls.' Sheriff Reply at 9–10.) Defendants acknowledge as much, noting that panhandlers are on the Plaza "virtually every day." (Sheriff's SOF ¶ 14; Pls.' Resp. to Sheriff's SOF ¶ 14.) When the Sheriff assigned deputies to posts on the Plaza, Plaintiffs continue, he should have realized they would come into contact with those panhandlers, and is, therefore, liable for inadequately preparing for those interactions. A jury could certainly reach this conclusion, but a reasonable factfinder might also

credit the testimony that peaceful panhandling occurs on the Plaza every day and conclude that the risk of a constitutional deprivation to Plaintiffs was not obvious to the Sheriff.

Second, Plaintiffs point to evidence which they urge shows that the Sheriff's Department made a deliberate policy choice to cede authority to Securitas and avoid training its deputies or implementing its own policies, despite knowing that Securitas was preventing Plaintiffs from panhandling.  As evidence of this policy choice, Plaintiffs highlight Deputy Jevtic's testimony that when he made the statements captured in the May 7, 2012 audio recording, he was simply repeating what the Securitas guard in the booth told him.  (Jevtic Dep. at 57:5–11.)  Plaintiffs also note that Deputy Nance can be seen on the September 24, 2010 video deferring to Securitas guards as they walk Pindak out of the Plaza.  (Sept. 24, 2010 Video at 1:21–1:26.)  Finally, Plaintiffs emphasize that by September 2010, when Pindak filed his initial complaint, the Sheriff's Department was put on actual notice that its policy of deference and lack of training resulted in violation of panhandler's rights.  (Pls.' Sheriff Reply at 15–16.)  Yet the Sheriff did not adopt new policies or provide additional training.

Whether this second set of facts is legally sufficient to establish *Monell* liability is uncertain.  Plaintiffs contend that "when city policymakers are on actual or constructive notice that a particular omission in their training program caused city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program."  *Connick*, 131 S. Ct at 1360.  They maintain that the Sheriff's Department was on notice that their deference to Securitas led to the violation of panhandlers' First Amendment rights.  As *Connick* itself explained, however, plaintiffs prevailing under this theory must show that the city's lack of training caused *its own* employees to violate citizens' constitutional rights.  *Id.*  This comports with the requirement that "[t]here must be a 'direct causal link between a policy or custom of the Sheriff's Department and the alleged constitutional violations.'"  *Grieveson v. Anderson*, 538 F.3d 763, 772 (7th Cir. 2008) (quoting *Estate of Sims ex rel. Sims v. County of Bureau*, 506 F.3d 509, 515 (7th Cir. 2007)); *see also id.* at 773 ("It is

only when execution of a government's policy or custom inflicts the injury that the government as an entity is responsible under § 1983.") (internal quotations and alterations omitted). A plaintiff must show that the policy (or lack of one) "not only causes but is the moving force behind the deprivation of constitutional rights." *Wilson v. Cook Cnty.*, 742 F.3d 775, 779 (7th Cir. 2014). Thus, courts have refused to impose liability where the absence of a policy or lack of training failed to prevent a third party from injuring the plaintiff. *See Wilson*, 742 F.3d at 780 (affirming grant of summary judgment because moving cause of sexual harassment was co-worker's conduct, not Cook County's failure to investigate or discipline that employee); *Grieveson v. Anderson*, 538 F.3d 763, 772 (7th Cir. 2008) (County jail not liable under *Monell* because plaintiff could not show that prison's ineffective grievance procedure caused prisoners to beat him, but noting that '[i]f [plaintiff] showed a prison policy or custom that effectively allowed prisoners to beat one another, he might have had a successful claim.").

The moving force requirement in § 1983 cases emerged because "the Supreme Court has been especially concerned with the broad application of causation principles in a way that would render municipalities vicariously liable for their officers' actions." *Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 306 (7th Cir. 2010). In light of that concern, this court is unwilling to allow Plaintiffs to proceed on a theory that would hold the Sheriff's Department liable for the actions of Securitas guards, which the Sheriff's Department did not cause. That is, if the Plaintiffs establish only that the Sheriff's deputies failed to prevent Securitas guards from interfering with peaceful panhandling, that showing is legally insufficient to establish that the Sheriff's lack of training or absence of policies was the moving force behind the constitutional deprivation. If the Plaintiffs, however, can establish that the Sheriff's absence of training and practice of deference to Securitas actually caused Securitas guards to engage in a widespread practice of removing panhandlers or caused the Sheriff's deputies to assist Securitas in its policy of removing panhandlers, that showing would satisfy the "moving cause" requirement.

In short, the court agrees with Plaintiffs that they have presented sufficient evidence to survive summary judgment: A jury might conclude that the need for training was so obvious to the Sheriff, based on the nature of the deputies' assignments, that failure to provide such training was deliberately indifferent. A jury might similarly conclude that the lack of training or policy of deference to Securitas caused the Sheriff's deputies to assist Securitas guards with Securitas' custom of removing panhandlers. But these are not the only possible conclusions that can be drawn from the evidence. A jury might, instead, rely on the testimony that peaceful panhandling occurs on the Plaza every day to infer that the risk of Plaintiffs' constitutional deprivation was not obvious to the Sheriff. Similarly, if a jury concludes that Securitas did not engage in a widespread practice of removing panhandlers, it would be difficult for that jury to find that the Sheriff's acquiescence to Securitas represented deliberate indifference to Plaintiffs' rights. Finally, even if a jury concludes that Securitas did engage in such a policy or widespread practice, the jury might conclude that Sheriff's deputies did not actively assist, but merely failed to prevent that practice. Thus, Plaintiffs' allegations against Sheriff Dart must be decided by a jury.

B.    *Respondeat Superior*

As this case illustrates, proving entity liability in § 1983 actions can present a difficult task for Plaintiffs. This is partly by design: In *Monell*, the Supreme Court sought to limit the liability of state and municipal governments, by requiring a showing of direct, rather than vicarious, liability. 436 U.S. at 691. State and municipal entities may not be vicariously liable for their employees' actions under a *respondeat superior* theory. *Id.* In *Iskander v. Village of Forest Park*, 690 F.2d 126 (7th Cir. 1982) the Seventh Circuit concluded, without further explanation, that the protection extends, as well, to private actors performing public functions: "[J]ust as a municipal corporation is not vicariously liable upon a theory of respondeat superior for the constitutional torts of its employees . . . a private corporation is not vicariously liable

under § 1983 for its employees' deprivations of others' civil rights." *Id.* at 128. (citing *Powell v. Shopco Laurel Co.*, 678 F.2d 504 (4th Cir. 1982)).

Recently, however, the Seventh Circuit has suggested that *Iskander's* holding may be open to challenge. In *Shields v. Illinois Department of Corrections*, the Court of Appeals analyzed a prisoner's claim that he suffered a permanent injury because Wexford Health Sources, a private company contracting with the state to provide health care in prisons, failed to provide him adequate care. 746 F.3d 782 (7th Cir. 2014). The court was troubled because, though it believed Shields was "the victim of serious institutional neglect of, and perhaps deliberate indifference to, his serious medical needs," under *Iskander* he could not recover against Wexford because the company had "diffused responsibility for Shields' medical care so widely [among its employees] that Shields [was] unable to identify a particular person who was responsible," and thus could not establish that a policy or custom caused any individual to deprive him of care. *Id.* at 785–86. The *Shields* court noted that the holding in *Iskander* is not required by *Monell* and its progeny, and observed that the opinion's reflexive application of *Monell*'s protections to private contractors may have "overlooked the *Monell* Court's special solicitude for municipalities and their budgets." *Id.* at 795. The *Shields* panel's concern about the "arbitrary gaps in the legal remedies under § 1983," combined with the flaws it identified in *Iskander*, prompted the court to consider "circulating an opinion overruling *Iskander* and its progeny on this point for consideration by the entire court." *Id.* at 795. The court declined to take that approach, however, because Shields had not asked the court to revisit *Iskander* and Wexford, therefore, had not briefed the issue. *Id.* Thus the court concluded "[f]or now, this circuit's case law still extends *Monell* from municipalities to private corporations." *Id.* at 796.

In light of the Seventh Circuit's willingness to revisit *Iskander*, Plaintiffs urge this court to hold Securitas vicariously liable for the actions of its employees under a theory of *respondeat superior*, even if they fail to establish that Truman and Kelly acted pursuant to an official policy or custom. The court is sympathetic to Plaintiffs' request. In addition to the problems that the

Seventh Circuit aptly identified in *Shields,* this case illustrates another kind of problem that arises from *Iskander's* holding. Often, as may ultimately be the case here, there will be no individual "final policymaker" or "final policy decision" by the private corporation. Rather, the authority to determine the private entity's policies and procedures will be divided among the private corporation and the relevant government agency or agencies. This case for example, presents much more complicated relationships between governmental and private entities than the Seventh Circuit considered in *Shields*. Here, the Public Building Commission (a municipal entity), hired MBRE (a private company) to manage the public building. MBRE in turn contracted with SMI, which was purchased by Securitas, and which itself employs subcontractors (for example, Waters is an employee of Star Detective Agency, a Securitas subcontractor). (*See* Pls.' Securitas SAF ¶ 18; Securitas Resp. to Pls.' SAF ¶ 18.) In addition to the diffuse responsibilities within an organization—as the Court of Appeals noted in *Shields*— these complex relationships spread responsibility across public and private entities. In this case, for example, Coleman explained that several people were involved in updating the Post Orders: According to Coleman, the general manager of MBRE, Orestes Ruffin, e-mailed Coleman, a Securitas employee, instructing him to make changes to the Post Order. (*Id.* at 20:9–13.) Coleman reviewed the Ruffin's suggestions, submitted them to Ed Carik, the Security Director for MBRE, and Ruffin gave final approval. (*Id.* at 20:14–16.) Then, Coleman ultimately typed up the language he received from Ruffin and added it to the collection of Post Orders. (*Id.* at 20:17–21:6.) This divided and overlapping authority presents difficult questions regarding causation and complicates the task of identifying who, if anyone, has final "policymaking" authority within the meaning of *Monell*. As the Appellate Court recognized in *Shields*, these legal standards simultaneously encourage government agencies to delegate responsibility to private corporations and encourage those private corporations to structure their operations to evade liability. A company might, for example, avoid written policies, as Securitas claims to have done here with its oral Post Order. Alternatively, a private contractor might divide and

delegate authority among multiple private contractors to further diffuse responsibility for public functions.

While the court is sympathetic to Plaintiffs' request, it remains bound by the holding in *Iskander.* After *Shields*, the Seventh Circuit revisited the question of permitting *respondeat superior* liability for private entities in § 1983 actions, but once again demurred because the plaintiffs had not preserved the question at the district court. *Hahn*, 762 F.3d at 639. In dicta, however, the Seventh Circuit cautioned that *Iskander* remains the law:

> The plaintiffs point to no "intervening on-point Supreme Court decision" that would permit us to overrule our prior cases. *De Leon Castellanos v. Holder,* 652 F.3d 762, 765 (7th Cir. 2011). Our considered decision in *Iskander* is compatible with the holding of every circuit to have addressed the issue. *See Shields v. Illinois Dep't of Corr.,* 746 F.3d 782, 790 & n.2 (7th Cir. 2014) (collecting cases).

*Id.* at 639-40. Because *Iskander* precludes vicarious liability, the court is required to grant summary judgment to Securitas on Count III.

## IV. Sheriff's Defendants are not entitled to qualified immunity

As the above analysis makes clear, Plaintiffs have offered sufficient evidence to describe a violation of their First Amendment rights. Sheriff's Defendants urge that, even if they can establish a violation, Defendants are entitled to qualified immunity because Plaintiffs' rights are not clearly established. "Once a public official has raised a defense of qualified immunity, the plaintiff must establish two things in order to defeat the defense: first, that the facts alleged describe a violation of a protected right; and second, that this right was clearly established at the time of the defendant's alleged misconduct." *Mordi v. Zeigler,* 770 F.3d 1161, 1163-64 (7th Cir. 2014).

Plaintiffs bear the burden of proving the existence of a constitutional right, and that such a right was clearly established. *Hernandez ex rel. Hernandez v. Foster,* 657 F.3d 463, 473 (7th Cir. 2011). To meet that burden, Plaintiffs do not need to establish that "the very action in question has previously been held unlawful." *Anderson v. Creighton,* 483 U.S. 635, 640 (1987). *See also Moss v. Martin,* 614 F.3d 707, 712 (7th Cir. 2010) (plaintiff is not required "to find a

64

factually indistinguishable case on point").  Officials can be "on notice that their conduct violates established law even in the absence of earlier cases involving fundamentally similar or materially similar facts."  *Currie v. Chhabra,* 728 F.3d 626, 632 (7th Cir. 2013) (quoting *Hope v. Pelzer,* 536 U.S. 730, 741 (2002)) (internal alterations and quotation marks omitted).  The relevant inquiry in determining whether a right is clearly established is whether a reasonable person in the official's position would have appreciated that his or her conduct was illegal under the circumstances.  *Seiser v. City of Chicago,* 762 F.3d 647, 659 (7th Cir. 2014); *see also Carroll v. Carman,* 135 S. Ct. 348, 350 (2014) ("A right is clearly established only if its contours are sufficiently clear that a reasonable official would understand that what he is doing violates that right.").

Defendants cite several cases concerning municipal ordinances that regulate panhandling or peddling.  (Sheriff's Mem. at 23–24) (citing *Norton v. City of Springfield, Illinois*, 768 F.3d 713 (7th Cir. 2014); *Gresham v. Peterson*, 225 F.3d 899 (7th Cir. 2000); *Ayers v. City of Chicago*, 125 F.3d 1010, 1015 (7th Cir. 1997).)  Those cases address the extent to which a municipality may restrict panhandling at a particular time (e.g., nighttime) or in a particular location (e.g., historic downtown area).  Sheriff's Defendants contend that those cases reflect the fact that "the exact contours of what protections panhandlers are afforded under the First Amendment" are not clear.  (Sheriff's Mem. at 23.)

The court disagrees with Sheriff's Defendants' reading of these cases.  Rather than question whether there is a constitutional right to panhandle, each of those cases begins by acknowledging that panhandling or peddling is protected First Amendment speech, and that it may only be regulated if those regulations are "reasonable" and reflect "due regard for the constitutional interests at stake."  *Gresham*, 225 F.3d at 905 (internal quotations omitted); *see also Ayres v. City of Chicago,* 125 F.3d 1010, 1014 (7th Cir. 1997) ("the expression of opinion on [important social issues] by means of paid advertising is close to the heart of the interests that the free-speech clause of the First Amendment protects.").

The Seventh Circuit was most explicit in *Gresham*, stating there that "[w]hile some communities might wish all solicitors, beggars and advocates of various causes be vanished from the streets, the First Amendment guarantees their right to be there, deliver their pitch and ask for support." 225 F.3d at 904. In the most recent case to address anti-panhandling ordinances, the "parties simplified the judicial task by agreeing that panhandling is a form of speech, to which the First Amendment applies," and the Seventh Circuit did not revisit the question. *Norton*, 768 F.3d at 714.[19] Sheriff's Defendants have identified no authority suggesting uncertainty about Plaintiffs' First Amendment right to panhandle on Daley Plaza. Nor have Sheriff's Defendants argued that they were merely enforcing a municipal ordinance that reasonably restricts panhandling. Plaintiffs' evidence describes the Sheriff's Defendants interfering with peaceful panhandling that complied with the City of Chicago's panhandling ordinance. The relevant case law clearly establishes Plaintiffs' First Amendment right to engage in such panhandling. Defendants are, therefore, not entitled to qualified immunity.

## V. Injunctive relief

Plaintiffs seek a permanent injunction "barring Defendant Securitas and its agents, servants, employees and attorneys from interfering with lawful panhandling activity on Daley Plaza." (Seventh. Am. Compl. ¶ 80.) To obtain permanent injunctive relief, Plaintiffs must show (1) they are likely to suffer irreparable harm in the absence of injunctive relief; (2) the balance of

---

[19] The Seventh Circuit recently revisited Springfield's anti-panhandling notice. *See Norton v. City of Springfield, Ill.*, No. 13-3581, 2015 WL 4714073 (7th Cir. Aug. 7, 2015). The Seventh Circuit originally concluded that the ordinance—which prohibits oral requests for money now, but did not regulate requests for money later—was not a form of content discrimination. *Id.* at * 1. After the Supreme Court's decision in *Reed v. Gilbert*, 135 S. Ct. 2218 (2015), however, the Appellate Court reversed its earlier decision because "*Reed* effectively abolishes any distinction between content regulation and subject-matter regulation. Any law distinguishing one kind of speech from another by reference to its meaning now requires a compelling justification," which Springfield did not provide. *Norton*, No. 13-3581, 2015 WL 4714073, at *3–4. *Norton* is not relevant to the court's qualified immunity analysis, however, because the right must have been "clearly established at the time of at the time of the defendant's alleged misconduct," *Mordi*, 770 F.3d at 1163-64, and *Reed* and *Norton* were decided after the Plaintiffs' alleged violations.

equities tips in their favor; and (3) an injunction is in the public interest. *Winter v. Natural Resources Defense Council Inc.*, 555 U.S. 7, 17, 32 (2008).[20]  Securitas argues that Plaintiffs are not entitled to injunctive relief for two reasons: first, they have not suffered any harm and therefore cannot satisfy the irreparable harm requirement, and second, an injunction is against the public interest because it would discourage private security guards from investigating disruptive activities and providing assistance to the public.  (Securitas Mem. at 38–39; Securitas Reply at 38–39.)

Neither of these arguments bars Plaintiffs from obtaining injunctive relief.  First, with respect to their claims against Truman, Kelly, and Deputy Jevtic, this court has already concluded that Plaintiffs suffered actionable harm.  Moreover, "[t]he loss of First Amendment freedoms is presumed to constitute an irreparable injury for which money damages are not adequate, and injunctions protecting First Amendment freedoms are always in the public interest." *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006).  Nor are Plaintiffs precluded from seeking injunctive relief based on Securitas' bare assertion that the injunction would interfere with Securitas' ability to keep the Plaza safe.  Securitas has identified nothing in the record to support this claim and there is no reason to believe that the Plaintiffs' lawful panhandling poses a threat to public safety or interferes with Securitas' investigations.  If Plaintiffs prevail at trial on their claim against Securitas, and establish that violations are ongoing, they will be free to seek injunctive relief.

---

[20]     Plaintiffs have also requested injunctive relief against Sheriff Dart, specifically, that the court "[e]nter a preliminary and then a permanent injunction barring Defendants Dart and Cook County and their agents, servants, employees and attorneys from interfering with lawful panhandling activity on Daley Plaza." (Seventh Am. Compl. ¶ 95.)  The elements for a preliminary injunction are the same, with the exception that the plaintiff must show a likelihood of success on the merits rather than actual success. *Winter v. Natural Resources Defense Council Inc.*, 555 U.S. 7, 32 (2008) (quoting *Amoco Production Co. v. Vill. of Gambell, AK*, 480 U.S. 531, 546 n.12 (1987).  The court notes that it would be willing to grant a request for a preliminary injunction only if there is evidence that violations of Plaintiffs' constitutional rights are ongoing and notorious.

## CONCLUSION

The court concludes that Securitas guards acts under color of state law when they regulate speech activities on Daley Plaza, a public forum, and that Plaintiffs present undisputed evidence that Truman, Kelly, and Deputy Jevtic interfered with Plaintiffs' attempts to panhandle on the Plaza. Because Plaintiffs' First Amendment right to panhandle is clearly established, Sheriff's Defendants are not entitled to qualified immunity. Material disputes of fact remain regarding Securitas' and the Sheriff Department's policies and customs. Finally, though the court is sympathetic to Plaintiffs' request to hold Securitas vicariously liable, the court remains bound by Seventh Circuit precedent precluding recovery under *respondeat superior* liability.

Plaintiffs' motions for summary judgment are, therefore, granted with respect to their claims against individual defendants, Truman, Kelly, and Jevtic, but denied with respect to their claims against Securitas and Sheriff Dart:

- Plaintiffs' motion against Securitas Defendants [217] is granted with respect to Count II, but denied with respect to Counts I and III.

- Plaintiffs' motion against Sheriff's Defendants [257] is granted with respect to Count V (Pindak's claim against Jevtic), but denied with respect to Count IV.

- The Sheriff's motion for summary judgment [231] is denied.

- Securitas' motion is granted [254] with respect to Count III but otherwise denied.

The issues reserved for trial are: (1) Deputy Nance's individual liability; (2) whether Securitas had a policy, custom, or widespread practice of removing panhandlers; (3) whether the Sheriff's Department was deliberately indifferent to the violation of panhandlers' rights on the Plaza; and (4) the amount of Plaintiffs' monetary damages.

ENTER:

Dated: August 27, 2015

REBECCA R. PALLMEYER
United States District Judge